IN THE UNITED STATES DISTRICT COURT
FOR THIS DISTRICT OF COLUMBIA

| | |
|---|---|
| ESTATE OF MICHAEL HEISER, et al.<br><br>Plaintiffs,<br><br>v.<br><br>ISLAMIC REPUBLIC OF IRAN, et al.<br><br>Defendants. | Case No.<br><br>00-CV-02329 (TPJ) (DAR)<br><br>**Consolidated With** |
| ESTATE OF MILLARD D. CAMPBELL, et al.<br><br>Plaintiffs,<br><br>v.<br><br>ISLAMIC REPUBLIC OF IRAN, et al.<br><br>Defendants. | Case No.<br><br>01-CV-02104 (TPJ) (DAR) |

**PLAINTIFFS' MEMORANDUM IN RESPONSE TO
A RECENT FOREIGN SOVEREIGN IMMUNITIES ACT OPINION**

Plaintiffs submit the following memorandum in response to a recent Opinion of this Court issued by the Honorable John D. Bates in a case brought pursuant to the waiver of immunity set forth in 28 U.S.C. § 1605(a)(7) of the Foreign Sovereign Immunities Act ("FSIA"): Dammarell v. Islamic Republic of Iran, Civil Action No. 01-2224 (JDB) [2005 WL 756090 (D.D.C. 2005)].[1]  Plaintiffs will address four issues in light of the Dammarell Opinion:

(1)    whether Plaintiffs have satisfied the requirements for pleading causes of action against a state sponsor of terrorism;

---

[1] Three other FSIA opinions were also issued on March 29, 2005: Salazar v. Islamic Republic of Iran, Civil Action No. 02-0558 (JDB); Owens v. Republic of Sudan, Civil Action No. 01-2244 (JDB); and Collett v. Socialist People's Libyan Arab Jamahiriya, Civil Action No. 01-2103 (RMU).  These opinions, however, largely repeat the analysis of and incorporate the rulings in the Dammarell Opinion.

(2)     the application of choice of law principles to the present case;

(3)     whether Plaintiffs may assert causes of action exist against Iran, a state sponsor of terrorism, under Federal common law; and

(4)     whether Plaintiffs may assert a cause of action against Iran under the Torture Victim's Protection Act of 1991 ("TVPA"), 28 U.S.C. § 1350 note.

With respect to the first two issues, Plaintiffs submit that this case presents distinct questions under distinct facts which mandate a different result than that reached in the Dammarell case. With respect to the latter two issues, Plaintiffs respectfully submit that Judge Bates' opinion in Dammarell was incorrect, and in the present case this Court should be guided by Opinions of this Court in which it reached a different conclusion. Specifically, in the following cases, this Court ruled that claims against state sponsors of terrorism may be pursued under Federal common law: Stethem v. Islamic Republic of Iran, 201 F. Supp. 2d 78, 87 (D.D.C. 2002) ("Consistent with its approach in previous FSIA case involving claims for personal injury or death resulting from state-sponsored terrorism, this Court will evaluate plaintiffs' claims under the federal common law."); Wagner v. The Islamic Republic of Iran, 172 F. Supp. 2d 128, 134-35 (D.D.C. 2001) ("Specifically, in FSIA cases involving claims for personal injury or death resulting from state-sponsored terrorism, the application of federal common law will ensure the greatest level of predictability and uniformity."); Flatow v. Islamic Republic of Iran, 999 F. Supp. 1, 14-15 (1998) ("In the interest of promoting uniformity of determinations with respect to the liability of foreign states for the terrorist acts of its officials, agents, and employees, this Court will employ interstitial federal common law to determine whether the terrorist acts were within the scope of their office, agency, or employment, as well as any other conclusions of law which typically rely upon state law."). Further on August 25, 2005, this Court ruled in Dodge. v. The Islamic Republic of Iran, Civil Action No. 03-252 (TPJ), that claims against state sponsors of terrorism may be pursued under the TVPA and the Flatow

Amendment through 28 U.S.C. § 1606 and awarded damages to Plaintiffs against the Defendants under these sources of law.

