**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| **ESTATE OF MICHAEL HEISER**, *et al.*, | ) ) ) |  |
| **Plaintiffs,** | ) ) |  |
| v. | ) ) |  |
| **ISLAMIC REPUBLIC OF IRAN**, *et al.*, | ) ) | **00-CV-2329 (RCL)** |
| **Defendants.** | ) ) ) | **Consolidated With** |
| **ESTATE OF MILLARD D. CAMPBELL,** *et al.*, | ) ) ) ) | **01-CV-2104 (RCL)** |
| **Plaintiffs,** | ) ) |  |
| v. | ) ) |  |
| **ISLAMIC REPUBLIC OF IRAN**, *et al.*, | ) ) |  |
| **Defendants.** | ) ) ) |  |

## MEMORANDUM OPINION

These postjudgment consolidated actions arise from the 1996 terrorist bombing of the Khobar Towers, a residential complex on a United States military base in Dhahran, Saudi Arabia. *See Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229 (D.D.C. 2006) (Lamberth, J.). The plaintiffs are the family members and estates of 17 of the 19 United States Air Force officers and airmen killed in the attack. The defendants are the Islamic Republic of Iran ("Iran"), the Iranian Ministry of Information and Security (MOIS), and the Iranian Islamic Revolutionary Guard Corps (IRGC). These cases were filed in September 2000 and October 2001,

- 1 -

respectively, under the state-sponsored terrorism exception to the Foreign Sovereign Immunities Act (FSIA) and the Flatow Amendment. *See* Mandatory Victims Restitution Act of 1996, Pub. L. No. 104-132, tit. II, sec. 221(a)(1)(C), § 7, 110 Stat. 1214, 1241 (former FSIA terrorism exception previously codified at 28 U.S.C. § 1605(a)(7)), *repealed by* National Defense Authorization Act for Fiscal Year 2008, Pub. L. No. 110-181, § 1083(b)(1)(A)(iii), 122 Stat. 3, 338, (hereinafter 2008 NDAA); *see also* § 1605 note.

While these cases were still pending, the D.C. Circuit Court of Appeals issued an opinion in *Cicippio-Puleo v. Islamic Republic of Iran* in which the Court held that "neither section 1605(a)(7) nor the Flatow Amendment, separately or together, establishes a cause of action against foreign state sponsors of terrorism." 353 F.3d 1024, 1027 (D.C. Cir. 2004); *accord Acree v. Republic of Iraq*, 370 F.3d 41, 58 (D.C. Cir. 2004). Following that ruling, this Court determined that plaintiffs in cases under the FSIA terrorism exception, § 1605(a)(7), may use that provision as a "pass-through" to causes of action found in state law. *See, e.g.*, *Bodoff v. Islamic Republic of Iran*, 424 F. Supp. 2d 74, 83 (D.D.C. 2006) (Lamberth, J.). Another consequence of the *Cicippio-Puleo* decision was that the Flatow Amendment, § 1605 note, could not itself serve as a basis punitive damages awards against Iran. Because the Court of Appeals found that the amendment was not intended to provide for claims against foreign states, *see id.* at 1027, the bar on punitive damages in § 1606 of the FSIA remained, even against state sponsors of terrorism.

Following *Cicippio-Puleo*, plaintiffs filed an amended complaint in which they made claims based on the state law of the jurisdictions where they were domiciled at the time of the Khobar Towers attack. *See* 466 F. Supp. 2d 250-251. This Court ultimately found that most plaintiffs had proven their right to relief in accordance with the applicable sources of state law,

and, on December 22, 2006, this Court entered Default Judgment in favor of most Plaintiffs, awarding economic and compensatory damages totaling $254,431,903.00. 466 F. Supp. 2d at 356-360. Certain sources of state law, however, either precluded a number of estates and individual plaintiffs from presenting valid claims or otherwise limited the relief available to those plaintiffs. Additionally, the Court was not able to award punitive damages.

