## IN THE UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ESTATE OF MICHAEL HEISER, *et al.*<br><br>Plaintiffs<br><br>v.<br><br>ISLAMIC REPUBLIC OF IRAN, *et al.*<br><br>Defendants | Case No.:   00-CV-02329 (RCL)<br><br>**Consolidated with** |
| ESTATE OF MILLARD D. CAMPBELL, *et al.*<br><br>Plaintiffs<br><br>v.<br><br>ISLAMIC REPUBLIC OF IRAN, *et al.*<br><br>Defendants | Case No.:  01-CV-02104 (RCL) |

## MOTION FOR JUDGMENT AGAINST GARNISHEES BANK OF AMERICA, N.A. AND WELLS FARGO BANK, N.A. AND FOR TURNOVER OF FUNDS

Plaintiffs/Judgment Creditors, (1) the Estate of Michael Heiser, deceased; (2) Gary Heiser; (3) Francis Heiser; (4) the Estate of Leland Timothy Haun, deceased; (5) Ibis S. Haun; (6) Milagritos Perez-Dalis; (7) Senator Haun; (8) the Estate of Justin R. Wood, deceased; (9) Richard W. Wood; (10) Kathleen M. Wood; (11) Shawn M. Wood; (12) the Estate of Earl F. Cartrette, Jr., deceased; (13) Denise M. Eichstaedt; (14) Anthony W. Cartrette; (15) Lewis W. Cartrette; (16) the Estate of Brian McVeigh, deceased; (17) Sandra M. Wetmore; (18) James V. Wetmore; (19) the Estate of Millard D. Campbell, deceased; (20) Marie R. Campbell; (21) Bessie A. Campbell; (22) the Estate of Kevin J. Johnson, deceased; (23) Shyrl L. Johnson; (24) Che G. Colson; (25) Kevin Johnson, a minor, by his legal guardian Shyrl L. Johnson; (26) Nicholas A. Johnson, a minor, by his legal guardian Shyrl L. Johnson; (27) Laura E. Johnson; (28) Bruce Johnson; (29) the Estate of Joseph E. Rimkus, deceased; (30) Bridget Brooks; (31) James R. Rimkus; (32) Anne M. Rimkus; (33) the Estate of Brent E. Marthaler, deceased; (34)

Katie L. Marthaler; (35) Sharon Marthaler; (36) Herman C. Marthaler III; (37) Matthew Marthaler; (38) Kirk Marthaler; (39) the Estate of Thanh Van Nguyen, deceased; (40) Christopher R. Nguyen; (41) the Estate of Joshua E. Woody, deceased; (42) Dawn Woody; (43) Bernadine R. Beekman; (44) George M. Beekman; (45) Tracy M. Smith; (46) Jonica L. Woody; (47) Timothy Woody; (48) the Estate of Peter J. Morgera, deceased; (49) Michael Morgera; (50) Thomas Morgera; (51) the Estate of Kendall Kitson, Jr., deceased; (52) Nancy R. Kitson; (53) Kendall K. Kitson; (54) Steve K. Kitson; (55) Nancy A. Kitson; (56) the Estate of Christopher Adams, deceased; (57) Catherine Adams; (58) John E. Adams; (59) Patrick D. Adams; (60) Michael T. Adams; (61) Daniel Adams; (62) Mary Young; (63) Elizabeth Wolf; (64) William Adams; (65) the Estate of Christopher Lester, deceased; (66) Cecil H. Lester; (67) Judy Lester; (68) Cecil H. Lester, Jr.; (69) Jessica F. Lester; (70) the Estate of Jeremy A. Taylor, deceased; (71) Lawrence E. Taylor; (72) Vickie L. Taylor; (73) Starlina D. Taylor; (74) the Estate of Patrick P. Fennig, deceased; (75) Thaddeus C. Fennig; (76) Catherine Fennig; (77) Paul D. Fennig; and (78) Mark Fennig (collectively, the "Plaintiffs") by their undersigned attorneys, hereby move for judgment against the Garnishees Bank of America, N.A. ("Bank of America") and Wells Fargo Bank, N.A. ("Wells Fargo") (collectively, the "Garnishees"), pursuant to D.C. Code §§ 16-501, *et seq*., made applicable to these proceedings through Fed. R. Civ. P. 69, 28 U.S.C. § 1610, *et. seq.* and section 201 of the Terrorism Risk Insurance Act of 2002, Pub. L. No. 107-297, 116 Stat. 2322 (2002), codified at 28 U.S.C. § 1610 note ("TRIA") with respect to blocked deposit accounts, blocked wire transfers, and other blocked assets located at the Garnishees in which the Islamic Republic of Iran, the Iranian Ministry of Information ("MOIS") and Security and/or the Iranian Islamic Republic Revolutionary Guard Corps. ("IRGC")

(collectively, "Iran" or the "Judgment Debtors") and Iran's agencies or instrumentalities have an interest.

In support hereof, the Plaintiffs state:

## FACTUAL BACKGROUND

1. The Plaintiffs hold an unsatisfied judgment against Iran in the amount of $591,089,966.00, plus post-judgment interest at the legal rate. The judgment is comprised of two parts: a judgment entered December 22, 2006 and a supplemental judgment entered September 30, 2009 (collectively, the "Judgment").

2. The Judgment remains unsatisfied.

### The Bank of America Writ

3. On or about June 14, 2011, the Plaintiffs served Bank of America with a Writ of Attachment on Judgment Other Than Wages, Salary and Commissions (the "BOA Writ"), seeking property or credits of Iran, its agencies or instrumentalities, and any separate juridical entities in which Iran may have an interest, direct or indirect.

4. On June 23, 2011, the Plaintiffs filed an Affidavit of Service evidencing service of the Writ on Bank of America [Dkt. No. 188].

5. On or about July 19, 2011, Bank of America filed an answer to the BOA Writ [Dkt. No. 191].

### The Wells Fargo Writ

6. On or about August 4, 2011, the Plaintiffs served Wells Fargo with a Writ of Attachment on Judgment Other Than Wages, Salary and Commissions (the "Wells Fargo Writ" and together with the BOA Writ the "Writs"), seeking property or credits of Iran, its agencies or

instrumentalities, and any separate juridical entities in which Iran may have an interest, direct or indirect.

7.      On or about September 8, 2011, Wells Fargo filed an answer to the Wells Fargo Writ [Dkt. No. 201].

### United States Sanctions Regime Governing Iranian Assets

8.      On November 17, 1979, pursuant to the International Emergency Economic Powers Act, 50 U.S.C. § 1701, *et seq.*, and other authorities, President Carter issued Executive Order 12170, which blocked all Iranian assets subject to the jurisdiction of the United States.  In addition, other Presidents have issued Executive Orders for the purpose of blocking transactions with Iran.  *See*, *e.g.*, Executive Order No. 12947, 60 Fed. Reg. 5079 (Jan. 23, 1995) (Prohibiting Transactions with Terrorists Who Threaten to Disrupt the Middle East Peace Process); Executive Order No. 13099, 63 Fed. Reg. 45167 (Aug. 20, 1998) (amending Exec. Order 12947); Executive Order 13224, 66 Fed. Reg. 49079 (Sept. 23, 2001) (Blocking Property and Prohibiting Transactions with Person Who Commit, Threaten to Commit or Support Terrorism); *see also* Executive Order No. 13382, 70 Fed. Reg. 38567 (Blocking Property of Weapons of Mass Destruction Proliferators and Their Supporters).

9.      Pursuant to these Executive Orders, the United States Department of Treasury's Office of Foreign Assets Control ("OFAC") administers several sanction regimes regulating the assets of terrorists and state sponsors of terrorism, as well as assets linked to proliferators of weapons of mass destruction ("WMD") and their supporters, who are placed on OFAC's list of "Specially    Designated    Nationals."    *See*    United    States    Treasury    Website, http://www.treasury.gov/resource-center/sanctions/SDN-List/Pages/default.aspx.

### The Blocked Assets Held by the Garnishees

10.    The Garnishees currently hold the proceeds of electronic funds transfer ("EFTs"), deposit accounts, and other assets that have been blocked by OFAC due to a nexus with Iran (the "Blocked Assets") under the aforementioned sanction regimes.    The Blocked Assets and amounts are set forth on the charts attached hereto as Exhibits A (Bank of America) and B (Wells Fargo).

### RELIEF REQUESTED

11.    The Plaintiffs seek an Order (A) entering judgment against the Garnishees and in favor of the Plaintiffs for the amounts of the Blocked Assets, plus any accrued interest, and (B) ordering that the Garnishees pay and turnover to the Plaintiffs the Blocked Assets, plus any accrued interest without further Court Order.

12.    The relief requested by the Plaintiffs is authorized under two separate provisions – 28 U.S.C. § 1610(g) and § 201 of TRIA.  The Plaintiffs hold the Judgment under 28 U.S.C. § 1605A, thereby entitling the Plaintiffs to enforce the Judgment in accordance with 28 U.S.C. § 1610(g).

### LEGAL ANALYSIS

**I.    Statutory Framework Governing Execution of the Blocked Assets**

13.    The FSIA "broadly designates all foreign-owned property as immune, and then articulates limited exceptions to that immunity." *Heiser v. Islamic Republic of Iran*, -- F. Supp. 2d --, 00 Civ. 2329, 2011 WL 3489109, *2 (D.D.C. Aug. 10, 2011) (citing 28 U.S.C. § 1609 ("[T]he property in the United States of a foreign state shall be immune from attachment, arrest and execution except as provided in sections 1610 and 1611 of this chapter.").

14.     Under the FSIA a "foreign state" "includes a political subdivision of a foreign state or an agency or instrumentality of a foreign state." 28 U.S.C. § 1603(a). "The FSIA defines [agency or] 'instrumentality' as any entity that (1) is a 'separate legal person, corporate or otherwise,' (2) is 'an organ of a foreign state' or 'whose shares or other ownership interest is owned by a foreign state,' and that (3) is 'neither a citizen of a State of the United States … nor created under the laws of any third country.'" *Heiser*, -- F. Supp. 2d --, 2011 WL 3489109, *8 (citing 28 U.S.C. § 1603(b)(1)-(3)).

15.     Two exceptions to immunity found in 28 U.S.C. § 1610, *et seq.* apply to the Blocked Assets and subject the Blocked Assets to execution in satisfaction of the Plaintiffs' Judgment, 28 U.S.C. § 1610(g) and TRIA § 201.

A.     **Section 1610(g)**

16.     28 U.S.C. § 1610(g)(1), permits the Plaintiffs to enforce the Judgment by executing against property of Iran and its agencies and instrumentalities, and it removes the defense of sovereign immunity afforded to the assets of Iran and its agencies and instrumentalities for execution purposes. Section 1610(g)(1) provides that the Plaintiffs may execute upon property of Iran, property of an agency or instrumentality of Iran, and also property that is a separate juridical entity or is an interest held directly or indirectly in a separate juridical entity in which Iran has an interest, direct or indirect. *See* 28 U.S.C. § 1610(g).

17.     "This provision [section 1610(g)] 'expand[s] the category of foreign sovereign property that can be attached; judgment creditors can now reach any U.S. property in which Iran has any interest...'" *Heiser*, -- F. Supp. 2d --, 2011 WL 3489109, *7 (quoting *Peterson v. Islamic Republic of Iran*, 627 F.3d 1117, 1123 n.2 (9th Cir. 2010)).

18.     Moreover, OFAC's regulation and blocking of the Blocked Assets does not exempt them from execution.  28 U.S.C. § 1610(g)(2) (providing that the property of a foreign state and its agencies and instrumentalities "shall not be immune from…execution, upon a judgment entered under section 1605A because the property is regulated by the United States Government by reason of action taken against that foreign state under the Trading With the Enemy Act or the International Emergency Economic Powers Act.").

19.     As this Court noted in *In re Islamic Republic of Iran Terrorism Litig.*,

> any actions filed or otherwise maintained under § 1605A may benefit from certain reforms to § 1610, which is the section of the FSIA that prescribes the limited circumstances in which the property of a foreign state may be subject to attachment or execution upon a civil judgment. Specifically, § 1083 of the 2008 NDAA adds to § 1610 new provisions **that are plainly intended to limit the application of foreign sovereign immunity or United States sovereign immunity as defenses to attachment or execution with respect to property belonging to designated states sponsors of terrorism.**

659 F. Supp. 2d 31, 61 (D.D.C. 2009) (emphasis added); *see also Peterson*, *supra*, 627 F. 3d at 1123 n.2.

## B.     TRIA

20.     Section 201 of TRIA, codified as a note to 28 U.S.C. §1610, provides:

> In every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism, or for which a terrorist party is not immune under section 1605(a)(7) of title 28, United States Code, the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in aid of execution in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable.

21.     Congress enacted TRIA "to 'deal comprehensively with the problem of enforcement of judgments rendered on behalf of victims of terrorism in any court of competent jurisdiction by enabling them to satisfy such judgments through the attachment of blocked assets of terrorist parties.'"  *Heiser*, -- F. Supp. 2d --, 2011 WL 3489109, *4 (quoting *Weininger v.*

*Castro*, 462 F. Supp. 2d 457, 483 (S.D.N.Y. 2006) (quoting H.R. Conf. Rep. 107-779, at 27 (2002)).