In short, in the present case the Plaintiffs, through 28 U.S.C. § 1606, assert claims for wrongful death and intentional infliction of emotional distress under the following sources of law: (1) Federal common law, (2) international law, (3) respondeat superior, (4) the TVPA, (5) the Flatow Amendment, 28 U.S.C. § 1605 Note, and (6) state law statutes (wrongful death and survival claims) and state common law (intentional infliction of emotional distress). Plaintiffs have explained these sources of law in detail in their Memorandum of Law in Support of Proposed Conclusions of Law ("Memorandum of Law") and do not seek to repeat any of those matters. Plaintiffs will only address briefly certain matters which were not anticipated by Plaintiffs in their Memorandum of Law.

## ANALYSIS

### 1.

### PLAINTIFFS IN THE PRESENT CASE HAVE ADEQUATELY PLED CAUSES OF ACTION UNDER FEDERAL COMMON LAW, INTERNATIONAL LAW, RESPONDEAT SUPERIOR, THE TVPA, AND THE FLATOW AMENDMENT

In the Dammarell case, the plaintiffs filed a complaint in which they referred in general terms to claims for wrongful death and solatium, battery, intention infliction of emotional distress, survival damages, economic damages, and punitive damages. Judge Bates noted that there was "no indication in the complaint whether these are common law or statutory claims or whether the claims purport[ed] to arise out of state, federal or international law." 2005 WL 756090 at *3. Accordingly, the Court ordered the plaintiffs to amend their complaint to state sources of law for their causes of action and whether the causes of action are based on common law or statute. 2005 WL 756090 at *32-33.

In the present case, at this Court's direction, Plaintiffs have filed Third Amended Complaints which state specific sources of law for the causes of action of wrongful death and intentional infliction of emotional distress. These sources include Federal common law, international law, the Flatow Amendment (28 U.S.C. § 1605 Note), the TVPA, and state statutory and common law. With respect to the Plaintiffs' claim under the TVPA, the Third Amended Complaints identified the 17 airmen killed by the bombing at the Khobar Towers as victims of "extrajudicial killing" as defined by the TVPA. (Heiser Third Amended Complaint at ¶ 24; Campbell Third Amended Complaint at ¶ 64). The Plaintiffs respectfully submit that this reference to the TVPA is a sufficient basis on which the Plaintiffs may pursue a cause of action under this statute. A direct precedent for Plaintiffs' position is Dodge v. The Islamic Republic of Iran, Civil Action No. 03-252 (TPJ), in which this Court permitted the Dodge plaintiffs to pursue a cause of action under the TVPA and the Flatow Amendment through § 1606 of the FSIA where the only reference in the Complaint to the TVPA was in ¶ 3 where the plaintiff identified himself as a victim of "torture" as defined in section 3 of the Torture Victims Protection Act of 1991 (28 U.S.C. § 1350 note).

## 2.

### CHOICE OF STATE LAW

In the Dammarell case, Judge Bates held that, as a general rule, state law should provide a cause of action against a state sponsor of terrorism in a case brought under § 1605(a)(7) of the FSIA. The Dammarell Court further ruled that the choice of law rules of the District of Columbia should be applied in an FSIA case. As explained in detail in the Plaintiffs' Memorandum of Law at pages 48-49, there is a split of authority as to whether the choice of law rules applicable to a FSIA case are those of the forum state or Federal common law. In the present case, however, there is no substantive difference between the rules of the District of Columbia and Federal common law.

In wrongful death cases, the District of Columbia applies the factors enumerated in the Restatement (Second) of Conflict of Laws, §§ 6, 145, and 175. Hitchcock v. United States, 665 F.2d 354, 360-361 (D.C. Cir. 1981); In re Air Crash at Wash. D.C. on January 13, 1982, 559 F. Supp. 333 341 (D.D.C. 1983). These sections (6, 145, and 175) of the Restatement (Second) of Conflict of Laws are described in detail at pages 49 - 57 of the Plaintiffs' Memorandum of Law. Under these provisions, the Court must focus on the "governmental interests" of the jurisdictions affected and which jurisdiction has the "most significant relationship" with the claim. The application of choice of law principles under the Restatement does not involve a rote application of "black letter" rules. Rather, "'no rigid rules exist for resolving conflict-of-laws problems in wrongful death actions governed by the Restatement, requiring instead an examination of the interest created by the facts and circumstances of each case.'" Walker v. Paradise Grand Hotel, 2003 WL 21361662 (S.D. Fla. 2003), quoting Paimba Cortes v. American Airlines, 177 F. 3d 1272, 1297 (11th Cir. 1999). Comment c to § 6 of the Restatement (Second) of Conflict of Laws states that the factors in § 6 "will point in different directions in all but the simplest case." Comment c, goes on to state: "Hence any rule of choice of law, like any other common law rule, represents an accommodation of conflicting values."