A little over a year later, the President signed the 2008 NDAA, which repealed § 1605(a)(7) and replaced that provision with a new version of the terrorism exception, § 1605A. *See* Pub. L. No. 110-181, § 1083, 122 Stat. 3, 338. While this new FSIA enactment is more advantageous to plaintiffs in many significant respects, what is most important for the purpose of today's decision is that § 1605A abrogates *Cicippio-Puleo* by establishing a federal cause of action against state sponsors of terrorism and provides that punitive damages may be awarded in those actions. *See* 1605A(c); *see also Simon v. Republic of Iraq*, 529 F.3d 1187, 1190 (D.C. Cir. 2008), *rev'd sub nom. on other grounds*, *Republic of Iraq v. Beaty*, 129 S.Ct. 2138 (2009). Thus, plaintiffs proceeding under § 1605A can forgo the pass-through approach that controlled in the wake of *Cicippio-Puleo* and may assert claims on the basis of the new federal statute alone.

Notably, Congress directed that this new terrorism exception, § 1605A, may be applied retroactively to a broad range of cases, provided certain conditions are satisfied. *See* § 1083(c). In March 2008, plaintiffs filed a Motion for Supplemental Relief in which they requested that this Court apply § 1605A retroactively to their actions and award additional damages, including 650 million dollars in punitive damages, against Iran. *See* Dk. # 127. On March 13, 2009, this Court determined that plaintiffs' actions satisfied the conditions for retroactive application of § 1605A and issued an order indicating that plaintiffs were entitled to proceed before this Court

under the terms of the new law.[1]  *See* Dk. # 143.  At that time, however, the Court did not determine what additional damages the plaintiffs were entitled to under the new terrorism exception, § 1605A, but took the matter under advisement, intending to take a closer look at the evidence and supplemental briefing in support of plaintiffs' new claims for money damages under federal law.  Having reviewed the record in light of plaintiffs' arguments for additional relief under the terms of § 1605A, this Court now finds in favor of plaintiffs on all claims.

## I.   ANALYSIS

Because § 1605A abrogates *Cicippio-Puleo* by creating a federal cause of action with punitive damages, this Court returns to this Circuit's pre-2004 interpretation of the terrorism exception.  Of course, as a result, the Court must again consider the complicated question of what principles of law it should apply to these claims sounding in tort.  On the one hand, because these actions arise solely from statutory rights, they are not in theory matters of "federal common law."  Yet, because federal courts must evaluate the extent and nature of the claims in these

---

[1] At least one judge of this Court has held that new claims under § 1605A "must be served on a defaulting party under Federal Rule of Civil Procedure 5(a)(2)," even when, as here, the new claims are presented on motion pursuant to § 1083(c)(2).  *Gates v. Syrian Arab Republic*, No. 06-CV-1500 (RMC), 2009 WL 2562660 (D.D.C. Aug. 20, 2009) (Collyer, J.).  This Court respectfully disagrees.  Rule 5(a)(2) states:  "No service is required on a party who is in default for failing to appear.  But a *pleading* that asserts a new claim for relief against such a party must be served on that party under Rule 4."  FED. R. CIV. P. 5(a)(2) (emphasis added).  Thus, Rule 5(a)(2) addresses only new claims presented in "pleadings," and, in this action, plaintiffs are proceeding not by way of pleading, but on motion in accordance with § 1083(c)(2).  Notably, in the Federal Rules of Civil Procedure, only the following kinds of documents constitute pleadings: "(1) a complaint; (2) an answer to a complaint; (3) an answer to a counterclaim designated as a counterclaim; (4) an answer to a crossclaim; (5) a third-party complaint; (6) an answer to a third-party complaint; and (7) if the court orders one, a reply to an answer."  FED R. CIV P. 7(a).  In contrast, a motion—excluded from the 7(a) list of pleadings and defined separately, under (b)—is generally "a request for a court order."  FED. R. CIV. P. 7(b).  For more on this issue, see the Court's omnibus opinion, *In Re: Islamic Republic of Terrorism Litigation*, issued this date.

actions, courts are forced, in practice, to apply general principles of tort law—an approach that in effect looks no different from one that explicitly applies federal common law.  The Court of Appeals addressed this difficulty in *Bettis v. Islamic Republic of Iran*:

> We recognize that some of the cases addressing these FSIA claims refer to "federal common law. . . ."  The term "federal common law" seems to us to be a misnomer. Indeed, it is a mistake, we think, to label actions under the FSIA and Flatow Amendment for solatium damages as "federal common law" cases, for these actions are based on *statutory* rights. . . .  Rather, . . . because the FSIA instructs that "the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances," 28 U.S.C. § 1606, it in effect instructs federal judges to find the relevant law, not to make it.