## III. Pursuant to 28 U.S.C. § 1610(g) and TRIA § 201, the Blocked Assets Held by the Garnishee are Subject to Execution in Satisfaction of the Plaintiffs' Judgment

22.     Iran and its agencies and instrumentalities have an interest in the Blocked Assets. Accordingly, under TRIA and section 1610(g), the Blocked Assets are subject to turnover to the Plaintiffs in satisfaction of the Judgment. *See Levin v. Bank of New York*, 09 Civ. 5900, 2011 WL 812032 (S.D.N.Y. Mar. 4, 2011) (awarding turnover of Iranian assets, including EFTs, blocked pursuant to OFAC regulations to judgment creditors of Iran under TRIA); *Hausler v. JPMorgan Chase Bank, N.A.*, 09 Civ. 10289, 2010 WL 3817546 (S.D.N.Y. Sept. 13, 2011) (awarding turnover of Cuban assets, including EFTs, blocked pursuant to OFAC regulations to judgment creditors of Cuba under TRIA); *Weinstein v. Islamic Republic of Iran*, 609 F.3d 43 (2d Cir. 2010) (holding that, under TRIA, the blocked property of Bank Melli, an admitted agency and instrumentality of Iran, may be used to satisfy a judgment obtained against Iran based upon an act of terrorism); *Weininger v. Castro*, 462 F. Supp. 2d 457 (S.D.N.Y. 2006) (awarding turnover of Cuban assets blocked pursuant to OFAC regulations to judgment creditors of Cuba under TRIA).

23.     This Court has already determined that the Plaintiffs may invoke section 1610(g) of the FSIA to execute against assets of Iran and its agencies and instrumentalities. *See Heiser*, -- F. Supp. 2d --, 2011 WL 3489109.

24.     Each of the elements of TRIA § 201 are also satisfied here. Iran has been designated a terrorist party pursuant to section 6(j) of the Export Administration Act of 1979, 50 U.S.C.App. § 2405(j), beginning January 19, 1984, and therefore is a "terrorist party" as defined by TRIA § 201(d)(4), 116 Stat. at 2340. *See Weinstein*, 609 F.3d at 48 (holding that Iran is a

"terrorist party" as defined under TRIA § 201(d)(4)). At the time of entry of the Judgment, this Court found jurisdiction existed under 28 U.S.C. § 1605(a)(7), and thus Iran was not immune from jurisdiction in the original proceeding. *See Estate of Michael Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 299 (D.D.C. 2006). The Blocked Assets held by the Garnishees have been "blocked" pursuant to the International Emergency Economic Powers Act, 50 U.S.C. § 1701, 1702, Executive Orders issued by Presidents, and OFAC's sanction regime. *See* Garnishees' Ans. to Interrogatories, Responses to Int. Nos. 2, 3, 4, 7 & 8. (stating that the Blocked Assets constitute "property blocked on the books of [the Garnishees] at one of [their] offices in the United States pursuant to regulations issued by OFAC that reflects blocked accounts, wire transfers, or property … in which (a) the Islamic Republic of Iran ('Iran'), (b) one of the other judgment debtors, (c) any Specially Designated National of Iran, (d) an agency or instrumentality of Iran, or (e) some other Iranian government entity that is believed, on information and belief, to have a blockable interest in the blocked accounts, wire transfers, or property.").[1] Finally, Iran and/or its agencies and instrumentalities have an interest in the Blocked Assets held by the Garnishees. *See* 28 U.S.C. § 1603, *et seq.* (defining a "foreign state" and "agency or instrumentality" of a foreign state). The Garnishees admit that Iran and/or its agencies and instrumentalities have an interest in the Blocked Assets. *See* Exhibits C & D (Garnishees' Ans. to Interrogatories).

　　25. Moreover, entities that OFAC has determined to be the "Government of Iran" have an interest in the Blocked Assets. OFAC maintains a list of persons and entities determined to be the "Government of Iran" in 31 C.F.R. part 560, appendix A (the "OFAC List"). Under

---

[1] A true and correct copy of the Answers and Objections of Garnishee Wells Fargo Bank, N.A. to the First Set of Interrogatories by the Judgment Creditors Garnishors Estate of Michael Heiser et al. is attached hereto as **Exhibit C**. A true and correct copy of the Answers and Objections of Garnishee Bank of America, N.A. to the First Set of Interrogatories by the Judgment Creditors Garnishors Estate of Michael Heiser et al. is attached hereto as **Exhibit D**.

OFAC's definition, the Government of Iran includes "(a) [T]he state and the Government of Iran, as well as any political subdivision, agency, or instrumentality thereof; (b) Any entity owned or controlled directly or indirectly by the foregoing;" and (c) any person or entity designated by the Secretary of the Treasury as falling in (a) or (b).  31 C.F.R. § 560.340.

26.     Iran's interest in the Blocked Assets is further confirmed by the affidavit of Dr. Patrick Clawson ("Dr. Clawson" and the "Clawson Affidavit"), the Director of Research of the Washington Institute for Near East Policy.  A true and correct copy of the Clawson Affidavit is attached hereto as **Exhibit E**.  Dr. Clawson, is an expert on the Islamic Republic of Iran, its sponsorship of terrorism, its economy, its politics, and its national and state owned banks. Clawson Affidavit ¶¶ 2, 9.  In the Clawson Affidavit, Dr. Clawson explains, in his expert opinion, why the Iranian entities (identified on Exhibits A & B) that have an interest in the Blocked Assets are agencies and instrumentalities of Iran.  *See* Clawson Affidavit.

A.     **The Bank of America Blocked Assets Subject to Execution**

27.     The Blocked Assets held by Bank of America, as set forth on Exhibit A, are comprised of two (2) blocked deposit accounts, one (1) blocked check, and two (2) blocked EFTs.

28.     The first account is a blocked deposit account held in the name of Iran Marine and Industrial holding funds in the amount of $37,453.88.  In Dr. Clawson's expert opinion, Iran Marine and Industrial also known as Iran Marine Industries is an organ of Iran, is controlled by Iran, and the majority of its shares are owned by Iran.  Clawson Affidavit ¶ 15.  Dr. Clawson bases his opinion on the fact that 51.18% of the entity's shares were sold to a consortium controlled by the IRGC's Khatam al-Anbia force.  *Id.*  The IRGC is one of the Judgment Debtors.  Moreover, Dr. Clawson states that the IRGC set up Khatam al-Anbia, which it directly

owns and controls, and has won multi-billion dollar government contracts.  Clawson Affidavit ¶ 13.  "IRGC's role as a government institution charged with safeguarding the Islamic Revolution is set forth in Iran's constitution."  Clawson Affidavit ¶ 13.

29.   The second account is a blocked deposit account held for the benefit of Sediran Drilling Company in the amount of $11,717.00.  In Dr. Clawson's expert opinion, Sediran Drilling Company is an organ of Iran, is controlled by Iran, and the majority of its shares are owned by Iran.  Clawson Affidavit ¶ 14.  In support, Dr. Clawson notes that on August 2, 1980, the Iranian government ordered that the ownership shares in Sediran Drilling Company be transferred to the government of Iran.  Clawson Affidavit ¶ 14.  Since then, Sediran Drilling Company became a part of the National Iranian Oil Company, another entity owned and controlled by Iran.  Clawson Affidavit ¶ 14; *see also* OFAC List (designating the National Iranian Oil Company as the "Government of Iran").

30.   The third transaction involves a blocked EFT in the amount of $5,939.97 in which Bank Sepah has an interest.  In Dr. Clawson's expert opinion, Bank Sepah is an organ of Iran, is controlled by Iran, and the majority of its shares are owned by Iran.  Clawson Affidavit ¶ 21.  Dr. Clawson bases his expert opinion, in part, on the fact that Bank Sepah was nationalized in 1980, and that there is no evidence that indicates a change in ownership or any plans to privatize Bank Sepah.  *Id.*  Bank Sepah is also listed on the OFAC List as being the Government of Iran.

31.   The fourth transaction involves what BOA has described as a blocked "check" in the amount of $9,721.85, in which Iran Air and Melli Bank PLC have an interest.  In Dr. Clawson's expert opinion, both Iran Air and Melli Bank PLC are organs of Iran, are controlled by Iran, and the majority of their shares are owned by Iran.  Clawson Affidavit ¶¶ 19, 20.

32.     The fifth transaction involves a blocked EFT in the amount of $38,469.57 in which Bank Melli Iran has an interest.  Bank Melli is an admitted agency and instrumentality of Iran.  *See Weinstein v. Islamic Republic of Iran*, 624 F. Supp. 2d 272, 274 (E.D.N.Y. 2009) (noting that Bank Melli admits that it is an agency and instrumentality of Iran).  Moreover, Dr. Clawson confirms that Bank Melli is an organ of Iran, is controlled by Iran, and one hundred percent (100%) of its shares are owned by Iran.  Clawson Affidavit ¶ 20.  Bank Melli is also listed on the OFAC List as being the Government of Iran.

**B.      The Wells Fargo Blocked Assets Subject to Execution**

33.     The Blocked Assets held by Wells Fargo, as set forth on Exhibit B, are comprised one (1) blocked account and fourteen (14) blocked EFTs, as more fully described below:

a.      A blocked account containing funds in the amount of $207,873.00 in which the Iranian Navy has an interest.

b.      A blocked EFT in the amount of $20,000.00 in which Bank Saderat Iran has an interest.

c.      A blocked EFT in the amount of $50,000.00 in which Bank Mellat Korea has an interest.

d.      A blocked EFT in the amount of $13,000.00 in which Bank Mellat London has an interest.

e.      A blocked EFT in the amount of $71,673.70 in which Bank Mellat Iran has an interest.

f.      A blocked EFT in the amount of $11,907.00 in which Bank Saderat Iran has an interest.

g.      A blocked EFT in the amount of $74,850.44 in which Bank Mellat has an interest.

h.      A blocked EFT in the amount of $6,500.00 in which Bank Saderat Iran has an interest.

i.      A blocked EFT in the amount of $34,298.81 in which Bank Saderat Iran has an interest.

j.      A blocked EFT in the amount of $105,000.00 in which the Export Development Bank of Iran has an interest.

k.      A blocked EFT in the amount of $6,300.00 in which the Export Development Bank of Iran has an interest.

l.      A blocked EFT in the amount of $5,562.36 in which the Iranian Islamic Revolutionary Guards has an interest.

m.      A blocked EFT in the amount of $10,000.00 in which Bank Mellat Turkey has an interest.

n.      A blocked EFT in the amount of $12,979.07 in which the Khazar Shipping has an interest.

34.     In Dr. Clawson's expert opinion, each of the aforementioned entities is an agency and instrumentality of Iran.  Clawson Affidavit ¶ 3.

35.     **Iranian Navy.**  Dr. Clawson states that the "Iranian Navy is as much an institution of the government of the Islamic Republic of Iran as the U.S. Navy is of the U.S. government.  That fact is widely known in security and economic circles interest in Iran and Iranian government finance."  Clawson Affidavit ¶ 12.  Accordingly the Iranian

Navy is a "foreign state" under the FSIA, and therefore deemed to be Iran for execution purposes. *See* 28 U.S.C. § 1603(a)-(b).

36.     **Bank Saderat Iran ("BSI")**.  In Dr. Clawson's expert opinion, BSI is an organ of Iran, is controlled by Iran, and the majority of its shares are owned by Iran. Clawson Affidavit ¶¶ 22-23.  In support of his conclusion that BSI is an agency and instrumentality of Iran, Dr. Clawson points out that 67.7% of the shares of BSI are under direct and indirect governmental control.  Clawson Affidavit ¶ 23.  Bank Saderat is also listed on the OFAC List as being the Government of Iran.

37.     **Bank Mellat Iran; Bank Mellat, Korea; Bank Mellat Turkey; and Bank Mellat, London (collectively, "Bank Mellat")**.  In Dr. Clawson's expert opinion, Bank Mellat is an organ of Iran and is controlled by Iran.  Clawson Affidavit ¶¶ 24-28. In addition, Dr. Clawson states that it is widely known in banking and business circles that Bank Mellat Korea, Bank Mellat Turkey, and Bank Mellat, London are branches of Bank Mellat Iran that are owned and controlled by Bank Mellat Iran.  Clawson Affidavit ¶ 27.  Bank Mellat is also listed on the OFAC List as being the Government of Iran.

38.     **Export Development Bank of Iran ("EDBI")**.  In Dr. Clawson's expert opinion, EDBI is an organ of Iran, is controlled by Iran, and the majority of its shares are owned by Iran.  Clawson Affidavit ¶ 18.  In support of his conclusion that EDBI is an agency and instrumentality of Iran, Dr. Clawson states that the Central Bank of Iran's official website lists EDBI as a specialized government bank.  Clawson Affidavit ¶ 18. Moreover, EDBI is widely known in banking and business circles as a state owned, specialist export and import bank created to increase non-oil exports from Iran and

develop international trade.  Clawson Affidavit ¶ 18.  EDBI is also listed on the OFAC List as being the Government of Iran.

39.     **Iranian Islamic Revolutionary Guards**.  The IRGC is one of the Judgment Debtors.  Moreover, as noted above at ¶ 28, the IRGC is an Iranian government institution.  Clawson Affidavit ¶ 13.

40.     **Khazar Shipping**.  In Dr. Clawson's expert opinion, Khazar Shipping is an organ of Iran, is controlled by Iran, and the majority of its shares are owned by Iran. Clawson Affidavit ¶ 15.  Dr. Clawson, in support of his conclusion that Khazar Shipping is an agency and instrumentality of Iran, points out that (a) Khazar Shipping is a wholly-owned subsidiary of the Islamic Republic of Iran Shipping Lines ("IRISL"), (b) Khazar Shipping's website refers to its fleet of ships as being part of the "national fleet" which implies government ownership, and (c) IRISL, its parent company, is an agency and instrumentality of Iran because it is an organ of Iran, is controlled by Iran, and the majority of its shares are owned by Iran.  Clawson Affidavit ¶¶ 16-17.

## CONCLUSION

41.     Because Iran and its agencies and instrumentalities have an interest in each of the Blocked Assets, the Plaintiffs are entitled to a judgment in favor of the Plaintiffs in the amount of the Blocked Assets pursuant to 28 U.S.C. § 1610(g) and TRIA § 201.