The critical provision for determining the applicable law in a case such as the present case is § 145(2)(c) which requires consideration of "the domicil, residence, nationality, place of incorporation and place of business of the parties." Plaintiffs respectfully submit that, in the present case, the state with the most significant governmental interest and significant relationship to the killing of the 17 airmen at the Khobar Towers is the state of residence of each of the murdered airmen. Airman Lester was a resident of Ohio, and the remaining 16 decedents were residents of Florida. The states of residence of the decedents were not only the states where they lived and worked, but were also, in many cases, the states where their closest family members, their spouses and children, lived. As the huge community outpouring and support at Eglin and

Patrick Air Force Bases demonstrated, these communities have enormous interest in both the young men who were killed and their families.

Both Florida and Ohio have a strong interest in protecting their residents and their families and provide complete and effective remedies for their murder. It is the public policy of both Florida and Ohio to shift the losses resulting when wrongful death occurs from the survivors of the decedent to the wrongdoer. See Fla. Stat. Ann. § 768.17 (2003); Ohio Rev. Code Ann. §§ 2125.01 and 2305.21 (2003). Further, neither Florida nor Ohio law requires the death of the decedent to have occurred within its respective borders. See Hughes Ex Rel. v. Unitech Aircraft Serv., 662 So. 2d 999 (Fla. App.), rev. den. sub non., Merrill, Inc. v. Hughes, 669 So. 2d 251 (Fla. 1995); Ohio Rev. Code Ann. § 2125.01 (2003).

In the Dammarell case, Judge Bates instructed the plaintiffs to look to the law of the domicile of each plaintiff. As previously indicated, § 145 of the Restatement (Second) of Conflict of Laws, requires consideration of the domicile and residence of the plaintiff. Judge Bates' focus on the domicile of origin of the parties may have resulted from the pragmatic consideration that many of the decedents in that case were State Department employees who were assigned to Lebanon. In the present case, however, the deceased airmen were not permanently assigned abroad. Rather, they were permanently assigned to Air Force Bases in Florida and Ohio. Consideration of the residence of the decedents is the most effective means of identifying the jurisdiction with the most significant interest in the claim. Black's Law Dictionary (7th Ed. 2000) defines residence as:

> (1) The act or fact of living in a given place for some time, (2) The place where one actually lives, as distinguished from a domicile. Residence usu. just means bodily presence as an inhabitant in a given place; domicile usu. requires bodily presence plus an intention to make the place one's home. A person thus may have more than one residence at a time but only one domicile. Sometimes, though, the two terms are used synonymously.

Typical examples of individuals with separate residences and domiciles are (1) "snowbirds" who live in Florida for the winter but return to a northern state in spring, and (2) college students who return home for the summer and vacations. All the decedents in the present case were permanently assigned to Eglin, Patrick, or Wright Patterson Air Force Base. Accordingly, the decedents were all residents of Florida and Ohio. Further, it is unlikely that they would have had another home that could have been fairly described as a domicile. For Air Force personnel, identifying a domicile of origin that they may not have visited for many years is, at best, a speculative and unproductive venture. Their place of residence, however, is well established and subject to definitive proof. Accordingly, given the fact that § 145(2)(c) specifically authorizes consideration of residence and domicile, it would serve no purpose to attempt to determine if any of the airmen, or their closest family members who lived with them, had a domicile distinct from their residence.