315 F.3d 325, 333 (D.C. Cir. 2003).  To this end, courts have often looked to sources such as state decisional law, legal treatises, or the Restatements in order to find and apply what are generally considered to be the well-established standards of state common law, a method of evaluation which mirrors—but is distinct from—the "federal common law" approach.

That the Court must proceed in this manner is necessary for several reasons.  First, in establishing both subject-matter jurisdiction and federal causes of action for personal injury or death resulting from state-sponsored terrorism, Congress intended that the terrorism exception authorize "federal courts [to] create coherent national standards to support this initiative of national significance," *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 15 (D.D.C. 1998) (Lamberth, J.)—a purpose which, following *Cicippio-Puleo*, Congress made more explicit in the 2008 NDAA.  Second, because courts have an "interest [in] promoting uniformity of determinations with respect to the liability of foreign states for the terrorist acts of its officials, agents, and employees," the generally accepted legal standards of the states provide the only steady foundation for the rules of decision. *Id*.  While applying these common-law standards, however, the Court also keeps in mind the remedial purpose of the terrorism exception statute—namely, to compensate victims for the losses suffered as a result of state-sponsored terrorism.

*Flatow*, 999 F. Supp. at 13. Yet, as the Court of Appeals noted in *Bettis*, "this fact is not a license for judges to legislate from the bench," for "[a]s much as we sympathize with appellants' claims, we have no authority to stretch the law beyond its *clear bounds* to satisfy our sense of justice." 315 F.3d at 338, 336.

Mindful of these considerations, this Court will now address the three categories of economic and compensatory damage claims that, in the original action, were either barred or severely restricted as a result of the pre-2008 NDAA application of state law of each plaintiff's domicile: (A) those barred or limited by state minimum-age, surviving-spouse-or-lineal-descendant, or sibling-financial-dependency requirements, (B) those barred by state "presence" requirements, and (C) those barred by state "immediate family" rules. Finally, the court will consider the plaintiffs' request for an award of punitive damages.

### A. PLAINTIFFS NEGATIVELY AFFECTED BY STATE MINIMUM-AGE, SURVIVING-SPOUSE-OR-LINEAL-DESCENDANTS, AND SIBLING-FINANCIAL-DEPENDENCY REQUIREMENTS

In its original *Heiser* opinion, this Court denied certain plaintiffs' request for economic damages in the form of lost wages and future earnings, because, under the state law of the victims' domicile when the attack occurred (Florida), the estates of decedents younger than 25 years of age and without a surviving spouse or surviving lineal descendants cannot recover. 466 F. Supp. 2d at 278 (citing Fla. Stat. Ann. § 768.21(6)(a)(1)). [2] Additionally, the Court limited recovery for another plaintiff, because he had failed, under New Hampshire law, to prove financial dependency on the decedent, his brother. These plaintiffs now rest their claims on the

---

[2] These plaintiffs are the Estate of Justin Wood; the Estate of Earl Cartrette, Jr.; the Estate of Brian McVeigh; the Estate of Joseph Rimkus; the Estate of Jeremy Taylor; and the Estate of Peter Morgera.

2008 NDAA, which provides a federal cause of action for wrongful death. Therefore, this Court will now consider their request for economic damages in light of traditional state-adopted principles of tort law, rather than—as was the practice under the old pass-through approach—simply the explicit requirements of the relevant state wrongful death statute.