WHEREFORE, the Plaintiffs respectfully request that the Court:

(A)     Enter judgment in favor of the Plaintiffs in the amount of the Blocked Assets held by Bank of America, plus any accrued interest, as identified on Exhibit A to this Motion, and direct Bank of America to pay such Blocked Assets, plus any accrued interest, to the Plaintiffs;

(B)     Enter judgment in favor of the Plaintiffs in the amount of the Blocked Assets held

by Wells Fargo, plus any accrued interest, as identified on Exhibit B to this Motion, and direct

Wells Fargo to pay such Blocked Assets, plus any accrued interest, to the Plaintiffs; and

(C)     Grant such further relief as the Court deems just and proper.


Respectfully submitted,


_____ /s/ Richard M. Kremen _____
Richard M. Kremen, D.C. Bar No. 195073
David B. Misler, D.C. Bar No. 991475
DLA PIPER LLP (US)
6225 Smith Avenue
Baltimore, Maryland  21209-3600
410-580-3000
410-580-3047 *facsimile*
richard.kremen@dlapiper.com
david.misler@dlapiper.com

Attorneys for Plaintiffs / Judgment Creditors

Dated:   November 15, 2011

## CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of November 2011, copies of the foregoing Motion

for Judgment against Garnishees Bank of America, N.A. and Wells Fargo Bank, N.A. and for

Turnover of Funds were served by first class U.S. mail on:

> Tessa L. Frederick
> E. Hutchinson Robbins, Jr.
> Todd M. Reinecker
> Miles & Stockbridge P.C.
> 10 Light Street
> Baltimore, MD  21202-1487
>
> Karen E. Wagner
> James L. Kerr
> Davis Polk & Wardwell LLP
> 901 – 15th Street NW
> Washington, DC  20005


> /s/ Richard M. Kremen
> Richard M. Kremen

## IN THE UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF COLUMBIA

| | |
|---|---|
| ESTATE OF MICHAEL HEISER, *et al.* | |
| Plaintiffs | |
| v. | Case No.:    00-CV-02329 (RCL) |
| ISLAMIC REPUBLIC OF IRAN, *et al.* | **Consolidated with** |
| Defendants | |
| ESTATE OF MILLARD D. CAMPBELL, *et al.* | |
| Plaintiffs | Case No.:   01-CV-02104 (RCL) |
| v. | |
| ISLAMIC REPUBLIC OF IRAN, *et al.* | |
| Defendants | |

### ORDER GRANTING MOTION FOR JUDGMENT
### AGAINST GARNISHEES BANK OF AMERICA, N.A. AND
### WELLS FARGO BANK, N.A. AND FOR TURNOVER OF FUNDS

UPON CONSIDERATION of the Motion for Judgment against Garnishees Bank of America, N.A. and Wells Fargo Bank, N.A. and for Turnover of Funds (the "Motion"), filed by the Plaintiffs/Judgment Creditors (1) the Estate of Michael Heiser, deceased; (2) Gary Heiser; (3) Francis Heiser; (4) the Estate of Leland Timothy Haun, deceased; (5) Ibis S. Haun; (6) Milagritos Perez-Dalis; (7) Senator Haun; (8) the Estate of Justin R. Wood, deceased; (9) Richard W. Wood; (10) Kathleen M. Wood; (11) Shawn M. Wood; (12) the Estate of Earl F. Cartrette, Jr., deceased; (13) Denise M. Eichstaedt; (14) Anthony W. Cartrette; (15) Lewis W. Cartrette; (16) the Estate of Brian McVeigh, deceased; (17) Sandra M. Wetmore; (18) James V. Wetmore; (19) the Estate of Millard D. Campbell, deceased; (20) Marie R. Campbell; (21) Bessie A. Campbell; (22) the Estate of Kevin J. Johnson, deceased; (23) Shyrl L. Johnson; (24) Che G. Colson; (25) Kevin Johnson, a minor, by his legal guardian Shyrl L. Johnson; (26) Nicholas A. Johnson, a minor, by his legal guardian Shyrl L. Johnson; (27) Laura E. Johnson;

(28) Bruce Johnson; (29) the Estate of Joseph E. Rimkus, deceased; (30) Bridget Brooks; (31) James R. Rimkus; (32) Anne M. Rimkus; (33) the Estate of Brent E. Marthaler, deceased; (34) Katie L. Marthaler; (35) Sharon Marthaler; (36) Herman C. Marthaler III; (37) Matthew Marthaler; (38) Kirk Marthaler; (39) the Estate of Thanh Van Nguyen, deceased; (40) Christopher R. Nguyen; (41) the Estate of Joshua E. Woody, deceased; (42) Dawn Woody; (43) Bernadine R. Beekman; (44) George M. Beekman; (45) Tracy M. Smith; (46) Jonica L. Woody; (47) Timothy Woody; (48) the Estate of Peter J. Morgera, deceased; (49) Michael Morgera; (50) Thomas Morgera; (51) the Estate of Kendall Kitson, Jr., deceased; (52) Nancy R. Kitson; (53) Kendall K. Kitson; (54) Steve K. Kitson; (55) Nancy A. Kitson; (56) the Estate of Christopher Adams, deceased; (57) Catherine Adams; (58) John E. Adams; (59) Patrick D. Adams; (60) Michael T. Adams; (61) Daniel Adams; (62) Mary Young; (63) Elizabeth Wolf; (64) William Adams; (65) the Estate of Christopher Lester, deceased; (66) Cecil H. Lester; (67) Judy Lester; (68) Cecil H. Lester, Jr.; (69) Jessica F. Lester; (70) the Estate of Jeremy A. Taylor, deceased; (71) Lawrence E. Taylor; (72) Vickie L. Taylor; (73) Starlina D. Taylor; (74) the Estate of Patrick P. Fennig, deceased; (75) Thaddeus C. Fennig; (76) Catherine Fennig; (77) Paul D. Fennig; and (78) Mark Fennig (collectively, the "Plaintiffs"), and any opposition thereto filed by the Garnishees Bank of America, N.A. ("Bank of America") and/or Wells Fargo Bank, N.A.("Wells Fargo"), it is this _____ day of _____ 20___, **ORDERED**:

1.      That the Motion is hereby GRANTED;

2.      Judgment is hereby entered in favor of the Plaintiffs in the amount totaling the Blocked Assets identified on Exhibit A to the Motion, plus any accrued interest thereon;

3.      Judgment is hereby entered in favor of the Plaintiffs in the amount totaling the Blocked Assets identified on Exhibit B to the Motion, plus any accrued interest thereon;

4.      Bank of America shall pay and turnover to the Plaintiffs the Blocked Assets and any accrued interest held by Bank of America, as identified on Exhibit A to the Motion, within ten (10) days of the date of this Order, and upon a turnover of the Blocked Assets by Bank of America, it shall receive a discharge for all further liability for the Blocked Assets as set forth in D.C. Code § 16-528; and

4.      Wells Fargo shall pay and turnover to the Plaintiffs the Blocked Assets and any accrued interest held by Wells Fargo, as identified on Exhibit B to the Motion, within ten (10) days of the date of this Order, and upon a turnover of the Blocked Assets by Wells Fargo, it shall receive a discharge for all further liability for the Blocked Assets as set forth in D.C. Code § 16-528.

_____
The Honorable Royce C. Lamberth
United States District Judge

# EXHIBIT A

EAST\47062727 1

Confidential

### Blocked Assets Held by Bank of America

| Account Number | Amount | Iranian Entity(ies) |
|---|---|---|
| 1979-0002 | $37,453.88 | Iran Marine and Industrial |
| 1979-0003 | $11,717.00 | SedIran Drilling Company |
| 2007-0320 | $5,839.97 | Bank Sepah |
| 2008-0069 | $9,721.85 | Iran Air & Melli Bank Plc UK |
| 2008-0311 | $38,469.57 | Bank Melli Iran |

# EXHIBIT B

EAST\47062727 1

Confidential

### Blocked Assets Held by Wells Fargo Bank, N.A.

| Amount | Iranian Entity |
|---|---|
| $207,873.00 | Iranian Navy |
| $20,000.00 | Bank Saderat Iran |
| $50,000.00 | Bank Mellat, Korea |
| $13,000.00 | Bank Mellat, London |
| $71,673.70 | Bank Mellat Iran |
| $11,907.00 | Bank Saderat Iran |
| $74,850.44 | Bank Mellat |
| $6,500.00 | Bank Saderat Iran |
| $34,298.81 | Bank Saderat Iran |
| $105,000.00 | Export Development Bank of Iran |
| $6,300.00 | Export Development Bank of Iran |
| $5,562.36 | Iranian Islamic Revolutionary Guards |
| $10,000.00 | Bank Mellat, Turkey |
| $12,979.07 | Khazar Shipping |

Confidential

# EXHIBIT C

UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ESTATE OF MICHAEL HEISER, et al.,                 :

        Judgment Creditors-Garnishors,     :

      - against -                                           :

ISLAMIC REPUBLIC OF IRAN, et al.,             :

        Judgment Debtors,                           :

      - and -                                                 :

WELLS FARGO BANK, N.A.,                          :

        Garnishee.                                       :

                            :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ESTATE OF MILLARD CAMPBELL, et al.,        :

        Judgment Creditors-Garnishors,     :

      - against -                                           :

ISLAMIC REPUBLIC OF IRAN, et al.,             :

        Judgment Debtors,                           :

      - and -                                                 :

WELLS FARGO BANK, N.A.,                          :

        Garnishee.                                       :

                            :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Case No. 1:11-cv-137-BEL

**ANSWERS AND OBJECTIONS OF GARNISHEE WELLS FARGO
BANK, N.A. TO THE FIRST SET OF INTERROGATORIES BY JUDGMENT
CREDITORS-GARNISHORS ESTATE OF MICHAEL HEISER ET AL.**

Pursuant to Rule 33(b) of the Federal Rules of Civil Procedure, Garnishee Wells

Fargo Bank, N.A. ("Wells Fargo" or the "Bank"), by its attorneys, Miles & Stockbridge,

P.C., hereby makes the following answers and objections to the Estate of Michael Heiser

et al.'s First Set of Interrogatories dated April 18, 2011 (the "Interrogatories"), as

follows:

## GENERAL OBJECTIONS

1.      Wells Fargo objects to the Interrogatories to the extent that they purport to

impose obligations on Wells Fargo beyond what is required by the Federal Rules of Civil

Procedure, the Local Rules of the United States District Court for the District of

Maryland, or any other applicable federal, state, local or foreign law.

2.      Wells Fargo objects to the Interrogatories as overly broad, unduly

burdensome and often repetitive.  Because the parties who have served a writ of

garnishment against Wells Fargo are merely attempting to execute on funds and assets

that are purportedly held by Wells Fargo, and because searching for and providing even a

portion of the information sought would result in substantial expense to Wells Fargo,

without providing a corresponding benefit to the judgment creditors garnishors, Wells

Fargo should not be required to search for and provide information that would have little

or no value to the persons seeking such discovery.  Wells Fargo should in any event be

reimbursed for the cost of searching for and providing the information sought, including

reimbursement for the time and efforts of its personnel and its reasonable attorneys' fees

and costs.

2

3.      Wells Fargo objects to the Interrogatories to the extent that they seek to obtain information regarding blocked wire transfers involving less than $5,000.00 at the time they were blocked on the ground that it would be unreasonably burdensome, time-consuming and expensive to search for, review, and provide such information, as well as to prepare, serve and respond to execution process, in light of the corresponding benefit to the parties seeking discovery.

4.      Wells Fargo objects to the Interrogatories to the extent they seek to impose an obligation on Wells Fargo to conduct anything beyond a reasonably diligent search of files where responsive information reasonably would be expected to be found.

5.      Wells Fargo objects to the Interrogatories to the extent that (a) the discovery sought by any demand is unreasonably cumulative or duplicative, or is obtainable from another source that is more convenient, less burdensome, or less expensive; (b) the discovery sought by any request has been obtained by any request or demand in any other proceeding or pursuant to any other means; or (c) the burden or expense of any demand outweighs its likely benefit.

6.      Wells Fargo objects to the Interrogatories to the extent that they purport to require information concerning or relating to accounts, wire transfers, money, or property being held at an office of Wells Fargo located outside the United States on the ground that such accounts, wire transfers, accounts and property are not subject to discovery or execution in this proceeding.

7.      Wells Fargo objects to the Interrogatories to the extent they seek information protected by the attorney-client privilege, the work product doctrine, or any

3

other applicable privilege, doctrine, or immunity.  Any such information will not be provided.

8.      Wells Fargo objects to the Interrogatories to the extent they seek confidential or proprietary information.

9.      Wells Fargo objects to the Interrogatories to the extent they seek information that is subject to the bank secrecy or other laws of any nation, state or subdivision thereof that prohibit, restrict, or impose conditions upon the disclosure of such information.

10.     Wells Fargo objects to the Interrogatories to the extent they seek information not relevant to the satisfaction of the judgment against the Islamic Republic of Iran or any of the other judgment debtors or that is not reasonably calculated to lead to the discovery of admissible evidence.

11.     Wells Fargo objects to the Interrogatories to the extent that they are vague, ambiguous, overly broad, capable of multiple interpretations, confusing, or unintelligible.

12.     Wells Fargo objects to the Interrogatories to the extent they assume disputed facts or legal conclusions.  Wells Fargo does not admit any such disputed facts or legal conclusions, and any information provided by Wells Fargo with respect to any interrogatory is without prejudice to this objection.

13.     Based on its review of the blocked wire transfer account information reflected in Exhibit A hereto, Wells Fargo has concluded that Iran (using that term as defined in the Definitions, subject to Wells Fargo's objection) does not own the proceeds of any blocked wire transfers on the books of Wells Fargo or possess sufficient interest in

4

such proceeds to make them subject to execution by the judgment creditors garnishors.

Wells Fargo accordingly objects to the production of information concerning any

Blocked Accounts or Blocked Assets (as those terms are used, subject to Wells Fargo's

objections, in the Definitions), but subject to this objection, to the specific objections set

forth below, and to the other General Objections set forth above, is prepared to make

available to the judgment creditors garnishors the information reflected in Exhibit A

hereto.