Comment b to § 145 of the Restatement (Second) of Conflicts of Law lists the following factors to be considered in making the decision as to choice of law: "the needs of judicial administration, namely ... ease in determination and action of the law to be applied." This factor has particular importance to the present case. The other states with an interest include: (a) New York, the residence of six individual Plaintiffs; (b) Minnesota, the residence of five individual Plaintiffs; (c) West Virginia, the residence of four individual Plaintiffs; (d) Wisconsin, the residence of four individual Plaintiffs; (e) California, the residence of three individual Plaintiffs; (f) Kansas, the residence of three individual Plaintiffs; (g) North Carolina, the residence of three individual Plaintiffs; (h) Oklahoma, the residence of three individual Plaintiffs; (i) Louisiana, the residence of two individual Plaintiffs; (j) Maryland, the residence of two individual Plaintiffs; (k) Tennessee, the residence of two individual Plaintiffs; (l) Texas, the residence of two individual Plaintiffs; (m) New Hampshire, the residence of one individual Plaintiff; (n) Georgia, the residence of one individual Plaintiff; and (o) Indiana, the residence of one individual Plaintiff.

The complexity and difficulty of applying administering the laws of so many different states would be enormous. Further, there is nothing to be achieved by imposing such difficulty in administration of this case because the laws of Florida and Ohio provide a full range of relief for the Plaintiffs. Additionally, as a practical matter, application of the laws of 17 different states could lead to divergent measures of recovery for essentially identical tort claims against the Defendants and would be violative of § 6 of the Restatement which seeks to ensure "certainty, predictability, and uniformity of result," and "ease in the determination and application of the law to be applied."

The District Court in <u>Walker v. Paradise Grand Hotel</u>, 2003 WL 21361662 (S.D. Fla. 2003) based its choice of law determination on considerations of uniformity and fairness in a case involving multiple wrongful deaths:

> The Court concludes that on balance promoting the consistency of result in this case is another factor militating towards the application of Florida law to the damages issues. The Court concludes that applying Florida law to the damages issues would promote the certainty, predictability, and uniformity of result in this case. In addition, consideration of the ease in determination and application of the law to be applied to this case provides further support to the Court's conclusion that Florida law is the most appropriate law to be applied to the damages claims. These are all factors to be considered by the Court in making its choice of law determination under both the Restatement and Florida law. <u>See</u> Restatement (Second) of Conflict of Laws §§ 6, 145-146; <u>Bishop v. Florida Speciality Paint Co.</u>, 389 So. 2d 999, 1001 (Fla. 1980).

Accordingly, the Plaintiffs respectfully submit that if this Court determines that state law is applicable, it should apply the statutory and common law of Ohio and Florida as described in detail in Plaintiffs' Memorandum of Law at pages 57-72.

## 3.

### FEDERAL COMMON LAW

Judge Bates in the <u>Dammarell</u> case concluded that Federal common law does not create a cause of action for claimants who seek to pursue a cause of action against a state sponsor of terrorism under 28 U.S.C. § 1605(a)(7). Plaintiffs respectfully submit that Judge Bates was incorrect on this issue and that this Court should be guided by those opinions of this Court which have ruled that claims for wrongful death and intentional infliction of emotional distress may be brought under Federal common law where immunity has been waived under § 1605(a)(7).

Plaintiffs explained in detail in their Memorandum of Law at pages 20 - 48, why, this Court should find a cause of action under Federal common law. Judge Bates, in the <u>Dammarell</u> opinion, focuses on the judicial interpretation of the FSIA prior to the enactment of § 1605(a)(7) which waived immunity in connection with certain acts of state sponsored terrorism. The judicial decisions under the FSIA prior to the enactment of § 1605(a)(7) cited by Judge Bates involve claims where immunity was waived for commercial activities and non-commercial torts. In many of these cases, the courts applied State law. Plaintiffs respectfully submit that decisions in cases involving commercial activities and torts involve entirely different policy considerations. The cases typically involved the business activity of, and torts committed by large, state-owned corporations. The defendant corporation was typically conducting business in the United States and availing itself of the economy of the states in which it was doing business and the protection of the laws of those states. The disputes typically involved the law of contracts and torts. The issues did not involve matters of Federal jurisdiction or national policy. On the other hand, cases brought against foreign states where immunity has been waived under § 1605(a)(7), the exception for acts of state sponsored terrorism, go to the very heart of international relations and our country's foreign policy. Cases under the terrorism exception do not involve a truck driver of a state-owned corporation in an accident or a breach of a commercial contract by such a corporation. Rather, they involve a decision of a foreign

government, as a matter of national policy, to pursue its interests through the use of terrorism, a form of low intensity warfare directed at innocent people and their loved ones. The purpose of terrorism is to alter the policies of the United States and its allies. It is the policy of the United States, as reflected in the enactment of §§ 1605(a)(7) and 1605 Note, to deter and punish terrorism and to provide relief for victims. It is hard to imagine an area of the law in which national interests are present to a greater degree and uniformity and consistency of application are more important.