Though the 2008 NDAA does not define the scope of this particular federal cause of action, "typically, a wrongful death statute is designed to compensate decedent's heirs-at-law for economic losses which result from decedent's premature death." *Flatow*, 999 F. Supp. at 27. In *Flatow*, this Court cited the District of Columbia's wrongful death law as one representative of most state statutes. Following *Flatow*, many federal judges have done likewise. *See, e.g.*, *Stethem*, 201 F. Supp. 2d 78 (D.D.C. 2002) (Jackson, J); *Wagner v. Islamic Republic of Iran*, 172 F. Supp. 2d 128 (D.D.C 2001) (Jackson, J.). This Court is unaware of any pre-*Cicippio-Puleo* terrorism exception case that has both affirmed a plaintiff's wrongful death claim and—because the deceased family member had been (1) under the age of 25, (2) without a surviving spouse or lineal descendants, or (3) not financially responsible for his or her sibling—denied the attendant request for economic damages. To the contrary, several decisions of this Court have awarded economic damages to plaintiffs *not* meeting those conditions. *See, e.g.*, *Stethem*, 201 F. Supp. 2d at 87 (awarding economic damages to the Estate of Robert Stethem, including non-dependent siblings, despite the fact that decedent had been under 25 years of age and without a surviving spouse or lineal descendants; *Eisenfeld v. Islamic Republic of Iran*, 172 F. Supp. 2d 1, 8 (D.D.C. 2000) (Lamberth, J.) (awarding economic damages to the Estate of Sara Rachel Duker, though decedent had been under 25 years of age and without a surviving spouse or lineal descendants).

Therefore, consistent with pre-*Cicippio-Puelo* precedent and mindful of the general aims of most state wrongful death statutes, this Court will grant these plaintiffs their requests for economic damages in their respective amounts calculated by the expert economist.

### B.   PLAINTIFFS NEGATIVELY AFFECTED BY STATE "PRESENCE" REQUIREMENTS.

In its original *Heiser* opinion, this Court denied certain plaintiffs' claims for intentional infliction of emotional distress, because, under the relevant state law, those not "physically present" to witness the harm done cannot recover.[3]  These plaintiffs now rest their claims on the 2008 NDAA, which provides a federal cause of action.  Therefore, this Court will now consider their request for compensatory damages in light of traditional state-adopted principles of tort law and the construction given them by federal judges in similar cases, rather than—as was the practice under the old pass-through approach—simply the explicit requirements of the relevant state law.

In evaluating intentional infliction of emotional distress claims in these actions, federal judges often turn to the Restatement (Second) of Torts as a "as a proxy for state common law." *Bettis*, 315 F.3d at 333, *see also Sutherland v. Islamic Republic of Iran*, 151 F. Supp. 2d 27, 48-50 (D.D.C. 2001) (Lamberth, J.) (applying the Restatement to battery, assault, IIED, and other tort claims).  In the section "Outrageous Conduct Causing Severe Emotional Distress," the Restatement states that

> (1) One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.

---

[3] These plaintiffs are Che Colson, Laura Johnson, and Bruce Johnson.

> (2) Where such conduct is directed at a third person, the actor is subject to liability if he intentionally or recklessly causes severe emotional distress
>
> > (a) to a member of such person's immediate family who is present at the time, whether or not such distress results in bodily harm, or
> >
> > (b) to any other person who is present at the time, if such distress results in bodily harm.

RESTATEMENT (SECOND) OF TORTS § 46.  In light of § 46(2), it appears that the general principles of common law do not permit recovery when a plaintiff fails to prove that he or she was not physically present at the time of the attack.  Yet, the Restatement attaches a caveat: "The Institute expresses no opinion as to whether there may not be other circumstances under which the actor may be subject to liability for the intentional or reckless infliction of emotional distress."  *Id*.  This qualification suggests that, in the words of one leading text, "If the defendants' conduct is sufficiently outrageous and intended to inflict severe emotional harm upon a person which is not present, no essential reason of logic or policy prevents liability."  Dan B. Dobbs, *The Law of Torts* § 307, at 834 (2000).

Terrorism, unique among the types of tortious activities in both its extreme methods and aims, passes this test easily.  As the *Stethem* court wrote, "All acts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress, literally, terror, in their targeted audience: The more extreme and outrageous, the greater the resulting distress."  201 F. Supp. 2d at 89.  Indeed, as this Court put it, the "intent to create maximum emotional impact," particularly on third parties, is terrorism's *raison d'etre*.  *Eisenfeld*, 172 F. Supp. 2d at 9.  Thus, in *Sutherland*, for example, the Court awarded compensatory damages to the wife of a terrorist hostage victim, upholding her intentional infliction of emotional distress claim on the grounds that the terrorists intended to—and did—cause her

emotional harm.  151 F. Supp. 2d at 50; *see also Jenco v. Islamic Republic of Iran*, 154 F. Supp. 2d 27, 36 (D.D.C. 2001) (Lamberth, J.) (another terrorist hostage case upholding a non-present spouse's claim of intentional infliction of emotional distress).  Additionally, even in terrorism exception suits not involving hostages, "Courts have uniformly held that a terrorist attack—by its nature—is directed not only at the victims but also at the victims' families." *Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d 105, 115 (D.D.C. 2005) (Bates, J.) (collecting cases).  Indeed, the *Salazar* court found that the "defendant's campaign of attacks against Westerners was intended not only to harm the victims, but to instill terror in their loved ones and others in the United States." *Id*.