    14.  The objections set forth above are hereby incorporated in each specific

response set forth below, as if fully set forth therein.  No such objection is waived by

Wells Fargo responding to a demand in whole or in part.

**OBJECTIONS TO THE DEFINITIONS**

    1.  Wells Fargo objects to the Definitions to the extent that they purport to

define terms differently than those terms are defined by the Federal Rules of Civil

Procedure, the Local Rules of the United States District Court for the District of

Maryland, or any other applicable law or rule, including regulations issued by the U.S.

Treasury Department's Office of Foreign Assets Control ("OFAC").  Any use of the

Definitions by Wells Fargo for the purpose of responding to the Interrogatories shall not

constitute a waiver of this or any other objection.

    2.  In addition to the General Objections set forth above, Wells Fargo objects

to the definition in paragraph 3 of the Definitions ("Iran") to the extent it states a legal

conclusion or purports to define the scope of any federal statute or regulation, including

regulations issued by OFAC, or otherwise seeks to impose obligations on Wells Fargo

5

beyond what is required by, or could be contrary to applicable federal, state, local or foreign law.  Wells Fargo further objects to the definition in Paragraph 3 to the extent that it fails to describe with reasonable particularity the information sought.

3.      In addition to the General Objections set forth above, Wells Fargo objects to the definition in paragraph 5 of the Definitions ("Process") to the extent that it purports to include "any other legal document," as such inclusion renders the definition overly broad, vague, unduly burdensome, and fails to describe with reasonable particularity the information sought.

4.      In addition to the General Objections set forth above, Wells Fargo objects to the definitions in paragraphs 7 and 8 of the Definitions ("Blocked Accounts" and "Blocked Wire Transfers") to the extent that they state legal conclusions or purport to define the scope of any federal statutes or regulations, including regulations issued by OFAC, or otherwise seek to impose obligations on Wells Fargo beyond what is required by applicable federal, state, local or foreign law.  Wells Fargo further objects to the definitions in paragraphs 7 and 8 as overly broad and unduly burdensome, and to the extent they fail to describe with reasonable particularity the information sought.

5.      In addition to the General Objections set forth above, Wells Fargo objects to the definition in paragraph 12 of the Definitions ("Document") as grossly overbroad, unduly burdensome, and to the extent it purports to require Wells Fargo to (i) produce documents or data in any particular media; (ii) search for and/or produce any documents or data on backup tapes or other source that is not reasonably accessible due to cost; (iii) produce any proprietary software, data, programs, or databases; or (iv) violate any

6

licensing agreement or copyright law. Wells Fargo further objects to the definition in

paragraph 12 to the extent that it purports to require the production of original

documents.

   6.  In addition to the General Objections set forth above, Wells Fargo objects

to the definition contained in paragraph 15 of the Definitions ("Communication") as

overly broad and unduly burdensome, and to the extent it purports to vary or expand

Wells Fargo's obligations under the Federal Rules of Civil Procedure.

   7.  In addition to the General Objections set forth above, Wells Fargo objects

to the definitions in paragraphs 16, 17, and 18 of the Definitions ("Identify") as vague,

confusing, unduly burdensome (in particular to the extent that they request "the substance

in detail of" documents and communications) and to the extent they purport to vary or

expand Wells Fargo's obligations under the Federal Rules of Civil Procedure.

## OBJECTIONS TO THE GENERAL PROVISIONS AND INSTRUCTIONS

   1.  Wells Fargo objects to the General Provisions and Instructions to the

extent that they purport to vary or expand Wells Fargo's obligations under the Federal

Rules of Civil Procedure, the Local Rules of the United States District Court for the

District of Maryland, or any other applicable law or rule.

   2.  In addition to the General Objections set forth above, Wells Fargo objects

to paragraph 2 of the General Provisions and Instructions as grossly overbroad and

unduly burdensome and to the extent it seeks information not relevant to the satisfaction

of any judgment against Iran or the other judgment debtors in favor of the parties seeking

such discovery or to any party's claim or defense in these proceedings and not reasonably

calculated to lead to the discovery of admissible evidence.

3.     In addition to the General Objections set forth above, Wells Fargo objects

to paragraph 5 of the General Provisions and Instructions as grossly overbroad and

unduly burdensome, as it could seemingly extend to all of Wells Fargo's agents and

representatives.

## RESPONSES AND OBJECTIONS TO THE INTERROGATORIES

**Interrogatory No. 1:** Identify all persons who provided information for all or any part of
your answers to these interrogatories and, for each person named, state the interrogatory
or interrogatories in response to which such person provided information.

**Response to Interrogatory No. 1:**

Subject to the General Objections set forth above, Wells Fargo objects to

Interrogatory No. 1 on the grounds that it is overly broad and seeks information not

relevant to the satisfaction of any judgment against Iran or the other judgment debtors,

and is not reasonably calculated to lead to the discovery of admissible evidence.  Subject

to and without waiving the foregoing objections, Catherine Malone, who is assigned to

the Wells Fargo Corporate OFAC Office, coordinated the gathering of information at the

direction and under the supervision of counsel in order to respond to the Interrogatories.

**Interrogatory No. 2:** Identify any and all Blocked Accounts located at the Bank.  For
each blocked account, please provide the account number, full name on the account, the
full address of the account holder, the name of any authorized signatories, and the current
account balance.

**Response to Interrogatory No. 2:**

Subject to the General Objections set forth above, Wells Fargo objects to

Interrogatory No. 2 on the grounds that it is vague and ambiguous, overly broad and

8

unduly burdensome, and seeks documents and information not relevant to the satisfaction of a judgment against Iran or the other judgment debtors. Nor is it reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiving the foregoing objections, Wells Fargo is prepared to produce, and attaches hereto as Exhibit A, a schedule of accounts, blocked wire transfers or other property blocked on the books of Wells Fargo at one of its offices in the United States pursuant to regulations issued by OFAC that reflects blocked accounts, wire transfers or property valued at or reflecting balances that amounted to or involved $5,000.00 or more at the time of blocking in which (a) the Islamic Republic of Iran ("Iran"), (b) one of the other judgment debtors, (c) any Specially Designated National of Iran, (d) an agency or instrumentality of Iran, or (e) some other Iranian government entity that is believed, on information and belief, to have a blockable interest in the blocked accounts, wire transfers or property within the meaning of OFAC regulations. Wells Fargo believes that the information on the schedule should provide all or substantially all the information the judgment creditors garnishors will need to make a preliminary determination as to whether any of the scheduled property is subject to execution, and therefore object to the production of the underlying documents at this time. To the extent, however, that the judgment creditors require any further information in order to determine whether Iran, any of the judgment creditors, or any agency or instrumentality of Iran, has an interest in any of the blocked accounts, wire transfers or items of property that would render it subject to execution under the Foreign Sovereign Immunities Act of 1976 and the law of Maryland, Wells Fargo will promptly produce the underlying documents upon the designation, by the judgment creditors based

9

on their review of the annexed schedule, of any specific account, blocked wire transfer,

or item of property as to which they need such documentation, including, without

limitation, the SWIFT messages or other documents reflecting the transaction or account

designated.  Blocked accounts are held in the name of the originator with the Wells Fargo

Corporate OFAC Office noted as an additional party.  All direction related to blocked

funds comes directly from the Wells Fargo Corporate OFAC Office.

**Interrogatory No. 3:** Identify all accounts located at the Bank in which Iran, as defined
above, owns or has an interest, direct or indirect. For each account, please provide the
account number, full name on the account, the full address of the account holder, the
name of any authorized signatories, and the current account balance.

**Response to Interrogatory No. 3:**

Subject to the General Objections set forth above, Wells Fargo objects to

Interrogatory No. 3 on the grounds that it is vague and ambiguous, overly broad and

unduly burdensome, and seeks documents and information not relevant to the satisfaction

of any judgment against Iran and the other judgment debtors.  Nor is it reasonably

calculated to lead to the discovery of admissible evidence.  Subject to and without

waiving the foregoing objections, Wells Fargo is prepared to produce, and attaches hereto

as Exhibit A, a schedule of accounts, blocked wire transfers or other property blocked on

the books of Wells Fargo at one of its offices in the United States pursuant to regulations

issued by OFAC that reflects blocked accounts, wire transfers or property valued at or

reflecting balances that amounted to or involved $5,000.00 or more at the time of

blocking in which (a) the Islamic Republic of Iran ("Iran"), (b) one of the other judgment

debtors, (c) any Specially Designated National of Iran, (d) an agency or instrumentality

of Iran, or (e) some other Iranian government entity that is believed, on information and

10

belief, to have a blockable interest in the blocked accounts, wire transfers or property

within the meaning of OFAC regulations.  Wells Fargo believes that the information on

the schedule should provide all or substantially all the information the judgment creditors

garnishors will need to make a preliminary determination as to whether any of the

scheduled property is subject to execution, and therefore object to the production of the

underlying documents at this time.  To the extent, however, that the judgment creditors

require any further information in order to determine whether Iran, any of the judgment

creditors, or any agency or instrumentality of Iran, has an interest in any of the blocked

accounts, wire transfers or items of property that would render it subject to execution

under the Foreign Sovereign Immunities Act of 1976 and the law of Maryland, Wells

Fargo will promptly produce the underlying documents upon the designation, by the

judgment creditors based on their review of the annexed schedule, of any specific

account, blocked wire transfer, or item of property as to which they need such

documentation, including, without limitation, the SWIFT messages or other documents

reflecting the transaction or account designated.

**Interrogatory No. 4:** Identify any and all Blocked Wire Transfers located at the Bank.
For each Blocked Wire Transfer, please provide the full name and address of the (a)
originator, (b) originating bank, (c) beneficiary, and (d) beneficiary bank. In addition,
please provide the amount of the Blocked Wire Transfer.

**Response to Interrogatory No. 4:**

In addition to the General Objections set forth above, Wells Fargo objects to

Interrogatory No. 4 on the grounds that it is vague and ambiguous, as well as overly

broad and unduly burdensome, and seeks documents and information not relevant to the

satisfaction of any judgment against Iran or the other judgment debtors.  Subject to and

11

without waiving the foregoing objections, Wells Fargo is prepared to produce, and attaches hereto as Exhibit A, a schedule of accounts, blocked wire transfers or other property blocked on the books of Wells Fargo at one of its offices in the United States pursuant to regulations issued by OFAC that reflects blocked accounts, wire transfers or property valued at or reflecting balances that amounted to or involved $5,000.00 or more at the time of blocking in which (a) the Islamic Republic of Iran ("Iran"), (b) one of the other judgment debtors, (c) any Specially Designated National of Iran, (d) an agency or instrumentality of Iran, or (e) some other Iranian government entity that is believed, on information and belief, to have a blockable interest in the blocked accounts, wire transfers or property within the meaning of OFAC regulations.  Wells Fargo believes that the information on the schedule should provide all or substantially all the information the judgment creditors garnishors will need to make a preliminary determination as to whether any of the scheduled property is subject to execution, and therefore object to the production of the underlying documents at this time.  To the extent, however, that the judgment creditors require any further information in order to determine whether Iran, any of the judgment creditors, or any agency or instrumentality of Iran, has an interest in any of the blocked accounts, wire transfers or items of property that would render it subject to execution under the Foreign Sovereign Immunities Act of 1976 and the law of Maryland, Wells Fargo will promptly produce the underlying documents upon the designation, by the judgment creditors based on their review of the annexed schedule, of any specific account, blocked wire transfer, or item of property as to which they need

such documentation, including, without limitation, the SWIFT messages or other

documents reflecting the transaction or account designated.

**Interrogatory No. 5:** Identify any and all Society for Worldwide Interbank Financial
Telecommunication ("SWIFT") messages and/or wire transfer instructions that were
included with and were a part of the Blocked Wire Transfers.

**Response to Interrogatory No. 5:**

Wells Fargo objects to a listing of the underlying SWIFT message on the ground

that doing so would be unduly burdensome. Subject to this objection, and as indicated in

response to several Interrogatories and Document Requests, Wells Fargo believes that the

essential information that can be derived from a SWIFT message is reflected on the

annexed schedule. That notwithstanding, Wells Fargo is prepared to produce the SWIFT

message or messages in respect of any blocked account if requested to do so by the

judgment creditors garnishors following the review of the annexed schedule.

**Interrogatory No. 6:** Identify any and all Process served on the Bank by other judgment
creditors of Iran relating to the attachment of assets of Iran. For each process, identify,
(a) the judgment creditor(s) who served the Process, (b) the type of Process, (c) the date
of service of the Process, and (d) what, if any, information was provided to the judgment
creditor(s).

**Response to Interrogatory No. 6:**

Subject to and without waiving the foregoing objections, including the objection

to the Definition of "Process," Wells Fargo objects to Interrogatory No. 6 on the grounds

that it is vague and ambiguous, grossly overbroad, and unduly burdensome, seeks

documents and information not relevant to the satisfaction of any judgment against Iran

or any of the other judgment debtors, and is not reasonably calculated to lead to the

discovery of admissible evidence. Subject to and without waiving the foregoing

objections, Wells Fargo states, upon information and belief, that it has been served with

Process by judgment creditors in the following actions:

    1.    Restraining Notice to Garnishee in <u>Steven M. Greenbaum, et al. v. Islamic</u>

<u>Republic of Iran</u>, et al., Judgment No. 08-2252 (Sup. Ct. N.Y. County, Dec. 12, 2008).

    2.    Writ of Garnishment in <u>Abkir Associates, LLC v. Wachovia Bank</u>, Civil

Action No. 02-00092 (HHK) (D.D.C., Nov. 11, 2010).

**Interrogatory No. 7:** Identify all accounts located at the Garnishee held in the name of
Iran (as defined above). For each account, please provide the account number, full name
on the account, the full address of the account holder, the name of any authorized
signatories, and the current account balance.

**Response to Interrogatory No. 7:**

    Subject to the General Objections set forth above, Wells Fargo states, on

information and belief, that there are no accounts located at Wells Fargo in name of Iran

(as that term is defined, subject to Wells Fargo's objection in the Definitions).