Furthermore, the United States Supreme Court's decision in Sosa v. Alvarez-Machain, 542 U.S. ___, 124 S. Ct. 2739 (2004), supports the creation of Federal common law in cases against state sponsors of terrorism brought pursuant to § 1605(a)(7). At issue in Sosa was the Alien Tort Statute, 28 U.S.C. § 1350, which provides that "[t]he district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 124 S. Ct. at 2770. In response to the contention that this was merely a grant of jurisdiction, and not the conferral of a right of action, the Supreme Court observed that "[i]t would have been passing strange for [Congress] to vest federal courts expressly with jurisdiction to entertain civil causes brought by aliens alleging violations of the law of nations, but to no effect whatever until the Congress should take further action." 124 S. Ct. at 2758. While agreeing with petitioner and the United States that the ATS did not itself create a new cause of action for torts committed in violation of international law, the Court held that Congress conferred this jurisdiction upon the federal courts "on the understanding that the common law would provide a cause of action" for violations of international law that give rise to personal liability. 124 S. Ct. at 2743-44.

The ATS and § 1605(a)(7) of the FSIA are kindred provisions of U.S. law, even though their enactment into law is separated by over 200 years. The ATS allows aliens to bring suit in U.S. courts for torts committed in violation of international law; § 1605(a)(7) allows U.S. citizens to bring suit in U.S. courts for specified actions which are themselves violations of

international law. Together, they are the legal foundation for much of the litigation that takes place in U.S. courts relating to the enforcement and vindication of fundamental human rights and universally accepted principles of international law.

### 4.

### THE TVPA CREATES A CAUSE OF ACTION AGAINST FOREIGN STATES

In the <u>Dammarell</u> case, Judge Bates ruled that the TVPA does not create a cause of action against a foreign state. The Court reviewed in detail the legislative history of the TVPA which was enacted in 1992 and concluded that: "Congress' plain intent in enacting the TVPA – as reflected in the text (which specifies only individuals) and the legislative history (which could not be clearer) – was to confine liability for acts of torture and extrajudicial killing to private individuals." 2005 WL 756090 at *31.

Plaintiffs respectfully submit that Judge Bates was incorrect in concluding that the TVPA cannot form the basis of a cause of action against a foreign state. It is true that the legislative history of the TVPA establishes that only private individuals may be liable under the statute. In 1996 when it waived the immunity of foreign states in § 1605(a)(7), Congress must be presumed to have understood that, under the FSIA, foreign states, for which immunity has been waived, are liable under § 1606 "in the same manner and to the same extent as a private individual under like circumstances...." Accordingly, in enacting § 1605(a)(7), Congress must have understood that it was making foreign states potentially liable under the TVPA and a host of other laws under which only private individuals were liable prior to the enactment of the waiver. A direct precedent for this conclusion is <u>Dodge v. The Islamic Republic of Iran</u>, Civil Action No. 03-252 (TPJ), in which this Court permitted the <u>Dodge</u> plaintiffs to recover damages pursuant to a cause of action under the TVPA.

Respectfully submitted,

/s/
_____
Shale D. Stiller, D.C. Bar No. MD00772
Kurt J. Fischer, D.C. Bar No. MD03300
Elizabeth R. Dewey, D.C. Bar No. 445334
Hank B. Walther, D.C. Bar No. 477218
Melissa L. Mackiewicz, D.C. Bar No. MD27005

DLA PIPER RUDNICK GRAY CARY US LLP
1200 Nineteenth Street, N.W.
Washington, D.C. 20036-2412
Tel: (202) 861-3941
Fax: (202) 223-2085

Attorneys for Plaintiffs

Dated: April 18, 2005