"Nonetheless," the Court said in *Jenco*, "some lines must be drawn."  154 F. Supp. 2d at 36.  While it is true that terrorist acts of the sort at issue in this case aim to "instill terror" among Westerners in general, no reasonable construction of the 2008 NDAA will turn the American citizenry into a potential class of IIED plaintiffs.  Judges must recognize the "clear bounds" of the law.  *Bettis*, 315 F.3d at 336.  Thus, "[t]he Court draws the line with respect to family relationship (and not presence)." *Jenco*, 154 F. Supp. 2d. at  36.  "[T]o collect for intentional infliction of emotional distress in cases such as this one, the plaintiff need not be present at the place of outrageous conduct, but must be a member of the victim's immediate family." *Id.* Furthermore, although *Jenco* and *Sutherland* appear to concern only those suits arising from hostage takings, the Court, consistent with the above-quoted reasoning in *Salazar*, here extends the suspension of the presence requirement to terrorism exception cases generally.

The Court finds, therefore, that the "presence" requirement by itself no longer bars the claims of the plaintiffs in this category.  Accordingly, the Court will award compensatory

damages to two of these plaintiffs,[4] while it will postpone its final evaluation of the third plaintiff's claim until it resolves the "immediate family" test issue, which it takes up below.[5]

### C. PLAINTIFFS NEGATIVELY AFFECTED BY THE "IMMEDIATE FAMILY" RULE.

In its original *Heiser* opinion, this Court denied certain plaintiffs' claims for intentional infliction of emotional distress, because, under the relevant state law, those who are not "immediate family"—in addition to those not "physically present"—cannot recover.[6] The plaintiffs in this category now rest their claims on the 2008 NDAA, which provides a federal cause of action. Therefore, this Court will now consider their request for compensatory damages in light of traditional state-adopted principles of tort law and the construction given them by federal judges in similar cases, rather than—as was the practice under the old pass-through approach—simply the explicit requirements of the relevant state law.

Again, to discern the governing (because well-established) principles of tort law in this case, we turn first to the Restatement: "Where such conduct is directed at a third person, the

---

[4] "'Solatium' is defined as compensation 'for hurt feelings or grief.' *Surette v. Islamic Republic of Iran*, 231 F. Supp. 2d 260, 267 (D.D.C. 2002) (quoting BLACK'S LAW DICTIONARY 1397 (7th ed. 1999)). "In the context of FSIA cases . . . [it is] 'indistinguishable' from the claim of intentional infliction of emotional distress." *Id.* (quoting *Wagner*, 172 F. Supp. 2d at 135 n.11). Accordingly, in calculating damages for valid IIED claims, the Court, consistent with prior cases, awards $5 million to parents (and sons or daughters, if the parent is the decedent) and $2.5 million to siblings. *See, e.g.*, *Anderson v. Islamic Republic of Iran*, 90 F. Supp. 2d 107, 113 (D.D.C. 2000); *Eisenfeld*, 172 F. Supp. 2d at 10-11; *Flatow*, 999 F. Supp. at 29-32.

[5] For their IIED claims, Laura Johnson and Bruce Johnson had merely to overcome the presence rule to show liability. They have done so. Consequently, they will be awarded damages. The other plaintiff in this category, however, Che Colson, must still satisfy the "immediate family" test in order to recover. That issue will be treated below.

[6] These plaintiffs are James Wetmore, George Beekman, and Che Colson.

actor is subject to liability if he intentionally or recklessly causes severe emotional distress to a member of such person's immediate family who is present at the time, whether or not such distress results in bodily harm.  RESTATEMENT (SECOND) OF TORTS § 46.  Though it has proved willing in terrorism exception suits to interpret the presence requirement loosely given the unconventional nature of the torts resulting from terrorist acts, this Court, in addition to the Court of Appeals, has generally adopted the strict meaning of "immediate family," defined as one's spouse, parents, siblings, and children.  *Jenco*, 154 F. Supp. 2d at 38 n.8 ("This definition is consistent with the traditional understanding of one's immediate family.")  *See* Dobbs, *supra*, § 310 (addressing the scope of recovery in consortium claims).