**Interrogatory No. 8:** Identify all assets in the possession, custody and/or control of the
Garnishee in which Iran (as defined above) has an interest. Include in your response the
location of the assets identified.

**Response to Interrogatory No. 8:**

    Subject to the General Objections set forth above, Wells Fargo objects to

Interrogatory No. 8 on the grounds that it is repetitive, vague and ambiguous, as well as

overly broad and unduly burdensome. Subject to and without waiving the foregoing

objections, Wells Fargo is prepared to produce, and attaches hereto as Exhibit A, a

schedule of accounts, blocked wire transfers or other property blocked on the books of

Wells Fargo at one of its offices in the United States pursuant to regulations issued by

OFAC that reflects blocked accounts, wire transfers or property valued at or reflecting

14

balances that amounted to or involved $5,000.00 or more at the time of blocking in which (a) the Islamic Republic of Iran ("Iran"), (b) one of the other judgment debtors, (c) any Specially Designated National of Iran, (d) an agency or instrumentality of Iran, or (e) some other Iranian government entity that is believed, on information and belief, to have a blockable interest in the blocked accounts, wire transfers or property within the meaning of OFAC regulations. Wells Fargo believes that the information on the schedule should provide all or substantially all the information the judgment creditors garnishors will need to make a preliminary determination as to whether any of the scheduled property is subject to execution, and therefore object to the production of the underlying documents at this time.  To the extent, however, that the judgment creditors require any further information in order to determine whether Iran, any of the judgment creditors, or any agency or instrumentality of Iran, has an interest in any of the blocked accounts, wire transfers or items of property that would render it subject to execution under the Foreign Sovereign Immunities Act of 1976 and the law of Maryland, Wells Fargo will promptly produce the underlying documents upon the designation, by the judgment creditors based on their review of the annexed schedule, of any specific account, blocked wire transfer, or item of property as to which they need such documentation, including, without limitation, the SWIFT messages or other documents reflecting the transaction or account designated.

**Interrogatory No. 9:** Identify the department(s) at the Bank responsible for reporting Blocked Assets and Blocked Wire Transfers to OFAC and provide the (a) address(es) where the department(s) is/are located; (b) name(s) of the employee(s) responsible for overseeing the Blocked Assets and Blocked Wire and reporting the same to OFAC; and (c) the address of the Bank branch and/or office where the employee(s) are located.

**Response to Interrogatory No. 9:**

Subject to the General Objections set forth above, Wells Fargo states that the

Wells Fargo Corporate OFAC Office is responsible for reporting Blocked Assets and

Blocked Wire Transfers (as those terms are defined, subject to Wells Fargo's objections,

in the Definitions) to OFAC.  Sara Satten is Wells Fargo's Corporate OFAC Officer.

Catherine Malone and Helene Johnson are the managers in Charlotte, North Carolina

responsible for oversight of the Blocked Assets and Blocked Wire Transfers.

**Interrogatory No. 10:** Identify the branch location of the Bank where each of the Blocked Assets is located.

**Response to Interrogatory No. 10:**

Subject to the General Objections set forth above, and to Wells Fargo's objections

as to the definition of Blocked Assets, the schedule attached hereto as Exhibit A

identifies the situs of each blocked account listed on Exhibit A.

**Interrogatory No. 11:** Identify the branch location of the Bank where each of the Blocked Wire Transfers is located.

**Response to Interrogatory No. 11:**

Subject to the General Objections set forth above, and to Wells Fargo's objections

as to the definition of Blocked Wire Transfers, the schedule attached hereto as Exhibit A

identifies the situs of each blocked account listed on Exhibit A.

Dated:   Baltimore, Maryland
         June 2, 2011

                                  MILES & STOCKBRIDGE P.C.

                                  By:   _____
                                        E. Hutchinson Robbins, Jr. (#11927)
                                        Todd M. Reinecker (#27028)

                                  10 Light Street
                                  Baltimore, MD  21202
                                  Tel:  (410) 727-6464
                                  Fax:  (410) 285-3700
                                  erobbins@milesstockbridge.com
                                  treinecker@milesstockbridge.com

                                  *Attorneys for Garnishee*

To:   Richard M. Kremen (#00532)
      Dale K. Cathell (#26924)
      David B. Misler (#28828)
      DLA Piper LLP (USA)
      6225 Smith Avenue
      Baltimore, MD 21209
      Tel: (410) 580-3000
      Fax: (410) 580-3001

      *Attorneys for Judgment Creditors-
      Garnishors*

VERIFICATION

STATE OF  North Carolina )
                                           : ss
COUNTY OF  Mecklenberg )

Catherine Malone, being duly sworn, deposes and says:

That she is an employee of Wells Fargo Bank, N.A., that she has read the

foregoing Answers and Objections of Garnishee Wells Fargo Bank, N.A. to the First Set

of Interrogatories of Judgment Creditors Garnishors Estate of Michael Heiser, et al., and

that the Answers to such Interrogatories are true to the best of her knowledge,

information or belief.

_____
Catherine Malone

Sworn to before me this
2nd day of ___June___, 2011.

_____
Notary Public

My Commission Expires
February 2nd 2016

JOSEPH I KEURZONEFF
NOTARY PUBLIC
MECKLENBURG COUNTY, NC

# EXHIBIT D

UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ESTATE OF MICHAEL HEISER, et al.,

           Judgment Creditors-Garnishors,

      - against -

ISLAMIC REPUBLIC OF IRAN, et al.,

          Judgment Debtors,

      - and -

BANK OF AMERICA, NATIONAL
ASSOCIATION,

          Garnishee.

:
:
:
:
:
:
:
:
:
:
:

Case No. 1:11-cv-137-BEL

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ESTATE OF MILLARD CAMPBELL, et al.,

           Judgment Creditors-Garnishors,

      - against -

ISLAMIC REPUBLIC OF IRAN, et al.,

          Judgment Debtors,

      - and -

BANK OF AMERICA, NATIONAL
ASSOCIATION,

          Garnishee.

:
:
:
:
:
:
:
:
:

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**ANSWERS AND OBJECTIONS OF GARNISHEE BANK OF
AMERICA, NATIONAL ASSOCIATION, TO THE FIRST SET OF
INTERROGATORIES BY THE JUDGMENT CREDITORS
<u>GARNISHORS ESTATE OF MICHAEL HEISER ET AL.</u>**

Pursuant to Rule 33(b) of the Federal Rules of Civil Procedure, Garnishee Bank of America, National Association ("Bank of America" or the "Bank"), by its attorneys, Miles & Stockbridge, P.C., hereby makes the following answers and objections to the Estate of Michael Heiser et al.'s First Set of Interrogatories dated April 18, 2011 (the "Interrogatories"), as follows:

## GENERAL OBJECTIONS

1.      Bank of America objects to the Interrogatories to the extent that they purport to impose obligations on Bank of America beyond what is required by the Federal Rules of Civil Procedure, the Local Rules of the United States District Court for the District of Maryland, or any other applicable federal, state, local or foreign law.

2.      Bank of America objects to the Interrogatories as overly broad, unduly burdensome and often repetitive.  Because the parties who have served a writ of garnishment against Bank of America are merely attempting to execute on funds and assets that are purportedly held by Bank of America, and because searching for and providing even a portion of the information sought would result in substantial expense to Bank of America, without providing a corresponding benefit to the judgment creditors garnishors, Bank of America should not be required to search for and provide information that would have little or no value to the persons seeking such discovery.  Bank of America should in any event be reimbursed for the cost of searching for and providing the information sought, including reimbursement for the time and efforts of its personnel and its reasonable attorneys' fees and costs.

2

3.     Bank of America objects to the Interrogatories to the extent that they seek to obtain information regarding blocked wire transfers involving less than $5,000.00 at the time they were blocked on the ground that it would be unreasonably burdensome, time-consuming and expensive to search for, review, and provide such information, as well as to prepare, serve and respond to execution process, in light of the corresponding benefit to the parties seeking discovery.

4.     Bank of America objects to the Interrogatories to the extent they seek to impose an obligation on Bank of America to conduct anything beyond a reasonably diligent search of files where responsive information reasonably would be expected to be found.

5.     Bank of America objects to the Interrogatories to the extent that (a) the discovery sought by any demand is unreasonably cumulative or duplicative, or is obtainable from another source that is more convenient, less burdensome, or less expensive; (b) the discovery sought by any request has been obtained by any request or demand in any other proceeding or pursuant to any other means; or (c) the burden or expense of any demand outweighs its likely benefit.

6.     Bank of America objects to the Interrogatories to the extent that they purport to require information concerning or relating to accounts, wire transfers, money, or property being held at an office of Bank of America located outside the United States on the ground that such accounts, wire transfers, accounts and property are not subject to discovery or execution in this proceeding.

7.     Bank of America objects to the Interrogatories to the extent they seek information protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege, doctrine, or immunity.  Any such information will not be provided.

8.     Bank of America objects to the Interrogatories to the extent they seek confidential or proprietary information.

9.     Bank of America objects to the Interrogatories to the extent they seek information that is subject to the bank secrecy or other laws of any nation, state or subdivision thereof that prohibit, restrict, or impose conditions upon the disclosure of such information.

10.    Bank of America objects to the Interrogatories to the extent they seek information not relevant to the satisfaction of the judgment against the Islamic Republic of Iran or any of the other judgment debtors or that is not reasonably calculated to lead to the discovery of admissible evidence.

11.    Bank of America objects to the Interrogatories to the extent that they are vague, ambiguous, overly broad, capable of multiple interpretations, confusing, or unintelligible.

12.    Bank of America objects to the Interrogatories to the extent they assume disputed facts or legal conclusions.  Bank of America does not admit any such disputed facts or legal conclusions, and any information provided by Bank of America with respect to any interrogatory is without prejudice to this objection.

4

13.   Based on its review of the blocked wire transfer account information reflected in Exhibit A hereto, Bank of America has concluded that Iran (using that term as defined in the Definitions, subject to Bank of America's objection) does not own the proceeds of any blocked wire transfers on the books of Bank of America or possess sufficient interest in such proceeds to make them subject to execution by the judgment creditors garnishors.  Bank of America accordingly objects to the production of information concerning any Blocked Accounts or Blocked Assets (as those terms are used, subject to Bank of America's objections, in the Definitions), but subject to this objection, to the specific objections set forth below, and to the other General Objections set forth above, is prepared to make available to the judgment creditors garnishors the information reflected in Exhibit A hereto.

14.   The objections set forth above are hereby incorporated in each specific response set forth below, as if fully set forth therein.  No such objection is waived by Bank of America responding to a demand in whole or in part.   .

### OBJECTIONS TO THE DEFINITIONS

1.   Bank of America objects to the Definitions to the extent that they purport to define terms differently than those terms are defined by the Federal Rules of Civil Procedure, the Local Rules of the United States District Court for the District of Maryland, or any other applicable law or rule, including regulations issued by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC").  Any use of the Definitions by Bank of America for the purpose of responding to the Interrogatories shall not constitute a waiver of this or any other objection.

2.      In addition to the General Objections set forth above, Bank of America objects to the definition in paragraph 3 of the Definitions ("Iran") to the extent it states a legal conclusion or purports to define the scope of any federal statute or regulation, including regulations issued by OFAC, or otherwise seeks to impose obligations on Bank of America beyond what is required by, or could be contrary to applicable federal, state, local or foreign law.  Bank of America further objects to the definition in Paragraph 3 to the extent that it fails to describe with reasonable particularity the information sought.

3.      In addition to the General Objections set forth above, Bank of America objects to the definition in paragraph 5 of the Definitions ("Process") to the extent that it purports to include "any other legal document," as such inclusion renders the definition overly broad, vague, unduly burdensome, and fails to describe with reasonable particularity the information sought.

4.      In addition to the General Objections set forth above, Bank of America objects to the definitions in paragraphs 7 and 8 of the Definitions ("Blocked Accounts" and "Blocked Wire Transfers") to the extent that they state legal conclusions or purport to define the scope of any federal statutes or regulations, including regulations issued by OFAC, or otherwise seek to impose obligations on Bank of America beyond what is required by applicable federal, state, local or foreign law.  Bank of America further objects to the definitions in paragraphs 7 and 8 as overly broad and unduly burdensome, and to the extent they fail to describe with reasonable particularity the information sought.

5.      In addition to the General Objections set forth above, Bank of America objects to the definition in paragraph 12 of the Definitions ("Document") as grossly overbroad, unduly burdensome, and to the extent it purports to require Bank of America to (i) produce documents or data in any particular media; (ii) search for and/or produce any documents or data on backup tapes or other source that is not reasonably accessible due to cost; (iii) produce any proprietary software, data, programs, or databases; or (iv) violate any licensing agreement or copyright law.  Bank of America further objects to the definition in paragraph 12 to the extent that it purports to require the production of original documents.

6.      In addition to the General Objections set forth above, Bank of America objects to the definition contained in paragraph 15 of the Definitions ("Communication") as overly broad and unduly burdensome, and to the extent it purports to vary or expand Bank of America's obligations under the Federal Rules of Civil Procedure.

7.      In addition to the General Objections set forth above, Bank of America objects to the definitions in paragraphs 16, 17, and 18 of the Definitions ("Identify") as vague, confusing, unduly burdensome (in particular to the extent that they request "the substance in detail of" documents and communications) and to the extent they purport to vary or expand Bank of America's obligations under the Federal Rules of Civil Procedure.

## OBJECTIONS TO THE GENERAL PROVISIONS AND INSTRUCTIONS

1.      Bank of America objects to the General Provisions and Instructions to the extent that they purport to vary or expand Bank of America's obligations under the

7

Federal Rules of Civil Procedure, the Local Rules of the United States District Court for the District of Maryland, or any other applicable law or rule.