In *Bettis*, for example, the Court of Appeals found that, under the FISA, nieces and nephews lacked standing to make IIED claims:

> Appellants claim that the "immediate family" requirement of § 46(2)(a) is satisfied in this case, because [t]he nieces and nephews were near relatives or close associates of Fr. Jenco.  This, of course, is not the test enunciated in the Restatement.  Rather, § 46(2)(a) is perfectly plain in its reference to "immediate family."  It does not refer to "family members," "near relatives," "close associates," or persons with whom the victim has "close emotional ties"—rather, it says, plainly, "immediate family."  And there is no doubt whatsoever that, in this case, nieces and nephews are not "immediate family" members.  Indeed, appellants do not dispute this point.  Rather, they claim that § 46(2)(a) should be construed liberally to afford "situational justice."  As much as we sympathize with appellants' claims, we have no authority to stretch the law beyond its clear bounds to satisfy our sense of justice.

315 F.3d at 335-36 (citations and quotations omitted).  Pages later, however, after noting the appellants' failure to cite a single case in which a niece or nephew has been considered "immediate family," the Court took notice of several exceptions to the strict application of the rule:

> In a few limited circumstances, some courts have allowed relatives who either *resided in the same household* with the victim or were *legal guardians* to recover

> for negligent infliction of emotional distress. . . . In these cases, the parties in issue were members of the victim's household, and they were viewed as the functional equivalents of immediate family members. In this case, however, appellants merely claim that the nieces and nephews enjoyed a close relationship with Fr. Jenco, which is far short of what § 46(2)(a) requires.

*Id.* at 337 (citations omitted) (emphasis in original). Tellingly, the *Bettis* court then noted that "[t]o define 'immediate family' to embrace nieces and nephews who do not live in the immediate household or have any legal obligation to the victim would stretch the term too far." *Id.*

Here, the Court must "bear in mind the realities of tort law and the necessity of limiting recovery to a definable scope of individuals." *Jenco*, 154 F. Supp. 2d at 36-37. Yet, in distinguishing the niece-and-nephew action from those involving "functional equivalents of immediate family members," the Court of Appeals subtly acknowledges that, in those rare cases in which the parties at issue had lived in the victim's immediate household and had been in other important respects like a spouse, parent, sibling, or child to the victim, circumstances may require a slight stretching of the immediate-family requirement—comparable to the way in which the unconventional nature of terrorist activity sometimes demands a suspension of the presence requirement.

In light of the evidence, then, this Court finds that James Wetmore, the non-adoptive stepfather of Brian McVeigh, and George Beekman, the non-adoptive stepfather of Joshua Woody, had been the functional equivalents of fathers and thus satisfy the immediate-family test. As the plaintiffs' noted in their brief the record in this case establishes that Messrs. Wetmore and Beekman both "lived in the same household" as their stepsons while the stepsons were still minors and "treated" them as their own sons "in every sense (e.g., financially, emotionally, socially)." *See* Dk. # 127 p.20. Additionally, in the case of Che Colson, the non-adopted stepson of Kevin Johnson, given the facts that "Kevin treated Che like he was his biological

stepfather," that "Che and Kevin maintained their close relationships until the day Kevin died," and that "[after] Shryl and Kevin married, Kevin was financially responsible for Che," *Heiser*, 499 F. Supp. 2d at 327, this Court finds that Che had been the functional equivalent of a son and thus satisfies the immediate-family test. Accordingly, the Court will award him compensatory damages in the amount requested in the motion.[7]

### D.   PUNITIVE DAMAGES.

In its original *Heiser* decision, this Court denied plaintiffs' request that punitive damages be awarded against the state of Iran, MOIS and the IRGC. 466 F. Supp. 2d at 270. Under § 1605A, however, plaintiffs are now entitled to an award of punitive damages. When determining punitive damage awards under the FSIA's terrorism exception, it is the custom of this Court to apply general principles of tort law. *Flatow*, 999 F. Supp. at 32. Among these is the "need for deterrence." *Id.* (citing RESTATEMENT (SECOND) OF TORTS § 908(1)-(2)). In *Flatow*, Iran expert Dr. Patrick Clawson testified that a factor of three times Iran's then-yearly expenditure of approximately $75 million on terrorist activities "would be the minimum amount in punitive damages that would affect the conduct of the Islamic Republic of Iran, and that a factor of up to ten times its annual expenditure for terrorism must be considered to constitute a serious deterrent to future terrorist activities aimed at United States nationals." *Id.* at 34. The Court then found that an award of three times the expenditure was appropriate—$225 million.