2.      In addition to the General Objections set forth above, Bank of America objects to paragraph 2 of the General Provisions and Instructions as grossly overbroad and unduly burdensome and to the extent it seeks information not relevant to the satisfaction of any judgment against Iran or the other judgment debtors in favor of the parties seeking such discovery or to any party's claim or defense in these proceedings and not reasonably calculated to lead to the discovery of admissible evidence.

3.      In addition to the General Objections set forth above, Bank of America objects to paragraph 5 of the General Provisions and Instructions as grossly overbroad and unduly burdensome, as it could seemingly extend to all of Bank of America's agents and representatives.

## RESPONSES AND OBJECTIONS TO THE INTERROGATORIES

**Interrogatory No. 1:** Identify all persons who provided information for all or any part of your answers to these interrogatories and, for each person named, state the interrogatory or interrogatories in response to which such person provided information.

**Response to Interrogatory No. 1:**

Subject to the General Objections set forth above, Bank of America objects to Interrogatory No. 1 on the grounds that it is overly broad and seeks information not relevant to the satisfaction of any judgment against Iran or the other judgment debtors, and is not reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiving the foregoing objections, Denis Caldera, Senior Risk Manager, Bank of America's Economic Sanctions Compliance Group, coordinated the gathering of information in order to respond to the Interrogatories.

8

**Interrogatory No. 2:** Identify any and all Blocked Accounts located at the Bank.  For each blocked account, please provide the account number, full name on the account, the full address of the account holder, the name of any authorized signatories, and the current account balance.

**Response to Interrogatory No. 2:**

Subject to the General Objections set forth above, Bank of America objects to

Interrogatory No. 2 on the grounds that it is vague and ambiguous, overly broad and

unduly burdensome, and seeks documents and information not relevant to the satisfaction

of a judgment against Iran or the other judgment debtors.  Nor is it reasonably calculated

to lead to the discovery of admissible evidence.  Subject to and without waiving the

foregoing objections, Bank of America is prepared to produce, and attaches hereto as

Exhibit A, a schedule of accounts, blocked wire transfers or other property blocked on the

books of Bank of America at one of its offices in the United States pursuant to

regulations issued by OFAC that reflects blocked accounts, wire transfers or property

valued at or reflecting balances that amounted to or involved $5,000.00 or more at the

time of blocking in which (a) the Islamic Republic of Iran ("Iran"), (b) one of the other

judgment debtors, (c) any Specially Designated National of Iran, (d) an agency or

instrumentality of Iran, or (e) some other Iranian government entity that is believed, on

information and belief, to have a blockable interest in the blocked accounts, wire

transfers or property within the meaning of OFAC regulations.  Bank of America believes

that the information on the schedule should provide all or substantially all the information

the judgment creditors garnishors will need to make a preliminary determination as to

whether any of the scheduled property is subject to execution, and therefore object to the

production of the underlying documents at this time.  To the extent, however, that the

judgment creditors require any further information in order to determine whether Iran,

any of the judgment creditors, or any agency or instrumentality of Iran, has an interest in

any of the blocked accounts, wire transfers or items of property that would render it

subject to execution under the Foreign Sovereign Immunities Act of 1976 and the law of

Maryland, Bank of America will promptly produce the underlying documents upon the

designation, by the judgment creditors based on their review of the annexed schedule, of

any specific account, blocked wire transfer, or item of property as to which they need

such documentation, including, without limitation, the SWIFT messages or other

documents reflecting the transaction or account designated.  Only specially authorized

Bank of America OFAC compliance personnel have control or signing authority over

these accounts, which are subject to regulation by the U.S. Treasury Department's Office

of Foreign Assets Control ("OFAC").

**Interrogatory No. 3:** Identify all accounts located at the Bank in which Iran, as defined
above, owns or has an interest, direct or indirect. For each account, please provide the
account number, full name on the account, the full address of the account holder, the
name of any authorized signatories, and the current account balance.

**Response to Interrogatory No. 3:**

Subject to the General Objections set forth above, Bank of America objects to

Interrogatory No. 3 on the grounds that it is vague and ambiguous, overly broad and

unduly burdensome, and seeks documents and information not relevant to the satisfaction

of any judgment against Iran and the other judgment debtors.  Nor is it reasonably

calculated to lead to the discovery of admissible evidence.  Subject to and without

waiving the foregoing objections, Bank of America is prepared to produce, and attaches

hereto as Exhibit A, a schedule of accounts, blocked wire transfers or other property

blocked on the books of Bank of America at one of its offices in the United States

pursuant to regulations issued by OFAC that reflects blocked accounts, wire transfers or

property valued at or reflecting balances that amounted to or involved $5,000.00 or more

at the time of blocking in which (a) the Islamic Republic of Iran ("Iran"), (b) one of the

other judgment debtors, (c) any Specially Designated National of Iran, (d) an agency or

instrumentality of Iran, or (e) some other Iranian government entity that is believed, on

information and belief, to have a blockable interest in the blocked accounts, wire

transfers or property within the meaning of OFAC regulations. Bank of America believes

that the information on the schedule should provide all or substantially all the information

the judgment creditors garnishors will need to make a preliminary determination as to

whether any of the scheduled property is subject to execution, and therefore object to the

production of the underlying documents at this time. To the extent, however, that the

judgment creditors require any further information in order to determine whether Iran,

any of the judgment creditors, or any agency or instrumentality of Iran, has an interest in

any of the blocked accounts, wire transfers or items of property that would render it

subject to execution under the Foreign Sovereign Immunities Act of 1976 and the law of

Maryland, Bank of America will promptly produce the underlying documents upon the

designation, by the judgment creditors based on their review of the annexed schedule, of

any specific account, blocked wire transfer, or item of property as to which they need

such documentation, including, without limitation, the SWIFT messages or other

documents reflecting the transaction or account designated.

**Interrogatory No. 4:** Identify any and all Blocked Wire Transfers located at the Bank.
For each Blocked Wire Transfer, please provide the full name and address of the (a)

11

originator, (b) originating bank, (c) beneficiary, and (d) beneficiary bank. In addition, please provide the amount of the Blocked Wire Transfer.

**Response to Interrogatory No. 4:**

In addition to the General Objections set forth above, Bank of America objects to Interrogatory No. 4 on the grounds that it is vague and ambiguous, as well as overly broad and unduly burdensome, and seeks documents and information not relevant to the satisfaction of any judgment against Iran or the other judgment debtors. Subject to and without waiving the foregoing objections, Bank of America is prepared to produce, and attaches hereto as Exhibit A, a schedule of accounts, blocked wire transfers or other property blocked on the books of Bank of America at one of its offices in the United States pursuant to regulations issued by OFAC that reflects blocked accounts, wire transfers or property valued at or reflecting balances that amounted to or involved $5,000.00 or more at the time of blocking in which (a) the Islamic Republic of Iran ("Iran"), (b) one of the other judgment debtors, (c) any Specially Designated National of Iran, (d) an agency or instrumentality of Iran, or (e) some other Iranian government entity that is believed, on information and belief, to have a blockable interest in the blocked accounts, wire transfers or property within the meaning of OFAC regulations. Bank of America believes that the information on the schedule should provide all or substantially all the information the judgment creditors garnishors will need to make a preliminary determination as to whether any of the scheduled property is subject to execution, and therefore object to the production of the underlying documents at this time. To the extent, however, that the judgment creditors require any further information in order to determine whether Iran, any of the judgment creditors, or any agency or instrumentality

12

of Iran, has an interest in any of the blocked accounts, wire transfers or items of property

that would render it subject to execution under the Foreign Sovereign Immunities Act of

1976 and the law of Maryland, Bank of America will promptly produce the underlying

documents upon the designation, by the judgment creditors based on their review of the

annexed schedule, of any specific account, blocked wire transfer, or item of property as

to which they need such documentation, including, without limitation, the SWIFT

messages or other documents reflecting the transaction or account designated.

**Interrogatory No. 5:** Identify any and all Society for Worldwide Interbank Financial
Telecommunication ("SWIFT") messages and/or wire transfer instructions that were
included with and were a part of the Blocked Wire Transfers.

**Response to Interrogatory No. 5:**

Bank of America objects to a listing of the underlying SWIFT message on the

ground that doing so would be unduly burdensome.  Subject to this objection, and as

indicated in response to several Interrogatories and Document Requests, Bank of

America believes that the essential information that can be derived from a SWIFT

message is reflected on the annexed schedule.  That notwithstanding, Bank of America is

prepared to produce the SWIFT message or messages in respect of any blocked account if

requested to do so by the judgment creditors garnishors following the review of the

annexed schedule.

**Interrogatory No. 6:** Identify any and all Process served on the Bank by other judgment creditors of Iran relating to the attachment of assets of Iran.  For each process, identify, (a) the judgment creditor(s) who served the Process, (b) the type of Process, (c) the date of service of the Process, and (d) what, if any, information was provided to the judgment creditor(s).

**Response to Interrogatory No. 6:**

Subject to and without waiving the foregoing objections, including the objection

to the Definition of "Process," Bank of America objects to Interrogatory No. 6 on the

grounds that it is vague and ambiguous, grossly overbroad, and unduly burdensome,

seeks documents and information not relevant to the satisfaction of any judgment against

Iran or any of the other judgment debtors, and is not reasonably calculated to lead to the

discovery of admissible evidence.  Subject to and without waiving the foregoing

objections, Bank of America states, upon information and belief, that it has been served

with Process by judgment creditors in the following actions:

1.      Notices Pursuant to 28 U.S.C. § 1605A(g) [sic] of Pending Action and of

Lien of Lis Pendens in:

        (a)      Rizwan Khaliq, et al. v. Republic of Sudan, et al.
                  Misc. No. 11-misc-00036 (S.D.N.Y. Feb. 15, 2011), as related to
                  Civil Action No. 10-CV-356 (JDB) (D.D.C.);

        (b)      James Owen, et al. v. Republic of Sudan, et al.
                  Misc. No. 11-misc-00037 (S.D.N.Y. Feb. 15, 2011), as related to
                  Civil Action No. 1:01-CV-02244 (JDB) (D.D.C.); and

        (c)      Judith Absi Mwila, et al. v. The Islamic Republic of Iran, et al.
                  Misc. No. 11-misc-00038 (S.D.N.Y. Feb. 15, 2011), as related to
                  Civil Action No. 1:08-CV-01377 (JDB) (D.D.C.)

2.      Deposition Subpoena in Carlos Acosta, et al. v. Islamic Republic of Iran,

et al., 2:09-MC-00101-JAM-GGH (E.D. Cal., Sac. Div., Apr. 21, 2011).

14

**Interrogatory No. 7:** Identify all accounts located at the Garnishee held in the name of Iran (as defined above).  For each account, please provide the account number, full name on the account, the full address of the account holder, the name of any authorized signatories, and the current account balance.

**Response to Interrogatory No. 7:**

Subject to the General Objections set forth above, Bank of America objects to

Interrogatory No. 8 on the grounds that it is repetitive, vague and ambiguous, as well as

overly broad and unduly burdensome.  Subject to and without waiving the foregoing

objections, Bank of America is prepared to produce, and attaches hereto as Exhibit A, a

schedule of accounts, blocked wire transfers or other property blocked on the books of

Bank of America at one of its offices in the United States pursuant to regulations issued

by OFAC that reflects blocked accounts, wire transfers or property valued at or reflecting

balances that amounted to or involved $5,000.00 or more at the time of blocking in which

(a) the Islamic Republic of Iran ("Iran"), (b) one of the other judgment debtors, (c) any

Specially Designated National of Iran, (d) an agency or instrumentality of Iran, or (e)

some other Iranian government entity that is believed, on information and belief, to have

a blockable interest in the blocked accounts, wire transfers or property within the

meaning of OFAC regulations. Bank of America believes that the information on the

schedule should provide all or substantially all the information the judgment creditors

garnishors will need to make a preliminary determination as to whether any of the

scheduled property is subject to execution, and therefore object to the production of the

underlying documents at this time.  To the extent, however, that the judgment creditors

require any further information in order to determine whether Iran, any of the judgment

creditors, or any agency or instrumentality of Iran, has an interest in any of the blocked

accounts, wire transfers or items of property that would render it subject to execution

under the Foreign Sovereign Immunities Act of 1976 and the law of Maryland, Bank of

America will promptly produce the underlying documents upon the designation, by the

judgment creditors based on their review of the annexed schedule, of any specific

account, blocked wire transfer, or item of property as to which they need such

documentation, including, without limitation, the SWIFT messages or other documents

reflecting the transaction or account designated.

**Interrogatory No. 8:** Identify all assets in the possession, custody and/or control of the
Garnishee in which Iran (as defined above) has an interest. Include in your response the
location of the assets identified.

**Response to Interrogatory No. 8:**

Subject to the General Objections set forth above, Bank of America objects to

Interrogatory No. 8 on the grounds that it is repetitive, vague and ambiguous, as well as

overly broad and unduly burdensome. Subject to and without waiving the foregoing

objections, Bank of America is prepared to produce, and attaches hereto as Exhibit A, a

schedule of accounts, blocked wire transfers or other property blocked on the books of

Bank of America at one of its offices in the United States pursuant to regulations issued

by OFAC that reflects blocked accounts, wire transfers or property valued at or reflecting

balances that amounted to or involved $5,000.00 or more at the time of blocking in which

(a) the Islamic Republic of Iran ("Iran"), (b) one of the other judgment debtors, (c) any

Specially Designated National of Iran, (d) an agency or instrumentality of Iran, or (e)

some other Iranian government entity that is believed, on information and belief, to have

a blockable interest in the blocked accounts, wire transfers or property within the

meaning of OFAC regulations. Bank of America believes that the information on the

16

schedule should provide all or substantially all the information the judgment creditors

garnishors will need to make a preliminary determination as to whether any of the

scheduled property is subject to execution, and therefore object to the production of the

underlying documents at this time.  To the extent, however, that the judgment creditors

require any further information in order to determine whether Iran, any of the judgment

creditors, or any agency or instrumentality of Iran, has an interest in any of the blocked

accounts, wire transfers or items of property that would render it subject to execution

under the Foreign Sovereign Immunities Act of 1976 and the law of Maryland, Bank of

America will promptly produce the underlying documents upon the designation, by the

judgment creditors based on their review of the annexed schedule, of any specific

account, blocked wire transfer, or item of property as to which they need such

documentation, including, without limitation, the SWIFT messages or other documents

reflecting the transaction or account designated.