Yet, on the matter of how this Court is to determine the proper amount in punitive damages, this action differs from *Flatow* in several respects. First, in this case, Dr. Clawson has

---

[7] *See supra* note 4 (listing typical damage award amounts for a family member's pain and suffering in terrorism cases).

recommended an award of damages between three and *five* times Iran's annual terrorism expenditure, not three and ten.  Second, rather than providing this Court with a single dollar amount spent by Iran on terrorism, Dr. Clawson has been able merely to estimate that in 1996 the sum fell between $50 million to $150 million.  This range, according to Dr. Clawson, reflects not only a degree of uncertainty regarding the precise dollar amount earmarked yearly for terrorists, but more significantly, disagreement among experts over what activities constitute terrorism in the first place.  Though some of the money goes directly to terrorist operations, most of it ultimately funds "arms" of the terrorist groups, such as hospitals and political organizations, through which the terrorists are able to recruit.  Third, relying on the expert opinion of Dr. Clawson, Plaintiffs have argued that a punitive damage award in this action less than any amount awarded in a prior case against Defendants would indicate to Iran "that the United States was less concerned about Iranian terrorism."  *See* Dk. # 143 at p. 28.  Fourth, though no prior FSIA case against Iran has resulted in an award of punitive damages exceeding $400 million,[8] Plaintiffs here requested first an award of $500 million—only later to increase that amount in their post-2008 NDAA motion to $650 million.

With these facts before it, this Court finds an award of punitive damages in the amount of $300 million to be appropriate.  In *Flatow*, the award of punitive damages equaled Iran's annual expenditure on terrorism multiplied by three (the lowest multiplier Dr. Clawson recommended), and, in numerous subsequent cases, such awards were calculated likewise.  This Court sees no reason to break from that tradition now.  Regarding the award formula's multiplicand, however, prior decisions offer little guidance.  Here, this Court is presented not with a single dollar

---

[8] The highest award of punitive damages ordered against Iran ($400 million) issued from *Estate of Bayani v. Islamic Republic of Iran*, 530 F. Supp. 2d 40 (D.D.C. 2007).

amount, but with a range—and, by extension, the controversy the range reflects. In the interest of remaining neutral in the debate on the complicated topic of terrorism financing, the Court chooses to take the mean of the range's two extremes ($50 million and $150 million) and multiply it ($100 million) by three. The result, an award of $300 million, appears fitting also in light of the foreign policy issue raised by Plaintiffs. Were the Court to award an amount less than any of those declared in prior cases, the U.S., Plaintiffs have argued, would risk seeming to Iran "less concerned about Iranian terrorism." Yet, with one exception, this Court has never awarded an amount higher than $300 million in punitive damages against Iran or its divisions and instrumentalities.[9] To the extent that Iran is paying attention and is sensitive to the judgments of this Court—and if Dr. Clawson is to be believed, it is—an award of $300 million in this case seems likely to have a deterrent effect.

## II.  CONCLUSION.

For the above reasons, the Court awards the plaintiffs a total of $36,658,063 in compensatory damages and $300,000,000 in punitive damages. This Court is mindful of the tremendous challenges that these and other plaintiffs face in their efforts to enforce Court judgments entered in accordance with the FISA terrorism exception. It is therefore the earnest hope of this Court that today's judgment will offer these victims something more than a symbolic victory in what has been their long and arduous struggle against state-sponsored terrorism.

A separate Order and Judgment consistent with this opinion shall issue this date.

---

[9] *See* case cited *supra* note 8.

**ROYCE C. LAMBERTH**

**CHIEF JUDGE**
**United States District Court**
**Washington, D.C.**

**September 30, 2009**