**Interrogatory No. 9:** Identify the department(s) at the Bank responsible for reporting
Blocked Assets and Blocked Wire Transfers to OFAC and provide the (a) address(es)
where the department(s) is/are located; (b) name(s) of the employee(s) responsible for
overseeing the Blocked Assets and Blocked Wire and reporting the same to OFAC; and (c)
the address of the Bank branch and/or office where the employee(s) are located.

**Response to Interrogatory No. 9:**

Subject to the General Objections set forth above, Bank of America states that the

department responsible for reporting Blocked Assets and Blocked Wire Transfers (as

those terms are defined, subject to Bank of America's objections, in the Definitions) to

OFAC is Bank of America's Economic Sanctions Compliance Group, and one of the

officers among others responsible for overseeing the Blocked Assets and Blocked Wire

17

Transfers and reporting the same to OFAC, is Denis Caldera, Senior Risk Manager, Bank

of America's Economic Sanctions Compliance Group.

**Interrogatory No. 10:** Identify the branch location of the Bank where each of the
Blocked Assets is located.

**Response to Interrogatory No. 10:**

Subject to the General Objections set forth above, and to Bank of America's

objections as to the definition of Blocked Assets, the schedule attached hereto as Exhibit

A identifies the situs of each blocked account listed on Exhibit A.

**Interrogatory No. 11:** Identify the branch location of the Bank where each of the
Blocked Wire Transfers is located.

**Response to Interrogatory No. 11:**

Subject to the General Objections set forth above, and to Bank of America's

objection as to the definition of Blocked Wire Transfers, the schedule attached hereto at

Exhibit A identifies the Bank of America situs of each blocked account listed on Exhibit

A.

Dated:   Baltimore, Maryland
         June 2, 2011

MILES & STOCKBRIDGE P.C.

By:   _____

E. Hutchinson Robbins, Jr. (#11927)
Todd M. Reinecker (#27028)

10 Light Street
Baltimore, MD  21202
Tel:  (410) 727-6464
Fax:  (410) 285-3700
erobbins@milesstockbridge.com
treinecker@milesstockbridge.com

*Attorneys for Garnishee*

To: Richard M. Kremen (#00532)
    Dale K. Cathell (#26924)
    David B. Misler (#28828)
    DLA Piper LLP (USA)
    6225 Smith Avenue
    Baltimore, MD 21209
    Tel: (410) 580-3000
    Fax: (410) 580-3001

*Attorneys for Judgment Creditors-*
*Garnishors*

## VERIFICATION

STATE OF NORTH CAROLINA )

                        : ss

COUNTY OF MECKLENBURG  )

       Denis Caldera, being duly sworn, deposes and says:

       That he is an employee of Bank of American, National Association, that he has

read the foregoing Responses and Objections of Garnishee Bank of America, National

Association, to the First Set of Interrogatories of Judgment Creditors Garnishors Estate of

Michael Heiser, et al., and that the Responses to such Interrogatories are true to the best

of his knowledge, information and belief.

Dénis Caldera .

Sworn to before me this
Second day of June, 2011.

Notary Public

DAVID M WALLACE, JR
NOTARY PUBLIC
MECKLENBURG COUNTY
NORTH CAROLINA
MY COMMISSION EXPIRES APR. 11, 2015

# EXHIBIT E

## IN THE UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF COLUMBIA

| | |
|---|---|
| ESTATE OF MICHAEL HEISER, *et al.,* | |
| Plaintiffs, | |
| v. | |
| ISLAMIC REPUBLIC OF IRAN, *et al.,* | Case No.:    00-CV-02329 (RCL) |
| Defendants. | **Consolidated with** |
| ESTATE OF MILLARD D. CAMPBELL, *et al.,* | |
| Plaintiffs, | Case No.: 01-CV-02104 (RCL) |
| v. | |
| ISLAMIC REPUBLIC OF IRAN, *et al.* | |
| Defendants. | |

## AFFIDAVIT OF PATRICK L. CLAWSON, PHD

I, Patrick L. Clawson, PhD, being duly sworn, do hereby swear and affirm under penalty of perjury that the contents of this Affidavit are true and correct to the best of my knowledge, information, and belief:

1.      I am an adult citizen of the District of Columbia.

2.      I have extensively studied and researched and am an expert on the Islamic Republic of Iran ("Iran"), its sponsorship of terrorism, its economy and its politics.

3.      This affidavit is submitted to provide the Court with facts and evidence confirming that the entities allegedly holding interest in the various accounts and funds identified on Exhibits A and B to the Motion for Judgment Against Garnishees Bank of America, N.A. and Wells Fargo Bank, N.A. and for Turnover of Funds filed by the Estate of Michael Heiser, et al., are agencies and/or instrumentalities of the Islamic Republic of Iran, the Iranian Ministry of

Information and Security ("MOIS"), and/or the Iranian Islamic Revolutionary Guard Corps. ("IRGC") (collectively, "Iran").

4.     I am Director of Research of the Washington Institute for Near East Policy, where I have been employed since 1997. My previous positions include five years as senior research professor at the Institute for National Strategic Studies of the National Defense University and senior economist for four years each at the Foreign Policy Research Institute, the World Bank, and the International Monetary Fund. I have done contract consulting work about Iran for U.S. government agencies over the last twenty-five years, including the Central Intelligence Agency, the Defense Department, and the State Department Bureau of Intelligence and Research.

5.     As the Director of Research at the Washington Institute for Near East Policy, a think tank focusing on contemporary issues of the Middle East, I supervise a staff of about twenty senior researchers who study Middle East politics and terrorism, with considerable focus on Iran. I also brief and receive briefings from senior United States military officials and senior officials of other governments friendly to the United States, about Iran.

6.     I have previously been designated and qualified by federal courts as an expert witness on issues relating to Iran, Iran's support for terrorism, its economy and other issues, and have given live or written testimony in various cases brought against Iran for its sponsorship of terror, including:

        a.     *Cicippio v. Islamic Republic of Iran*, U.S.D.C., D.C. No. 96-01805 (1996);

        b.     *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 8-9 (D.D.C. 1998);

        c.     *Cronin v. Islamic Republic of Iran*, U.S.D.C., D.C. No. 99-02890 (1999);

        d.     *Higgins v. Islamic Republic of Iran*, U.S.D.C., D.C. No. 99-00377 (1999);

2

e.  *Stethem v. Islamic Republic of Iran*, U.S.D.C., D.C. No. 00-00159 (2000);

f.  *Hegna v. Islamic Republic of Iran*, U.S.D.C., D.C. No. 00-00716 (2000);

g.  *Anderson v. Islamic Republic of Iran*, 90 F. Supp. 2d 107, 112-113 (D.D.C. 2000);

h.  *Eisenfeld v. Islamic Republic of Iran*, 172 F. Supp. 2d 1, 5 (D.D.C. 2000);

i.  *Elahi v. Islamic Republic of Iran*, U.S.D.C., D.C. No. 99-02802 (1999);

j.  *Wagner v. Islamic Republic of Iran*, U.S.D.C., D.C. No. 00-01799 (2000);

k.  *Polhill v. Islamic Republic of Iran*, U.S.D.C., D.C. No. 00-01798 (2000);

l.  *Mousa v. Islamic Republic of Iran*, 238 F. Supp. 2d 1, 3-4 (D.D.C. 2001);

m.  *Rafii v. Islamic Republic of Iran*, U.S.D.C., D.C. No. 01-850 (2001);

n.  *Kerr v. Islamic Republic of Iran*, U.S.D.C., D.C. No. 01-01994 (2001);

o.  *Surette v. Islamic Republic of Iran*, U.S.D.C., D.C. No. 01-00570 (2001);

p.  *Weinstein v. Islamic Republic of Iran*, 184 F. Supp. 2d 13, 19 (D.D.C. 2002);

q.  *Ungar v. Islamic Republic of Iran*, 211 F. Supp. 2d 91, 93 (D.D.C. 2002);

r.  *Stern v. Islamic Republic of Iran*, 271 F. Supp. 2d 286, 288 (D.D.C. 2003);

s.  *Rieger v. Islamic Republic of Iran*, 281 F. Supp. 2d 87, 90 (D.D.C. 2003);

t.  *Campuzano v. Islamic Republic of Iran*, 281 F. Supp. 2d 258, 262 (D.D.C. 2003);

u.  *Greenbaum v. Islamic Republic of Iran*, No. 02-2148, 2006 WL 2374241 at *3 (D.D.C. Aug. 10, 2006); and

v.  *Levin v. Islamic Republic of Iran*, U.S.D.C. No. 05-2494 (2007), among others.

7.  My books and monographs include: *The Perfect Handshake with Iran: Prudent Military Strategy and Pragmatic Engagement Policy* (The Washington Institute, 2010); Much

3

Traction from Measured Steps: The Iranian Opposition, the Nuclear Issue, and the West (The Washington Institute, 2010); Engaging Iran: Lessons from the Past (The Washington Institute for Near East Policy, 2009, edited); *The Last Resort: Consequences of Preventive Military Action Against Iran* (The Washington Institute, 2008, with Michael Eisenstadt); *Eternal Iran: Continuity and Chaos* (Palgrave Press, 2005, with Michael Rubin); *Getting Ready for a Nuclear-Ready Iran* (U.S. Army War College, 2005, with Henry Sokolski, edited); *Checking Iran's Nuclear Ambitions* (U.S. Army War College, 2004, with Henry Sokolski, edited); *Iran Under Khatami* (The Washington Institute for Near East Policy, 1998, with others); *Strategic Assessment*, (the flagship annual report of the Institute for National Strategic Studies of the National Defense University, which I inaugurated and edited for three years 1995-1997); *U.S. Sanctions on Iran* (Emirates Centre for Strategic Studies and Research, 1997); *Business As Usual? Western Policy Options Towards Iran* (American Jewish Committee, 1995); *Energy Security in the Twenty-ain First Century* (National Defense University Press, 1995, edited); *Iran's Strategic Intentions and Capabilities* (National Defense University Press, 1994, edited); and *Iran's Challenge to the West: How, When, and Why* (the Washington Institute for Near East Policy, 1993).

8.      My Ph.D. in economics is from the New School for Social Research and my B.A. is from Oberlin College. I am able to read and/or speak Persian and French as well as some Hebrew, Spanish, and German. I read the Iranian press regularly through the internet. I also read other publications from Iran, including books in Persian.

9.      As part of my training and professional experience, I am knowledgeable about international banks, banking, and commercial activities. I have a particular interest in and

4

specialized knowledge concerning accounts, wire transfers and other transactions which involve assets blocked by the division of the United States Treasury called the Office of Foreign Assets Control ("OFAC"). I have expertise in the procedures and effects of OFAC's regulations blocking assets held by United States banks both in the United States and in their foreign offices, specifically those involving statutes and regulations enacted to protect United States citizens who are victims of terrorism, including state sponsors of terrorism. I am knowledgeable concerning bank charters and ownership of banks both in the United States and internationally, particularly with respect to national or state owned banks in the Islamic Republic of Iran ("Iran"), and I am also knowledgeable about the identities of agencies and instrumentalities of the Iran, including nationally owned banks, oil companies and other commercial entities.

10.     My knowledge of Iran's economy comes as a result of my routine and in-depth access to facts concerning Iran and my extensive study of Iran as outlined herein, including my professional research and publishing in this field over the course of many years. Iran is a relatively open information country in which the competing political forces frequently reveal information about the country's economy and debate the economic situation and government economic policy; Iran has many internet sites that publish information on these subjects. From my years studying Iranian politics and given the competing sources which can be compared, I believe that I am able to determine whether Iranian reports on these subjects are credible. Indeed, I use this information as a source to brief the United States and other governments.

11.     My opinions set forth below are based upon my education, research, and experience, as well as my review and analysis of documents typically relied upon by experts in my field. Such basis includes, but is not limited to: official speeches made by Iranian officials,

5

U.S. officials, and the officials of other countries; my conversations with U.S. officials, former Iranian officials, and officials of other countries; and my review and analysis of relevant documents, including newspaper accounts (in both the English-language press and Persian language press).

### Information on Particular Entities

12.   **Iranian Navy.**  The Iranian Navy is as much as institution of the government of the Islamic Republic of Iran as the U.S. Navy is of the U.S. government.  That fact is widely known in security and economic circles interested in Iran and in Iranian government finance.

13.   **Iranian Islamic Revolutionary Guards** ("IRGC").  The IRGC's role as a government institution charged with safeguarding the Islamic Revolution is set forth in Iran's constitution.  The IRGC comes directly under Iran's Supreme Leader, the official charged in the constitution with supervising all government activities and given extensive authorities, such as being commander-in-chief and authorized to dismiss the president and override any law. Because it comes directly under the Supreme Leader, the IRGC does not answer to the president or the Majlis (parliament), which makes its status within the Iranian government quite privileged. In recent years, the IRGC has asserted increasing influence in the Iranian economy, politics, and society.  Among other things, the IRGC set up a firm Khatam al-Anbia which it directly owns and controls, which has won multi-billion dollar government contracts. That the IRGC is an institution mandated by the Iranian constitution is a fact well known in circles following Iranian security and government finances.

14.   **SedIran Drilling Company.**  The Iran - United States Claims Tribunal, an international judicial body located in the Hague, Netherlands, established by the January 20,

6

1981 Algiers Accord which freed the hostages from the U.S. Embassy, made an important decision in 1986 about the SedIran Drilling Company. The Tribunal held that the August 2, 1980 order by the Iranian government transferring the ownership shares in SedIran Drilling Company of SEDCO, a U.S. firm, constituted a nationalization of the company. In a much cited and hotly contested decision, the Tribunal established how much compensation SEDCO was due for this nationalization. Since the early 1980s, little if anything has been heard from SedIran Drilling Company. My impression is that it was folded into the very active National Iranian Drilling Company, another entity owned by the Iranian government which was established in 1980, but I have been unable to confirm that. However, it is my expert opinion that SedIran Drilling Company is an organ of Iran, is controlled by Iran, and the majority of its shares are owned by Iran.

15.  **"Iran Marine and Industrial"** is presumably the large Iranian firm, Iran Marine Industries, known usually by its Persian initials SADRA. On April 25, 2009, 51.18% of SADRA's shares were sold to a consortium controlled by IRGC's Khatam al-Anbia force (http://www.payvand.com/news/10/mar/1213.html). This episode was much commented on in Iran, because it was seen as an important step in the process of IRGC asserting influence in Iranian society. Khatam al-Anbia was already bitterly resented by many in the Iranian business community for muscling in on multi-billion dollar government contracts, which it won even when it was in little position to provide the needed services. The IRGC was increasingly asserting its power; indeed, less than two months later, millions of protestors filled Tehran's streets complaining that the presidential election had been rigged to assure victory of the candidate supported by the IRGC. Shortly thereafter, an IRGC-affiliated firm purchased

7

majority interest in Iran's largest non-oil firm, its highly profitable telecommunications company, under highly favorable firms, after the only other bidder was disqualified on national security grounds.  Based on this information, it is my expert opinion that Iran Marine and Industrial also known as Iran Marine Industries is an organ of Iran, is controlled by Iran, and the majority of its shares are owned by Iran.

16.   **Khazar Shipping**.  Khazar Shipping is widely known in business circles as a wholly-owned subsidiary of the Islamic Republic of Iran Shipping Lines (IRISL). Its website in Persian, http://www.khazarshipping.ir/fa/, refers to the firm's ships as part of the "national fleet," a Persian term which implies government ownership rather than simply flying the Iranian flag. No direct reference is made on the website or on other material I was able to locate to the firm's ownership.  However, based upon this information, it is my expert opinion that Khazar Shipping is an organ of Iran, is controlled by Iran, and the majority of its shares are owned by Iran.

17.   IRISL is widely known in business circles as a company owned and controlled by the Iranian government.  The Iranian government has announced that it plans to "privatize" most government-owned companies. In general, the privatization process is not transparent; it is difficult to get information about which firms have been or will be affected.  Furthermore, in several important cases, it appears that the "privatization" has consisted of selling government-owned firms largely to entirely to government-controlled entities, such as the pension plans of government-controlled firms or to heavily regulated insurance firms. It is by no means clear to what extent such "privatized" entities are able to make decisions independent of government regulation.   Iranian President Mahmood Ahmadinejad has asserted his authority to control theoretically independent entities, such as the Central Bank of Iran, irrespective of clear

8

provisions of law which set out such entities independent legal existence and establish their governance. Ahmadinejad speaks often of giving orders to banks, which he clearly thinks apply to banks that appear to have been "privatized." The combination of tight government regulation and behind-the-scenes ownership has left many firms, including the major banks, in effect so closely controlled by the government that they are best described as under de facto government ownership even if in some cases these firms have been nominally privatized. The management of IRISL, the parent company of Khazar Shipping, has for many years expressed a desire for the company to be privatized. However, there is no clear indication that any such privatization has taken place. None of the information made available by IRISL on its website in English or Persian refers to any such privatization. Accordingly, it is my expert opinion that IRISL is an organ of Iran, is controlled by Iran, and the majority of its shares are owned by Iran.

18. **Export Development Bank of Iran ("EDBI")**. The Central Bank of Iran's website lists EDBI as a specialized government bank. EDBI is widely known in banking and business circles as a state owned, specialist export and import bank created to increase non-oil exports from Iran and develop international trade. EBDI is active in promoting Iran's non-oil exports and trade with Iran's neighbors. Along with all of its branches worldwide, EDBI was added to the Specially Designated National (SDN) list maintained by the U.S. Department of the Treasury's Office of Foreign Assets Control (OFAC) on October 22, 2008, freezing its assets under U.S. jurisdiction and prohibiting transactions with U.S. parties, pursuant to Executive Order 13382, which targets proliferators of weapons of mass destruction (WMD) and their delivery. Accordingly, it is my expert opinion that EDBI is an organ of Iran, is controlled by Iran, and the majority of its shares are owned by Iran.

9

19.   **Iran Air.**   Iran Air was established in 1961 as a fully government-owned company and has continued to be fully government owned.  On several occasions since 2007, Iran Air or the Iranian government have announced plans to privatize Iran Air.  Most recently, in August 2011, Iran Air chairman Farhad Parvaresh announced Iran Air might be purchased by a "quasi-government         corporation"         on         September         20,         2011 (http://travel.usatoday.com/alliance/flights/boardingarea/post/2011/08/Flying-With-Fish---Iran-Seeks-To-Privatize-Iran-Air-to-Skirt-US-Sanctions/416265/1).  That does not appear to have happened.  In any case, the phrase "quasi-government corporation" suggests that any action taken might not in fact transfer ownership and control from the government.  Accordingly, it is my expert opinion that Iran Air is an organ of Iran, is controlled by Iran, and the majority of its shares are owned by Iran.

20.   **Bank Melli Iran and Bank Melli PLC UK (also know as Melli Bank PLC).**  Bank Melli Iran is listed on the Central Bank of Iran's website as a "commercial government-owned bank."  Bank Melli Iran was established as a government-owned bank in 1930; it was responsible for issuing Iran's currency from 1931 to 1960, when the Central Bank of Iran was established.  The most recent financial report on Bank Melli's website, in either English or Persian is the 2008/09 report, available in a serviceable if awkward English at http://www.bmi.ir/Fa/uploadedFiles/FinanceReportFiles/2011_2_13/f97c06b161__2752675b48. pdf, which states, "The capital is completely owned by the Government of the Islamic Republic of Iran." I am unaware of any proposals to privatize Bank Melli Iran.  That Bank Melli Iran is owned by the Iranian government is well known to those interested in Iranian banking and business.  According to its own website, Bank Melli PLC UK is the London branch of Bank

10

Melli    Iran    and    is    wholly-owned    by    Bank    Melli    Iran.    *See* http://www.mellibank.co.uk/AboutUs.aspx (last visited on November 7, 2011). Moreover, it is common knowledge among experts in international banking and commerce that Bank Melli PLC UK is wholly owned by Bank Melli. Accordingly, it is my expert opinion that Bank Melli PLC UK is an organ of Iran, is controlled by Iran, and the majority of its shares are owned by Iran.

21.    **Bank Sepah**. Bank Sepah is one of Iran's oldest banks, having been established in 1925 to service government officials. It was privatized in 1953 and then, as noted on its English website, http://www.banksepah.ir/English/default-450.aspx, nationalized in 1980. Neither that website nor any other source I could locate referred to any change in ownership or any plans to privatize Bank Sepah. The most recent annual report on the Persian website, for 2006/07, makes no reference I could locate to ownership. Accordingly, it is my opinion that Bank Sepah is an organ of Iran, is controlled by Iran, and the majority of its shares are owned by Iran.

22.    **Bank Saderat Iran** ("BSI"). One of Iran's largest banks, Bank Saderat was directly and completely owned by the government of Iran from 1979 to 2009. The 2009-10 Annual    Report    of    Bank    Sedarat,    available    in    English    at http://in.bsi.ir/PortalData/Subsystems/StaticContent/uploads/Image/En/File/Final%20BSI%20An nual%20Report.pdf, states, "Upon Ministry of Finance and Economic Affairs' approval to sell BSI [Bank Sedarat Iran] stock, 6% was sold on June 9, 2009, 5% was assigned to BSI staff, 40% to Provincial Investment Co and the remaining 49% stayed with the government." On this basis, BSI and the Central Bank of Iran describe Bank Sedarat on their websites and press releases as a private bank.    The 2010-11 Annual Report of Bank Sedarat, available in English at

11

http://in.bsi.ir/PortalData/Subsystems/StaticContent/uploads/Image/En/File/BSI-2010-2011.pdf,
states that its ownership is 40% by "Provincial Investment Co," 27.7% by the Islamic Republic
of Iran government, 17.1% by "legal entities," 10.2% by individuals, and 5.% by "BSI's staff." I
verify that the English translation of the information draw from those two reports is an accurate
account of the information in the Persian Annual Reports.

23.     The Iranian Privatization Organization, an agency of the government of Iran,
describes on its website, http://www.en.ipo.ir/index.aspx?siteid=83&pageid=305, the "Provincial
Investment Companies" which were established pursuant to the decree of the Council of
Ministers (i.e., Iran's Cabinet) in its meeting of November 12, 2006, based on proposal No.
31168 of the Ministry of Economics and Finance.  That decree, printed in English on the
website, provides that some shares in state companies are to be available for purchase by
individuals on a ten-year installment program and that, until the shares are fully paid for, they are
to be managed by Provincial Investment Companies to be set up in each province and controlled
by a Headquarters in Tehran under a board made up entirely of senior government officials, most
of whom are cabinet ministers.  That is the body then which controls the 40% of Bank Saderat
shares held by Provincial Investment Companies.  Combined with the government's direct
27.7% share, that makes a 67.7% share under direct and indirect government control.
Accordingly, it is my expert opinion that BSI is an organ of Iran, is controlled by Iran, and the
majority of its shares are owned by Iran.

24.     **Bank Mellat Iran; Bank Mellat, Korea; Bank Mellat, Turkey; and Bank
Mellat, London (collectively, "Bank Mellat")**.  Bank Mellat was formed in 1979-80, after the
Islamic Revolution, by the merger of ten private banks.  It has long described itself as a private

12

bank, whereas economists, bankers, and those knowledgeable about the Iranian scene have concluded that it is in fact controlled by the government as directly and completely as the openly state-owned banks. Indeed, when the Iranian government decided in the 1990s to allow private banking, Iranian officials described the previous banking system – implicitly including Bank Mellat – as having been entirely government-owned. It is unclear what was the nominal ownership of Bank Mellat during those decades when Iran was widely described, including by Iranian government officials, as having a completely state-owned banking system. Bank Mellat does not make its annual report readily available, but its website does provide a link to the data of the Tehran Stock Exchange, http://www.tsetmc.com/loader.aspx?ParTree=111C1412&inscode=778253364357513, which report on all 19 entities owning more than 1% of Bank Mellat's 16 billion shares. The four largest owners, with a cumulative 15.75% of the shares, are the Bank Mellat's workers' fund and three firms which, following through the links on the Tehran Stock Exchange website, also own significant parts of other banks said to have been privatized, especially Bank Saderat and Bank Tejarat.   Such interlinking ownership by investment funds is consistent with the pattern complained about by Iranian economists, businessmen, and journalists in which ownership over important institutions is superficially said to be in the hands of politically well-connected individuals, while effective control of the institution remains in the hands of government officials.

25.   Bank Mellat has been used to carry out some of the most sensitive national security transactions of the Iranian government.  UN Security Council Resolution 1929, adopted June 9, 2009, refers to Bank Mellat's role in Iran's activities banned by the Security Council:

13

"Over the last seven years, Bank Mellat has facilitated hundreds of millions of dollars in transactions for Iranian nuclear, missile, and defense entities." Along with all of its offices worldwide, Bank Mellat was added to the Specially Designated National (SDN) list maintained by the U.S. Department of Treasury's Office of Foreign Assets Control (OFAC) on October 25, 2007, freezing its assets under U.S. jurisdiction and prohibiting transactions with U.S. parties, pursuant to Executive Order 13382, which targets proliferators of weapons of mass destruction (WMD) and their delivery systems. Bank Mellat has been similarly designated by the European Union, with all EU banks being banned from conducting transactions with Bank Mellat.

26.     In my expert opinion the Iranian government would not entrust delicate national security transactions to Bank Mellat unless the Iranian government were confident it had considerable control over Bank Mellat. After all, were Bank Mellat run as a purely commercial venture, then the obvious course of action when faced with substantial loss of business because of U.S., EU, and UN actions would have been to get out of the business of facilitating transactions for Iranian nuclear, missile, and defense entities. Bank Mellat has taken no steps in that direction. Its UK branch has sued the UK government for information about why that government ordered the bank to cease transactions with Iran, but the UK government noted in its unsuccessful effort to block the release of that information that the Bank Mellat suit could expose the UK's intelligence sources and reveal the extent of its knowledge about Bank Mellat's activities. Bank Mellat has not to my knowledge offered to cease those activities which led the UK government to place restrictions on it. That seems inconsistent with the actions to be expected from a privately-owned bank.

14

27.     Neither in the UK court suit by Bank Mellat London nor in the statements by Bank Mellat and its officials complaining about restrictions placed upon Bank Mellat, Korea and Bank Mellat, Turkey by the governments of the Republic of Korea and of Turkey has Bank Mellat in any way contested that Bank Mellat Iran owns and controls Bank Mellat London; Bank Mellat, Korea; and Bank Mellat, Turkey. It is widely known in banking and business circles that those three banks are owned and controlled by Bank Mellat Iran.

28.     In short, Bank Mellat's actions and the clearly suspicious nature of the identity of the so-called owners of record leads to the conclusion that Bank Mellat is controlled by the Iranian government,. Accordingly, it is my expert opinion that Bank Mellat is an organ of Iran and is controlled by Iran.

*[signature page follows]*

15

In accordance with 28 U.S.C. § 1746, I declare under the penalty of perjury that the foregoing is true and correct.

Executed on:

14 November 2011

Patrick L. Clawson, PhD

Sworn and subscribed to before me

On this 14th day of November 2011

Notary Public

G. Ron Sessoms
Notary Public, District of Columbia
My Commission Expires 11/14/2015

16

EAST\47126652.2