**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| ESTATE OF MICHAEL HEISER, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 00-cv-2329 (RCL) |
| | ) | |
| ISLAMIC REPUBLIC OF IRAN, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | Consolidated With |
| | ) | |
| ESTATE OF MILLARD D. CAMPBELL, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 01-cv-2104 (RCL) |
| | ) | |
| ISLAMIC REPUBLIC OF IRAN, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**MEMORANDUM OPINION**

## I.    INTRODUCTION

On the night of June 25, 1996, a tanker truck crept quietly along the streets of Dhahran, coming to rest alongside a fence surrounding the Khobar Towers complex, a residential facility housing United States Air Force personnel stationed in Saudi Arabia.  A few minutes later, the truck exploded in a massive fireball that was, at the time, the largest non-nuclear explosion ever recorded on Earth.  The devastating blast—felt up to twenty miles away—sheared the face off Building 131 of the Khobar Towers complex and left a crater more than eighty-five feet wide and thirty-five feet deep.  The bombing killed nineteen U.S. military personnel and wounded

more than 100.  Subsequent investigations revealed that members of Hezbollah carried out the attack.

Four years after the bombing, plaintiffs—who are former service members injured in the attack, various family members, and the estates of those killed—brought suit under the "state-sponsored terrorism" exception to the Foreign Sovereign Immunities Act ("FSIA"), then codified at 28 U.S.C. § 1605(a)(7).  Plaintiffs alleged that the Islamic Republic of Iran ("Iran"), the Iranian Ministry of Information and Security ("MOIS"), and the Iranian Islamic Revolutionary Guard Corps ("IRG") provided material support and assistance to Hezbollah in carrying out the heinous attack.  Following Iran's failure to appear and plaintiffs' presentation of evidence to substantiate their claims, the Court found that "the Khobar Towers bombing was planned, funded, and sponsored by senior leadership in the government of the Islamic Republic of Iran; the IRGC had the responsibility and worked with Saudi Hizbollah to execute the plan; and the MOIS participated in the planning and funding of the attack." *Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229, 265 (D.D.C. 2006) ("*Heiser I*").[1]  The Court subsequently entered judgment against all defendants for $254 million in compensatory damages.  *Id*. at 356.

A few years later, Congress passed the National Defense Authorization Act for Fiscal Year 2008 ("NDAA" or the "2008 Amendments"), which replaced § 1605(a)(7) with a new state-sponsored terrorism exception codified at 28 U.S.C. § 1605A, permitted recovery of punitive damages, and added a new provision concerning the enforcement of judgments.  Pub. L. No. 110-181, § 1083, 122 Stat. 3, 338–44 (2008).  Invoking the NDAA's procedures for retroactive application, in 2009 the Court entered an amended judgment, holding defendants jointly and severally liable for an additional $36 million in compensatory damages and $300

---

[1] Hezbollah is synonymous with "Hizbollah," which is merely a "variant transliteration[] of the same name." *Oveissi v. Islamic Republic of Iran*, 498 F. Supp. 2d 268, 273 n.3 (D.D.C. 2007), *rev'd on other grounds*, 573 F.3d 835 (D.C. Cir. 2009).

million in punitive damages. *Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20, 31 (D.D.C. 2009) ("*Heiser II*").

Following entry of final judgment, plaintiffs began their journey down the often-frustrating and always-arduous path shared by countless victims of state-sponsored terrorism attempting to enforce FSIA judgments. On August 10, 2011, this Court ordered Sprint Communications Company LP to turn over $613,587.38 owed to the Telecommunication Infrastructure Company of Iran. *Heiser v. Islamic Republic of Iran*, 807 F. Supp. 2d 9 (D.D.C. 2011) (*Heiser III*).[2] While this clearly represented a victory for the plaintiffs, this Court noted that "the bleak reality is that today's decisions comes after more than a year of litigation and results in a turnover of funds amounting to less than one-tenth of one-percent of what plaintiffs are entitled to . . . ." *Id.* at 27.

The matter before the Court today requires exploration of two attempts by Congress to aid these victims: Terrorism Risk Insurance Act of 2002 § 201 ("TRIA"), and FSIA § 1610(g). In accordance with these statutes, plaintiffs ultimately seek the turnover of funds held in various blocked accounts at Wells Fargo, N.A, and Bank of America, N.A. (collectively, "the Banks"). The Banks respond in two ways: first, the Banks argue that the TRIA and FSIA require that the terrorist party—Iran—have an "ownership interest" in the blocked funds in order for them to be subject to execution; second, for those accounts in which Iran does have an ownership interest, the Banks argue that they should be permitted to file an interpleader complaint to account for potential third-party interests in the blocked funds. The Court first reviews the regime of legal and regulatory provisions governing execution of FSIA judgments, and then turns to the parties' dispute.

---

[2] In the interest of efficiency because of the number of potential turnover cases related to the *Heiser I* and *Heiser II* judgments, substantial parts of the introduction, background, and procedural history section of this Memorandum Opinion are taken from this Court's August 10, 2011 *Heiser III* opinion. *See* 659 F. Supp. 2d 20.

## II.    BACKGROUND

### A.    Statutory and Regulatory Framework

#### 1.    Iran-Specific Regulations

Relations between the United States and Iran deteriorated following the 1979 revolution in which Iran's monarchy was displaced by an Islamic republic, ruled by the Ayatollahs, that remains in power today.  Following the regime change and fueled by the Iran hostage crisis, President Carter—exercising the authority granted to him under the International Emergency Economic Powers Act, 50 U.S.C. § 1701 *et seq.*—blocked the flow of assets between the United States and Iran, and seized Iranian property located within the United States.  Executive Order 12170, 44 Fed. Reg. 65,729 (Nov. 14, 1979).  Over the next two years, Presidents Carter and Reagan issued numerous Executive Orders seizing additional assets, while the Office of Foreign Assets Control ("OFAC")—a component of the Department of the Treasury that administers and enforces economic and trade sanctions—promulgated regulations concerning transactions between persons in the United States and Iran.  In 1981, the United States and Iran reached an agreement, known as the Algiers Accords, which led to the release of the hostages and the unfreezing of most Iranian assets.  Over the following decades, sanctions regimes instituted by Executive Orders and rules promulgated by OFAC evolved into the complex web of regulations governing Iranian assets in the United States, as well as transactions with Iran.[3]

Today, the basic framework for the treatment of Iranian property and trade with Iran is set forth in two complementary sets of provisions promulgated by OFAC that generally bar all transactions either with Iran or involving Iranian interests and then carve out limited exceptions to that embargo.  The first, known as the Iranian Assets Control Regulations ("IACR") and

---

[3] The Court here only briefly recounts the relevant background to place the current regulatory framework in proper context.  For an extensive history of regulations and Executive Orders concerning Iran, see Judge Wexler's excellent summary in *Weinstein v. Islamic Republic of Iran*, 299 F. Supp. 2d 63, 65–68 (E.D.N.Y. 2004).

codified at 31 C.F.R. Part 535, was implemented in 1980 during the Iran Hostage Crisis, 45 Fed.

Reg. 24,432 (Apr. 9, 1980), and "broadly prohibits unauthorized transactions involving property

in which Iran has any interest," while granting specific licenses for certain transactions.  *Flatow*

*v. Islamic Republic of Iran*, 305 F.3d 1249, 1255 (D.C. Cir. 2002).  The second, known as the

Iranian Transactions Regulations ("ITR") and codified at 31 C.F.R. Part 560, "confirms the

broad reach of OFAC's Iranian sanctions programs by establishing controls on Iranian trade,

investments, and services. . . . As under the IACR, there is a general prohibition under the ITR of

unauthorized transactions, coupled with specific licenses permitting certain kinds of

transactions."  *Flatow*, 305 F.3d at 1255; *see also Weinstein v. Islamic Republic of Iran*, 299 F.

Supp. 2d 63, 68 (E.D.N.Y. 2004) ("The ITR prohibited, *inter alia*, the importation of goods and

services from Iran, and the exportation, reexportation, and sale or supply of goods, technology or

services to Iran.").

    B.    **Procedural History**

        After securing judgment against defendants and properly serving them with copies of that

judgment as required under the FSIA, *see* Order, May 10, 2010, ECF No. 158, plaintiffs issued

writs of attachment to garnishees Bank of America, N.A., and Wells Fargo, N.A., asking, *inter*

*alia*, whether each company was indebted to defendants.

        Bank of America answered its writ on July 19, 2011.  Answer to Writ of Garnishment,

ECF No. 191.  Bank of America responded that it holds the proceeds of various Iranian-related

transactions that it blocked pursuant to OFAC regulations.  Specifically, Bank of America holds

the following blocked asset accounts:

| Amount | Iranian Entity(ies) | Type of Blocked Account |
|---|---|---|
| $34,453.88 | Iran Marine and Industrial | Deposit Account |

| $11,717.00 | SedIran Drilling Company | Deposit Account |
|---|---|---|
| **$5,939.97** | **Bank Sepah** | **EFT** |
| $9,721.85 | Iran Air & Melli Bank Plc UK | Check Proceeds |
| **$38,469.57** | **Bank Melli Iran** | **EFT** |

Bank of America contests the turnover of only the two blocked Electronic Funds Transfer ("EFT") accounts in its possession. These are the accounts involving Bank Sepah and Bank Melli Iran (bolded above). The remaining three accounts are uncontested and subject to the Banks' motion to file an interpleader complaint.

Wells Fargo answered its writ on September 8, 2011. Answer to Writ of Garnishment, ECF No. 201. Wells Fargo also responded that it holds the proceeds of various Iranian-related transactions that it blocked pursuant to OFAC regulations. Specifically, Wells Fargo holds the following blocked asset accounts:

| Amount | Iranian Entity(ies) | Type of Blocked Account |
|---|---|---|
| $207,873.00 | Iranian Navy | Deposit Account |
| $20,000.00 | Bank Saderat Iran | EFT |
| **$50,000.00** | **Bank Mellat, Korea** | **EFT** |
| **$13,000.00** | **Bank Mellat, London** | **EFT** |
| **$71,673.70** | **Bank Mellat Iran** | **EFT** |
| **$11,907.00** | **Bank Saderat Iran** | **EFT** |
| $74,850.44 | Bank Mellat | EFT |
| **$6,500.00** | **Bank Saderat Iran** | **EFT** |
| **$34,298.81** | **Bank Saderat Iran** | **EFT** |

| | | |
|---|---|---|
| **$105,000.00** | **Export Dev. Bank of Iran** | **EFT** |
| **$6,300** | **Export Dev. Bank of Iran** | **EFT** |
| $5,562.36 | Iranian IRG | EFT |
| **$10,000.00** | **Bank Mellat, Turkey** | **EFT** |
| $12,979.07 | Khazar Shipping | EFT |

Wells Fargo contests the turnover of only nine of the blocked EFT accounts in its possession. These are the accounts involving Bank Mellat, Korea; Bank Mellat, London; Bank Mellat Iran; Bank Saderat Iran; Export Dev. Bank of Iran; and Bank Mellat, Turkey (bolded above).  The remaining five accounts are uncontested and subject to the Banks' motion to file an interpleader complaint.

Throughout this opinion, this Court refers to the eleven blocked accounts that the Banks contest turning over as "the Contested Accounts."  This Court refers to the remaining eight accounts as "the Uncontested Accounts."

## III.   ANALYSIS

This Court will first discuss the cross-motions for judgment as a matter of law raised by plaintiffs and the Banks.  ECF Nos. 206, 212.  Subsequently, this Court will consider the Banks' Motion for Leave to File Third Party Petition Alleging Claims in the Nature of Interpleader. ECF No. 213.

### A.   Contested Accounts – Cross-Motions for Judgment as a Matter of Law

Both plaintiffs and the Banks have moved for judgment as a matter of law with respect to turnover of the funds contained in the eleven Contested Accounts.  Plaintiffs invoke FSIA § 1610(g) and TRIA § 201(a) as authority to execute on these funds.  This Court begins with an

overview of attachment and execution provisions of the FSIA and then discusses whether TRIA § 201(a) or FSIA §1610(g) permit execution on the Contested Accounts.

### 1.      Attachment & Execution under the FSIA

"It is a well-established rule of international law that the public property of a foreign sovereign is immune from legal process without the consent of that sovereign." *Loomis v. Rogers*, 254 F.2d 941, 943 (D.C. Cir. 1958); *see also Weinstein v. Islamic Republic of Iran*, 274 F. Supp. 2d 53, 56 (D.D.C. 2003) ("[T]he principles of sovereign immunity 'apply with equal force to attachments and garnishments.'") (quoting *Flatow*, 74 F. Supp. 2d at 21).  To promote this general principle, the FSIA broadly designates all foreign-owned property as immune, and then articulates limited exceptions to that immunity.  *See* 28 U.S.C. § 1609 ("[T]he property in the United States of a foreign state shall be immune from attachment, arrest and execution except as provided in sections 1610 and 1611 of this chapter.").  Though providing a workable framework in theory, the past decade of litigation under the Act has proved, for victims of state-sponsored terrorism, to be a journey down a never-ending road littered with barriers and often obstructed entirely.  Two particular roadblocks merit greater discussion.

The first difficulty plaintiffs holding judgments against Iran often faced was the limited number of Iranian assets remaining in the United States.  Attempting to overcome this shortfall, plaintiffs targeted property in which an Iranian entity—often a financial institution owned or controlled by Iran—had an interest.  Though expressly sanctioned by § 1610(b), this strategy was undercut by the Supreme Court's decision in *First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*, which involved a U.S. financial institution's attempt to collect money owed to it by the Cuban government through the seizure of funds deposited in the institution by a Cuban bank.  462 U.S. 611, 613 (1983).  In its opinion, the Supreme Court observed that "government

8

instrumentalities established as juridical entities distinct and independent from their sovereign should normally be treated as such," and determined that Congress "clearly expressed its intention that duly created instrumentalities of a foreign state are to be accorded a presumption of independent status." *Id*. at 626–27.  According to the *First Nat'l* Court, this presumption may be overridden *only* where the plaintiff demonstrates that the foreign entity is exclusively controlled by the foreign state or where recognizing the separateness of that entity and the foreign state "would work fraud or injustice." *Id*. at 629–30.  The practical effect of this holding was to shield the property of instrumentalities of foreign states from attachment or execution absent evidence of a connection between the instrumentality and the foreign state so strong as to render any distinction irrelevant.  And by placing the burden of proof on this issue squarely on plaintiffs, the *First Nat'l* holding became a substantial obstacle to FSIA plaintiffs' attempts to satisfy judgments.  *See, e.g.*, *Oster v. Republic of S. Afr.*, 530 F. Supp. 2d 92, 97–100 (D.D.C. 2007); *Bayer & Willis Inc. v. Republic of the Gam.*, 283 F. Supp. 2d 1, 4–5 (D.D.C. 2003).

The second hurdle facing FSIA plaintiffs involved assets that once belonged to Iran or its agencies but had been seized and retained by the United States.  As a legal matter, "assets held within United State Treasury accounts that might otherwise be attributed to Iran are the property of the United States and are therefore exempt from attachment or execution by virtue of the federal government's sovereign immunity." *In re Islamic Republic of Terrorism Litig.*, 659 F. Supp. 2d 31, 53 (D.D.C. 2009) (citing *Dep't of the Army v. Blue Fox, Inc.*, 525 U.S. 255 (1999)).  Victims of state-sponsored terrorism attempting to seize such assets were thus put in the perverse position of litigating against their own government, *see Weinstein*, 274 F. Supp. 2d at 56 ("[I]f a litigant seeks to attach funds held in the United States Treasury, he or she must demonstrate that

the United States has waived its sovereign immunity with respect to those funds."), which

strongly opposed attempts to attach such assets.  As one commentator explains:

> As a matter of foreign policy, the President regards frozen assets as a powerful
> bargaining chip to induce behavior desirable to the United States; accordingly,
> allowing private plaintiffs to file civil lawsuits and tap into the frozen assets
> located in the United States may weaken the executive branch's negotiating
> position with other countries.  For this reason, several U.S. presidents have
> opposed giving victims access to these funds.

Debra M. Strauss, *Reaching Out to the International Community: Civil Lawsuits as the Common

Ground in the Battle against Terrorism*, 19 Duke J. Comp. & Int'l L. 307, 322 (2009).  The

Executive Branch has consistently succeeded in arguing that the FSIA does not waive the United

States' immunity with respect to seized Iranian assets.  *See, e.g.*, *Flatow*, 74 F. Supp. 2d 18.

Eventually Congress enacted the Terrorism Risk Insurance Act ("TRIA"), Pub. L. No.

107-297, 116 Stat. 2322 (2002), "to 'deal comprehensively with the problem of enforcement of

judgments rendered on behalf of victims of terrorism in any court of competent jurisdiction by

enabling them to satisfy such judgments through the attachment of blocked assets of terrorist

parties.'"  *Weininger v. Castro*, 462 F. Supp. 2d 457, 483 (S.D.N.Y. 2006) (quoting H.R. Conf.

Rep. 107-779, at 27 (2002)).  The TRIA declares that

> [n]otwithstanding any other provision of law, . . . in every case in which a person
> has obtained a judgment against a terrorist party on a claim based upon an act of
> terrorism, . . . the blocked assets of the terrorist party (including the blocked assets
> of any agency or instrumentality of that terrorist party) shall be subject to
> execution or attachment in aid of execution in order to satisfy such judgment to
> the extent of any compensatory damages for which such terrorist party has been
> adjudged liable.

§ 201(a).  In other words, the TRIA "subjects the assets of state sponsors of terrorism to

attachment and execution in satisfaction of judgments under § 1605(a)(7)," *In re Terrorism

Litig.*, 659 F. Supp. 2d at 57, by "authoriz[ing] holders of terrorism-related judgments against

Iran . . . to attach Iranian assets that the United States has *blocked*."  *Ministry of Def. & Support*

*for the Armed Forces of the Islamic Republic of Iran v. Elahi*, 129 S. Ct. 1732, 1735 (2009)

(quotations omitted; emphasis in original).

      The TRIA was designed to remedy many of the problems that previously plagued victims

of state-sponsored terrorism; in practice, however, it led to very few successes.  Victims

discovered that, at least with respect to Iran, "very few blocked assets exist."  *In re Terrorism*

*Litig.*, 659 F. Supp. 2d at 58.  And the barren landscape facing these FSIA plaintiffs was only

further depleted by the exclusion of diplomatic properties from the TRIA's reach.  *See Bennett*,

604 F. Supp. 2d at 161 ("[The TRIA] expressly excludes 'property subject to Vienna Convention

on Diplomatic relations, or that enjoys equivalent privileges and immunities under the law of the

United States, being used for exclusively for diplomatic or consular purposes.'") (quoting TRIA

§ 201(d)(2)(B)(ii)).

      Against this desolate backdrop, Congress enacted the NDAA, which added paragraph (g)

to the execution section of the FSIA.  This new provision, in its entirety, declares:

    (g) Property in Certain Actions.—

    (1) In general.— Subject to paragraph (3), the property of a foreign state against
    which a judgment is entered under section 1605A, and the property of an agency
    or instrumentality of such a state, including property that is a separate juridical
    entity or is an interest held directly or indirectly in a separate juridical entity, is
    subject to attachment in aid of execution, and execution, upon that judgment as
    provided in this section, regardless of—
        (A) the level of economic control over the property by the
        government of the foreign state;
        (B) whether the profits of the property go to that government;
        (C) the degree to which officials of that government manage the
        property or otherwise control its daily affairs;
        (D) whether that government is the sole beneficiary in interest of
        the property; or
        (E) whether establishing the property as a separate entity would
        entitle the foreign state to benefits in United States courts while
        avoiding its obligations.

(2) United states sovereign immunity inapplicable.— Any property of a foreign state, or agency or instrumentality of a foreign state, to which paragraph (1) applies shall not be immune from attachment in aid of execution, or execution, upon a judgment entered under section 1605A because the property is regulated by the United States Government by reason of action taken against that foreign state under the [TWEA] or the [IEEPA].

(3) Third-party joint property holders.— Nothing in this subsection shall be construed to supersede the authority of a court to prevent appropriately the impairment of an interest held by a person who is not liable in the action giving rise to a judgment in property subject to attachment in aid of execution, or execution, upon such judgment.

28 U.S.C. § 1610(g). Courts have had little opportunity to explore the full implications of § 1610(g), though at least one court has observed that the NDAA will have a significant impact on plaintiffs' attempts to enforce FSIA judgments. *See Calderon-Cardona v. Dem. Rep. Congo*, 723 F. Supp. 2d 441, 458 (D.D.C. 2009) ("Section 1083 adds a new subsection, section 1610(g)(1), which significantly eases enforcement of judgments entered under section 1605A.").

## 2.      Attachment and Execution on the Contested Accounts

Plaintiffs claim that they have met all of the elements necessary to satisfy both FSIA § 1610(g) and TRIA § 201(a), with satisfaction of either section being sufficient to execute on the Contested Accounts. The Banks respond that both statutes require plaintiffs to show that Iran has an ownership interest in the blocked assets—and Iran has no ownership interest in the Contested Accounts. The Banks concede that Iran has an ownership interest in the Uncontested Accounts. Accordingly, this Court must determine what, if any, ownership interest is required to execute on the Contested Accounts.

### a.      TRIA § 201(a) Requires an Iranian Ownership Interest

As with any question of statutory interpretation, this Court's analysis begins with the plain language of the statute. *Jimenez v. Quarterman*, 555 U.S. 113, 118 (2009) (citations omitted). When the statutory language is clear, it must be enforced according to its own terms so

long as "the disposition required by the text is not absurd." *Lamie v. U.S. Trustee*, 540 U.S. 526, 534 (2004). Therefore, this Court must first determine whether the statutory language contained in TRIA § 201(a) is clear.

TRIA § 201(a) allows a person holding a judgment against a state-sponsor of terrorism to attach and execute on "the blocked assets of that terrorist party." The parties agree that the Contested Accounts meet the definition of "blocked assets" provided in TRIA § 201(d)(2). The parties also agree that Iran qualifies as a "terrorist party" under TRIA § 201(d)(4). The issue is whether Congress' use of the word "of" requires plaintiff to prove that Iran has an ownership interest in the Contested Accounts.

In *Board of Trustees of the Leland Stanford Junior University v. Roche Molecular Systems, Inc.*, 131 S. Ct. 2188, 2196 (2011), the Supreme Court reaffirmed its longstanding precedent that "the use of the word 'of' denotes ownership." *Id.* (quoting *Poe v. Seaborn*, 282 U.S. 101, 109 (1930)); *see Flores-Figueroa v. United States*, 556 U.S. 648–49, 657 (2009) (treating the phrase "identification [papers] of another person" as meaning such items *belonging to* another person); *Ellis v. United States*, 206 U.S. 246, 259 (interpreting the phrase "works of the United States" to mean "works *belonging to* the United States") (internal citations and quotations omitted). As the *Stanford* Court noted, this reading is consistent with a common definition of the word "of" denoting a possessive relationship. *Stanford*, 131 S. Ct. at 2196 (citing Webster's Third New International Dictionary 1565 (2002)).

Applying *Stanford* and interpreting the word "of" in TRIA § 201(a) to mean "belonging to" makes sense: judgment debtors normally pay for whatever caused the adverse judgment against them—third parties do not usually pick up the tab. Additionally, the common law historically provided that "[t]he lien of a judgment attaches to the precise interest or estate which

the judgment debtor has actually and effectively in the property, and only to such interest."  50

C.J.S. Judgments § 787 (2012); *see also U.S. v. Rodgers*, 461 U.S. 677, 713 (1983).  Thus, the

plain language, as informed by the common law, strongly indicates that Congress intended to

permit terrorist victims to execute on only the assets "of"—or, in other words, "belonging to"—

the terrorist state committing the act.  At least one other district court has come to this same

conclusion regarding TRIA § 201(a).  *See Ruth Calderon-Cardona v. JPMorgan Chase Bank,*

*N.A.*, 2011 WL 6155987, at *14 (S.D.N.Y. Dec. 7, 2011) ("TRIA § 201 *requires* property

ownership").

 Unwilling to concede defeat on a plain language analysis, plaintiffs seek refuge in the

expansive definition of "blocked asset" found in TRIA § 201(d)(2):

> **(2) Blocked asset.**—The term 'blocked asset' means—
>  **(A)** <u>any asset seized or frozen</u> by the United States under section
> 5(b) of the Trading With the Enemy Act (50 U.S.C. App. 5(b)) or
> under sections 202 and 203 of the International Emergency
> Economic Powers Act (50 U.S.C. 1701; 1702); and
>  **(B)** Does not include property that—
>  **(i)** is subject to a license issued by the United States Government
> for final payment, transfer or disposition by or to a person subject
> to the jurisdictions of the United States in connection with a
> transaction for which the issuance of such license has been
> specifically required by statute other than the International
> Emergency Economic Powers Act (50 U.S.C. 1701 et seq.) or the
> United Nations Participation Act of 1945 (22 U.S.C. 287 et seq.);
> or
>  **(ii)** in the case of property subject to the Vienna Convention on
> Diplomatic Relations or the Vienna Convention on Consular
> Relations, or that enjoys similar privileges and immunities under
> the law of the United States, is being used exclusively for
> diplomatic or consular purposes.

(emphasis added).  Plaintiffs argue that Congress intended the phrase "of that terrorist party" to

limit the expansive definition of "blocked asset" in one way—to restrict a judgment creditor to

pursuing only assets blocked under a sanctions scheme targeting *that* terrorist party.  In other

words, TRIA permits an *Iranian* judgment creditor to attach assets blocked only under the

*Iranian* sanctions regulations; simultaneously, TRIA prohibits an Iranian judgment creditor from

attaching assets blocked under Cuban, Syrian, or other sanctions regimes.  Judge Marrero's

decision in *Hausler v. JPMorgan Chase Bank, N.A.*, 845 F. Supp. 2d 553, 566–67 (S.D.N.Y.

2012), agrees with plaintiffs argument.[4]  Judge Marrero reasoned that an ownership requirement

> overlooks a very basic aspect of the TRIA: The statute is not directed at a single
> terrorist entity and does not relate to a single set of blocking regulations.  The
> TRIA expressly defines "[t]he term 'blocked asset' [to] mean[ ] . . . any asset
> seized or frozen by the United States under section 5(b) of the Trading With the
> Enemy Act (50 U.S.C.App. 5(b)) or under sections 202 and 203 of the
> International Emergency Economic Powers Act . . . ."  The phrase "of that
> terrorist party" provides the necessary, though perhaps perfunctory, instruction
> that the "blocked assets" available for execution are only those assets blocked
> pursuant to the particular regulation or administrative action directed at the
> particular terrorist-party judgment debtor.  In other words, the TRIA does not
> permit a party with a judgment against Iran to execute against funds blocked
> pursuant to the CACRs, regulations which are, of course, targeted at Cuba.

*Id.*  (citations omitted).

The Banks agree that, as Iran's judgment creditors under TRIA § 201(a), plaintiffs may

execute on only the assets blocked pursuant to the Iranian sanctions regimes and not on assets

blocked pursuant to other sanctions regimes.  To otherwise interpret the statute would read "that"

out of the phrase "blocked assets of *that* terrorist party."  But plaintiffs go too far in presuming

that the scope of the OFAC blocking regulations is coextensive with the scope of attachment

authorized by TRIA.  Examining OFAC regulations, it is quite apparent that OFAC blocks a

much broader category of assets than those "of" a terrorist party.

> OFAC regulations provide the following:

> No property subject to the jurisdiction of the United States or which is in the
> possession of or control of persons subject to the jurisdiction of the United States
> in which on or after the effective date Iran has *any interest of any nature*

---

[4] *Accord Levin v. Bank of New York*, 2011 WL 821032 (S.D.N.Y. Feb. 22, 2012).

*whatsoever* may be transferred, paid, exported, withdrawn or otherwise dealt in
except as authorized.

31 C.F.R. § 535.201 (emphasis added).  While this language is broad, OFAC regulations go one

step further by defining "interest" as "any interest of any nature whatsoever, direct or indirect."

§ 535.312.  Moreover, "property" includes a laundry list of items such as "money, checks, . . .

obligations . . . pledges, liens or other rights in the nature of security . . . contracts of any nature

whatsoever, and any other property, real, personal, or mixed, tangible or intangible, or interest or

interests therein, present, future or contingent."  § 535.311.  Applying these regulations literally,

OFAC apparently may block a transaction involving an indirect, intangible, future, contingent

Iranian interest of any nature whatsoever.

  The expansive language OFAC employs to block transactions with Iranian entities stands

in stark contrast to the language employed in TRIA § 201(a) where Congress chose to allow

execution on only a subset of blocked assets: those "of" a terrorist party.  Every word in a statute

must be given effect, including the seemingly trivial word "of."  *Kawasaki Kisen Kaisha Ltd. v.

Regal-Beloit Corp.*, 130 S. Ct. 2433, 2445 (2010) (*citing Reiter v. Sonotone Corp.*, 442 U.S. 330,

339 (courts are "obliged to give effect, if possible, to every word Congress used")).  The Court

must also presume that Congress was aware of the breadth of OFAC blocking regulations when

it authored TRIA § 201(a).  *Miles v. Apex Marine Corp.*, 498 U.S. 19, 32 (1990) ("We assume

that Congress is aware of existing law when it passes legislation").  OFAC has used the "any

interest of any nature whatsoever" and other broad language since at least 1979.  *See* Iranian

Assets Control Regulations, 44 Fed. Reg. 65956, 65956–65957 (Nov. 17, 1979).  Congress could

have written—and could rewrite—TRIA § 201(a) to say "blocked assets related to that terrorist

party" or "blocked assets in which that terrorist party has any property interest" and avoided

creating an ownership requirement.  Unfortunately for plaintiffs, the inescapable conclusion is

that Congress intentionally used narrower language to permit attachment and execution only on a subset of blocked assets—those "of" ("owned by" or "belonging to") a terrorist state.

At first glance, it might appear strange for a sanctions regime to block transfers of assets that a terrorist state—in this case, Iran—did not legally own. Why cast such a broad net? John E. Smith, Associate Director of OFAC's Office of Policy and Implementation, explains that blocking serves a number of goals: providing the President with leverage to negotiate in resolving foreign policy disputes, depriving Iran of property that it might otherwise use contrary to U.S. interests, preventing Iran from transacting with U.S. persons or the U.S. financial market, limiting the flow of goods and U.S. dollars Iran has available, and making it more difficult for third parties to transact with Iran. Decl. of James Kerr, ECF No. 212-7, Ex. D, ¶ 10.

On the other hand, OFAC blocking regulations implicate a different set of interests than TRIA § 201. Congress intended TRIA as a vehicle to compensate victims of terrorist attacks while also punishing terrorist states by making them pay for their acts. However, under plaintiffs' interpretation, virtually all blocked assets—regardless of whether Iran has an ownership interest in them—could be used to compensate victims. Such an attachment would actually *reduce* Iran's liability for the judgments entered against it while imposing a potentially heavy cost on innocent property owners. For example, if a foreign national living and working in a different country attempted to send money to his personal bank account in Iran, this transfer could be blocked and, under plaintiffs' reading of TRIA, be subject to attachment. *See Calderon-Cardona*, 2011 WL 6155987, at *11.

Because the plain language of the statute cuts against plaintiffs' interpretation, plaintiffs seek refuge in the traditional cannon of statutory interpretation that remedial statutes are to be liberally construed. *See* 3 *Sutherland Statutory Construction* § 60:1 (7th ed.). Justice Scalia

describes this cannon as "surely among the prime examples of lego-babble."  Antonin Scalia, *Assorted Cannards of Contemporary Legal Analysis*, 40 Case W. Res. L. Rev. 581, 581–582 (1990) ("It is so wonderfully indeterminate, as both when it applies and what it achieves, that it can be used, or not used, or half-used, almost *ad libitum*, depending mostly upon whether its use, or nonuse, or half-use, will assist in reaching the result the court wishes to achieve.).  Thankfully, this Court does not have to decide what a liberal interpretation of this statute would mean because the plain meaning of "of" requires ownership—and plain meaning wins.  3 *Sutherland* § 60.1 ("The rule of liberal construction does not override other rules where its application . . . defeats the evident meaning of an act.").

The Court also hesitates to interpret TRIA § 201(a) broadly in light of the important role blocked assets play in foreign policy—an area where the Courts have traditionally accorded some weight to the views of the Executive Branch.  *See Republic of Austria v. Altmann*, 541 U.S. 677, 701–702 (2004); *Sosa v. Alvarez-Machain*, 542 U.S. 692, 733 n.21 (2004); *Doe v. Exxon Mobil Corp.* 473 F.3d 345, 354 (D.C. Cir. 2007).  This Court will accord the Government's interpretation, advanced in this case through its Statement of Interest and other related declarations, "a measure of deference proportional to the 'thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade.'"  *Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156, 2169 (2012) (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).

The Government notes that "any judicial application of TRIA has important consequences for the Executive Branch's implementation of sanctions regimes in the public interest."  ECF No. 230, at 3.  Historically, the Executive Branch has viewed blocked assets as

important "leverage in working out policy disputes with other countries . . . ."  Jennifer K. Elsea, Congressional Research Serv., Suits Against Terrorist States by Victims of Terrorism, at 9 (2008), *available at* http://www.fas.org/sgp/crs/terror/RL31258.pdf (last accessed August 21, 2012); *see also* Decl. of James Kerr, ECF No. 212-7, Ex. D, ¶ 10.  The Executive Branch also worries that attachment "exposes the United States to the risk of reciprocal actions against U.S. assets by other States."  Elsea, at 9.

Plaintiffs' sweeping interpretation would effectively—through future attachments and executions—eliminate the President's ability to use blocked assets as bargaining chips in solving foreign policy disputes.  This is especially true as the amount of outstanding judgments against terrorist states greatly exceed the amount of blocked assets.  *Compare* U.S. Dep't of the Treasury, Office of Foreign Assets Control, *Terrorist Assets Report Calendar Year 2011*, at 13, *available at* http://www.treasury.gov/resource-center/sanctions/Programs/Documents/tar2011.pdf ($72 million in blocked assets relating to Iran exist) *with Taylor v. Islamic Republic of Iran*, 2012 WL 3126774, at *4 (D.D.C. Aug. 2, 2012) ($9.5 billion in outstanding judgments against Iran exist from the 1983 Beirut bombing).  Absent an express indication that Congress intended attachment and execution of all blocked assets[5]—including blocked assets totally unowned by terrorist states—this Court will not interpret TRIA § 201(a) to conflict with both its plain language and decades of practice.

### b.    FSIA § 1610(g) Requires an Iranian Ownership Interest

In the alternative, plaintiffs argue that they may execute on the Contested accounts under FSIA § 1610(g).  Section 1610(g), passed in 2008, contains language very similar to that of TRIA § 201(a).  The relevant section provides:

---

[5] Except, of course, diplomatic assets exempt under TRIA § 201(d)(2)(B)(ii), which have long been treated as *sui generis*.

**(g) Property in certain actions.**—

> **(1) In general.**--Subject to paragraph (3), the <u>property of a foreign state</u>
> against which a judgment is entered under section 1605A, and the property
> of an agency or instrumentality of such a state, including property that is a
> separate juridical entity or is an interest held directly or indirectly in a
> separate juridical entity, is subject to attachment in aid of execution, and
> execution, upon that judgment as provided in this section, regardless of—
>
>> **(A)** the level of economic control over the property by the
>> government of the foreign state;
>> **(B)** whether the profits of the property go to that
>> government;
>> **(C)** the degree to which officials of that government
>> manage the property or otherwise control its daily affairs;
>> **(D)** whether that government is the sole beneficiary in
>> interest of the property; or
>> **(E)** whether establishing the property as a separate entity
>> would entitle the foreign state to benefits in United States
>> courts while avoiding its obligations.

28 U.S.C. § 1610(g) (emphasis added).  Again, the textual issue under § 1610(g) is the same:

does the word "of" require plaintiff to prove that Iran had an ownership interest in the Contested

Accounts?  For the same textual reasons previously discussed in reference to TRIA § 201(a), the

answer remains yes.  *See* Part III.A.2.a.  Nonetheless, three unique aspects of § 1610(g) merit

separate discussion.

First, the language in § 1610(g)(1) specifically permitting attachment of "an interest held

directly or indirectly in a separate juridical entity" is inapplicable here.  Congress included this

language "to overcome the effect of *Dole Food Co. v. Patrickson*, which held that an entity

owned indirectly by a foreign state, through another wholly-owned entity, was not an 'agency or

instrumentality' of the foreign state."  *Calderon-Cardona*, 2011 WL 6155987 at * 17 (citing

*Dole Food Co*. 538 U.S. at 473 ("[A] subsidiary of an instrumentality is not itself entitled to

instrumentality status.")).  *Dole Food* followed the earlier *Bancec*, 462 U.S. 611, decision.

Courts applying *Bancec* fashioned a five-factor test to determine whether an instrumentality

served merely as the *alter ego* of the foreign state.  *See Flatow v. Islamic Republic of Iran*, 308

F.3d 1065, 1071 n.9 (9th Cir. 2002).  Section §1610(g) subparagraphs (A)–(E) explicitly prohibit consideration of each of the five *Bancec* factors.  By abrogating *Dole Food* and *Bancec*, § 1610(g)(1) made property that a foreign state owns through an instrumentality—or a subsidiary of an instrumentality—attachable.  Nonetheless, these sections do nothing to modify § 1610(g)(1)'s requirement that the Contested Accounts be "the property <u>of</u> a foreign state."  As with TRIA § 201(a), this "of" cannot be ignored.

Second, when this Court first described § 1610(g)'s attachment provisions in 2009, it found that § 1610(g) permitted "attachment or execution with respect to property *belonging to* designated state sponsors of terrorism."  *In re Terrorism Litig.*, 659 F. Supp. 2d at 62.  While perhaps dicta in the 2009 opinion, this finding was consistent with the Conference Committee Report adopted prior to enactment of § 1610(g).  H.R. Rep. No. 110-447, at 1001.  The Report stated that § 16010(g) "is written to subject any property interest in which the foreign state enjoys *a beneficial ownership* to attachment and execution. . . ."  H.R. Rep. No. 110-447, at 1001 (2007) (emphasis added).

Third, plaintiffs argue that § 1610(g)(3) is rendered superfluous by the Banks' reading of the statute.  Section 1610(g)(3) provides the following:

> **(3) Third-party joint property holders**.—Nothing in this subsection shall be construed to supersede the authority of a court to prevent appropriately the impairment of an interest held by a person who is not liable in the action giving rise to a judgment in property subject to attachment in aid of execution, or execution, upon such judgment.

Plaintiffs argue that "if property 'owned' only by Iran were subject to attachment, there would be no need for Congress to protect third-party 'interests.'"  Pls.' Reply, ECF No. 220, at 17.  This argument, however, fails to account for a number of possible situations.  For example, Iran may jointly own property with a number of innocent third-parties who could have joint ownership

rights that 1610(g)(3) protects.  Or, Iran may wholly own an asset in which an innocent third-party holds a lesser interest—like a right of first refusal—that carries some economic value which 1610(g)(3) protects.  Far from being superfluous, 1610(g)(3) provides courts with the important power to protect interests held by third-parties where Iran has some ownership of a property.

### 3.     Iran Does Not Have an Ownership Interest in the Contested Accounts

In light of this Court's ruling that both "blocked assets _of_ that terrorist party" in TRIA § 201(a) and "property _of_ a foreign state" in FSIA § 1610(g)(1) require plaintiffs to prove some terrorist state ownership in order to attach and execute on property, this Court must do two things: decide what law should be applied to determine whether Iran has an ownership interest, and apply that law to the Contested Accounts.

### a.     Federal Law Preempts D.C. Law

Federal Rule of Civil Procedure 69 provides that "[t]he procedure on execution . . . must accord with the procedure of the state where the court is located, but a federal statute governs to the extent it applies."  Both parties concede that this Court must follow District of Columbia procedure for execution on both the Contested and Uncontested Accounts.   Plaintiffs, however, argue that the substantive basis for their right to execution is found in federal law—specifically, TRIA § 201, FSIA § 1610(g), and OFAC regulations.  Pls.' Reply, ECF 220, at 34 (citing _Heiser III_, 2011 WL 3489109, at *13).  Plaintiffs contend that federal law and OFAC regulations govern all property in which Iran has any interest, therefore preempting the entire field and leaving no room for state law to supplement or contradict District of Columbia law.  Plaintiffs also argue that a conflict exists between the OFAC definitions of "blocked assets"—which are incorporated

into TRIA § 201 and FSIA § 1610(g)—and D.C. law defining ownership interests more narrowly.

The Banks respond that neither the TRIA, FSIA, nor OFAC regulations define whether Iran has an ownership interest Contested Accounts, and that therefore state law must apply. The Banks propose that the substantive District of Columbia law which applies to this case is Uniform Commercial Code Article 4A, as codified in D.C. Code § 28:4A *et seq.* The Banks rely on Second Circuit precedent stating that "[i]n the absence of a superseding federal statute or regulation, state law generally governs the nature of any interests in or rights to property that an entity may have." *Export-Import Bank of the United States v. Asia Pulp & Paper Co.*, 609 F.3d 111 (2d Cir. 2010) ("*Asia Pulp*").

State law must give way to federal law in at least three circumstances: (1) when Congress expressly preempts state law, (2) when Congress undertakes so-called "field preemption," and (3) when state law conflicts with federal law. *Arizona v. U.S.*, 132 S. Ct. 2492, 2501 (2012). Neither party asserts that TRIA § 201 or FSIA § 1610 expressly preempt state property law. Therefore, the first question this Court must ask is whether field preemption applies. Because this Court finds that field preemption does apply, it need not address the Banks' conflict preemption argument.

Field preemption forecloses states from regulating an area of law—whether that state law conflicts with federal law or complements federal law. *Arizona v. U.S.*, 132 S. Ct. 2492, 2502 (2012). The purpose of Congress is the ultimate touchstone in every preemption case. *Medtronic, Inc. v. Lohr*, 518 U.S. 470 (1996) (citations and quotations omitted). Courts look to see if a federal law is designed to function as a "harmonious whole." *Hines v. Davidowitz*, 312 U.S. 52, 72 (1941). "The intent to displace state law altogether can be inferred from a

framework of regulation so pervasive . . . the Congress left no room for the States to supplement it or where there is a federal interest . . . so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Arizona*, 132 S. Ct. at 2501 (citations and quotations omitted).

The Supreme Court has emphasized the paramount federal interest that exists in the conduct of our foreign relations. In a recent pronouncement in this area, the Supreme Court stated that "[t]here is, of course, no question that at some point an exercise of state power that touches on foreign relations must yield to the National Government's policy. . . ." *American Ins. Ass'n v. Garamendi*, 539 U.S. 396, 413 (2003); *accord Hines*, 312 U.S. at 63 ("Our system of government . . . imperatively requires that federal power in the field affecting foreign relations be left entirely free from local interference."). The founders surely agreed with this sentiment. Alexander Hamilton implored that "The Peace of the WHOLE ought not to be left at the disposal of a PART." The Federalist No. 80, 535–36 (Jacob E. Cooke ed., 1961). James Madison similarly urged uniformity in our infant nation's dealings with other countries. The Federalist No. 42, at 279 ("If we are to be one nation in any respect, it clearly ought to be in respect to other nations.").

TRIA § 201 and FSIA § 1610(g) implicate exclusively federal interests and, therefore, preempt District of Columbia law. These statutes concern property "of" a foreign sovereign, and not just any foreign sovereign—only those designated as state-sponsors of terror. TRIA § 201(d)(4); FSIA §§ 1610(g)(1), 1605A(h)(6). Designating a country as a state-sponsor of terrorism is a drastic decision that the Executive Branch does not make on a whim; serious political and economic consequences result from this designation. One such consequence is that the "property of" a designated state-sponsor of terror loses its sovereign immunity and may

24

become subject to attachment and execution.  FSIA § 1610(g)(1).  The idea that *state* property

law definitions of ownership should control the disposition of these assets flies in the face of the

dominant *federal* interest in our relations with terrorist states.  *Cf. Crosby v. National Foreign*

*Trade Council*, 530 U.S. 363, 375 (2000) ("It is simply implausible that Congress would have

gone to such lengths to empower the President if it had been willing to compromise his

effectiveness by deference to every provision of state statute or local ordinance that might, if

enforced, blunt the consequences of discretionary Presidential action.").

Additionally, the National Defense Authorization Act of 2008 ("NDAA"), which created

FSIA §1610(g), shows that Congress intends for the federal government to wholly occupy this

field.  From 2004 when the D.C. Circuit decided *Cicippio-Puelo* until 2008, the state-sponsored

terrorism exception (then codified at 28 U.S.C. § 1605(a)(7)) acted only as a jurisdiction-

conferring provision—the substantive causes of action against foreign state-sponsors of terrorism

were found in state law.  *See Cicippio-Puelo v. Islamic Republic of Iran*, 353 F. 2d 1024, 1027

(D.C. Cir. 2004).  Congress became unhappy with this pass-through approach and the "lack of

uniformity in the underlying state sources of law."  *In Re Terrorism Litig.*, 659 F. Supp. 2d at 60.

As this Court noted, this pass-through approach often caused "equally deserving plaintiffs to

have their claims denied because they were domiciled in jurisdictions that did not afford them a

substantive [state law] claim."  *Id.* at 59.  Congress responded to this unfairness with § 1083 of

the 2008 NDAA.  *Id.* at 58–59.  This statute (1) took the extraordinary step of creating a federal

cause of action against designated state-sponsors of terrorism (now codified at FSIA § 1605A),

(2) provided for punitive damage awards against state-sponsors of terrorism, (3) provided federal

funding for special masters assisting the Court in these cases, and (4) created the broader

attachment and execution rights found in FSIA § 1610(g).  *Id.* at 58–62.  The FSIA already

contained provisions related to damages, counterclaims, service, venue, default, in addition to a laundry list of exceptions to foreign sovereign immunity, all of which can be found in FSIA §§ 1603–1611.  Reading TRIA § 201 and FSIA § 1610(g) in conjunction with the entire FSIA and the 2008 NDAA amendments shows that Congress intended to create a "harmonious whole" and intended that the federal government occupy this field.

> **b.** **Federal Common Law Applies and Iran Does Not Have an Ownership Interest in the Contested Accounts.**

Since Congress has preempted District of Columbia law in this area, the Court is left with a puzzling situation: how to determine the level of ownership TRIA § 201(a) and FSIA § 1610(g) require Iran to have in the Contested Accounts.  The Government suggests that in this situation, "courts could achieve the desired uniformity through the development of federal common law or its functional equivalent to govern attachment."  Statement of Interest, ECF No. 230, at 13.  This Court agrees.  The D.C. Circuit has, however, long cautioned that "it is a mistake . . . to label actions under the FSIA as 'federal common law' cases, for these actions are based on *statutory* rights."  *Bettis v. Islamic Republic of Iran*, 315 F.3d 325, 333 (2003).

In such cases, this Court "look[s] to Restatements, legal treatises, and state decisional law to find and apply what are generally considered to be the well-established standards of state common law, a method of evaluation which mirrors—but is distinct from—the 'federal common law' approach."  *Estate of Doe v. Islamic Republic of Iran*, 808 F. Supp. 2d 1, 23 n.7 (D.D.C. 2011); *see also Owens v. Republic of Sudan*, 826 F. Supp. 2d 128, 157 n.3 (D.D.C. 2011).  The D.C. Circuit in *Bettis* adopted this approach when it applied Restatement (Second) of Torts § 46 to FSIA intentional infliction of emotional distress claims, a practice that continues to this day. *See Oveissi v. Islamic Republic of Iran*, 2012 WL 3024758, at *7 (D.D.C. July 25, 2012).  In light of this, the Court will now examine the Restatement (First) of Property, relevant legal

treatises, and state decisional law to determine whether Iran has an ownership interest that

sufficient for attachment and execution under TRIA § 201(a) or FSIA § 1610(g).

Comment b to the Restatement (First) of Property § 10 states that "[a] person who has the

totality of rights, power, privileges and immunities which constitute complete property in a thing

[] is the 'owner' of the 'thing,' or 'owns' the 'thing.'"  The Restatement recognizes that the

owner's control is not necessarily absolute:

> *Ownership despite decrease in interests.*  The owner may part with many of the
> rights, powers, privileges and immunities that constitute complete property and
> his relation to the thing is still termed ownership both in this Restatement and as a
> matter of popular usage. Thus an owner of an automobile may mortgage it, or
> have it subjected to a mechanic's lien, and still properly be said to be the owner. It
> is characteristic of ownership that upon the termination of any lesser interests, the
> interests of the owner are thereby automatically increased.

*Id.* at § 10 cmt. c.  OFAC regulations blocked the Contested Accounts because an Iranian bank

had a "contingent, future, interest" in the funds.  Pls.' at 33, 36.  This description of Iran's

interest in the Contested Accounts could hardly sound less absolute.  Common sense—and the

Restatement's definition of ownership—support the finding that Iran's indefinite, ephemeral

interest in the Contested Accounts does not rise to the level that would typically be considered

"of," "belonging to," or "owned by" Iran.

However, while applying the Restatement's skeletal definition of ownership may be quite

simple, in "finding" the federal common law, *Bettis* was also guided by FSIA § 1606.  *Bettis*,

315 F.3d at 333.  This section provides that "foreign state[s] shall be liable in the same manner

and to the same extent as a private individual under like circumstances."  *Id.  Bettis* and FSIA §

1606 counsel the Court to examine how ownership interests in Electronic Funds Transfers

("EFTs")—like those blocked by the Banks in this case—are treated under state law.

The operation of an EFT can appear quite complicated.  Fortunately, the Second Circuit

has outlined the EFT process:

> An EFT is nothing other than an instruction to transfer funds from one account to
> another.  When the originator and the beneficiary each have accounts in the same
> bank that bank simply debits the originator's account and credits the beneficiary's
> account.  When the originator and beneficiary have accounts in different banks,
> the method for transferring funds depends on whether the banks are members of
> the same wire transfer consortium.  If the banks are in the same consortium, the
> originator's bank debits the originator's account and sends instructions directly to
> the beneficiary's bank upon which the beneficiary's bank credits the beneficiary's
> account.  If the banks are not in the same consortium—as is often true in
> international transactions—then the banks must use an intermediary bank.  To use
> an intermediary bank to complete the transfer, the banks must each have an
> account at the intermediary bank (or at different banks in the same consortium).
> After the originator directs its bank to commence an EFT, the originator's bank
> would instruct the intermediary to begin the transfer of funds.  The intermediary
> bank would then debit the account of the bank where the originator has an account
> and credit the account of the bank where the beneficiary has an account.  The
> originator's bank and the beneficiary's bank would then adjust the accounts of
> their respective clients.

*Shipping Corp. of India Ltd. v. Jaldhi Overseas Pte Ltd.*, 585 F.3d 58, 60 n.1 (2d Cir.

2009).  The Contested Accounts contain the proceeds of EFTs that were blocked by the

Banks pursuant to OFAC regulations in the Banks' role as U.S. intermediary banks.

EFTs passing through intermediary banks are sometimes referred to as "midstream"

EFTs.  With respect each of the Contested Accounts, the Iranian government party

triggering the EFT block was the beneficiary's bank.[6]

Property rights in EFTs are covered under Article 4A of the Uniform Commercial

Code, which every state (including the District of Columbia) has adopted and which the

Federal Reserve applies to its Federal Reserve Wire Transfer Network through

Regulation J.  *See* Gary D. Spivey, Annotation, *Effect of Uniform Commercial Code*

---

[6] The Uncontested Accounts contain, among other types of accounts, four blocked EFTs.  In each of these four
EFTs, Iran or its instrumentality functioned as the originator, the originator's bank, or in some role that is unclear
from the record.  The Banks concede that Iran has a sufficient ownership interest in these accounts to permit
attachment.

*Article 4A on Attachment, Garnishment, Forfeiture or Other Third-Party Process Against Funds Transfers*, 66 A.L.R. 6th 567, § 2 (2011).  The universal adoption of Article 4A makes it of great importance to this Court in finding principles of law to apply to the Contested Accounts.  In examining Article 4A, three things are clear.

First, "[a] creditor of the *originator* can levy on the account of the originator in the originator's bank before the funds transfer is initiated."  U.C.C. Article 4A-502 official cmt. 4 (emphasis added).  Once the EFT process has commenced, "[t]he creditor of the originator cannot reach any other funds because no property of the originator is being transferred."  *Id.*  This is because, under Article 4A, "title to the funds passed when the originator's payment order was executed upon transmittal to the intermediary bank."  *Palestine Monetary Authority v. Strachman*, 62 A.3d 213, 225 (N.Y. Sup. Ct. App. Div. 2009); *accord Asia Pulp*, 609 F.3d at 120.

Second, "[a] creditor of the *beneficiary* cannot levy on property of the originator."  U.C.C. Article 4A-502 official cmt. 4 (emphasis added).  Additionally, "until the funds transfer is completed by acceptance by the beneficiary's bank of a payment order for the benefit of the beneficiary, the beneficiary has no property interest in the funds transfer which the beneficiary's creditor can reach."  *Id.*  This is because, under Article 4A, title passes when the beneficiary's bank accepts the payment order from the intermediary bank.  *See Asia Pulp*, 609 F.3d at 120 (citing *Bank of New York v. Nickel*, 14 A.3d 140, 145–47 (N.Y. App. Div. 1st Dep't 2004)).

Third, a creditor of *the originator or the beneficiary* cannot levy on the property of either while the property is in the possession of an intermediary bank.  *Jaldhi*, 585

F.3d at 71.  This is because midstream EFTs held by an intermediary bank "are not the property of either the originator or the beneficiary."  *Id.* at 71.

These three situations explain when creditors of either the originator of the EFT or creditors of the intended beneficiary of the EFT may attach funds.  However, Iran is neither the originator of the blocked EFTs contained in the Contested Accounts nor the intended beneficiary of these funds.  Iran's "contingent, future, interest"—the reason these accounts were blocked—stems from the fact that an Iranian instrumentality acted as the *beneficiary's bank*.  Plaintiffs here are creditors of the beneficiary's bank.  Therefore, the issue is whether a creditor of a *beneficiary's bank* may attach a midstream ETF held at an intermediary bank.  Clearly, a creditor may do no such thing.

Legal title does not pass to the beneficiary's bank until it accepts the payment order from the intermediary bank.  *Asia Pulp*, 690 F.3d at 120 (citing reference omitted).  The beneficiary's bank then becomes obligated to credit the beneficiary's account or otherwise pay the beneficiary, thus ultimately transferring title to the beneficiary.  In this case, the Iranian banks never obtained legal title to the funds in the Contested Accounts because—due to OFAC blocking regulations—they never accepted the intermediary banks' payment orders.

Moreover, Article 4A contains a "money-back guarantee provision" as "an important protection" for the originator.  Article 4A-402 cmt 2.  This is because—if an EFT is not completed—the originator likely continues to have an underlying obligation to pay the beneficiary.  U.C.C. Article 4A-402(e) provides that when "an intermediary bank is obliged to refund payment . . . but is unable to do so because not permitted by applicable law," the originator may be "subrogated to the right of the bank that paid the

intermediary bank to refund."  In other words, the originator and the originator's banks have claims to an interrupted EFT and *not* the beneficiary or the beneficiary's banks.

Plaintiffs argue that the money-back guarantee cannot apply to blocked accounts because OFAC regulations preclude such a refund from issuing absent a specific OFAC license.  Pls.' Reply at 35.  While this may be true, OFAC blocking only inhibits the originator and the originator's bank from pursuing a refund, it does not vest title in the beneficiary or the beneficiary's bank.  Under Article 4A, property rights do not pass to the beneficiary's bank until it has accepted the intermediary bank's payment order. U.C.C. Article 4A-402(c).

Plaintiffs also rely on the one-year statute of repose contained Article 4A.  U.C.C. Article 4A-505.  This provision extinguishes the right of an originator and an originator's bank to seek a refund of an incomplete EFT.  Again, plaintiffs' argument fails because the statute of repose—if it applies—only extinguishes an originator's or an originator's banks right of refund.  That provision does not magically vest property rights forward in the EFT transaction process to the beneficiary or the beneficiary's bank.  *Cf. India Steamship v. Kobil Petroleum Ltd.*, 663 F.3d 118, 121 (2d Cir. 2011) ("no alchemy by the bank can transform EFT's that cannot be attached into property . . .  that can be attached.").

Applying both the Restatement and U.C.C. Article 4A, plaintiffs cannot show that Iran has any ownership interest in the Contested Accounts.  Plaintiffs alternatively argue that OFAC regulations contain broad definitions of property that should control.  The Banks—correctly—respond that OFAC regulations have nothing to do with defining what constitutes an Iranian ownership interest in property.  While OFAC regulations may provide a broad definition of "property" for the purposes of FSIA § 1610(g) and a

similarly broad definition of "blocked assets" for the purposes of TRIA § 201(a), plaintiff again mistakenly interprets these broad regulations coextensively with the narrower language requiring the Contested Accounts to be the property "of" Iran.  The Government concurs, stating that "[t]here is no need—and no justifiable basis—to force OFAC's regulations into serving a role they were not intended to perform."

Even if OFAC regulations were ambiguous on the question of ownership, OFAC's narrower interpretation would ordinarily be entitled to deference unless "plainly erroneous or inconsistent with regulation."  *See Auer v. Robbins*, 519 U.S. 452, 461 (1997) (citing reference omitted).  That standard is easily met here.  As explained earlier, the expansive language OFAC employs in 31 C.F.R. § 535 to block transactions with Iranian entities stands in stark contrast to the language employed in TRIA § 201(a) and FSIA § 1610(g) where Congress chose to allow execution on only a subset of blocked assets: those "of" a terrorist party.

Accordingly, the Banks' motion for judgment as a matter of law is granted and plaintiffs' motion for judgment as a matter of law is denied as to the Contested Accounts.

### B.      Uncontested Accounts – Garnishees' Motion for Interpleader

The Banks move for leave to file a third-party petition alleging claims in the nature of interpleader against parties that the Banks believe may assert an interest in the Uncontested Accounts.  Garnishee Banks' Mot. for Leave to File Third Party Petition, ECF No. 213. Plaintiffs take no position on the Banks' motion.

Interpleader is a tool which protects a stakeholder—here, the Banks—from multiple liability arising from multiple claims to the same fund.  *See Commercial Union Ins. Co. v. U.S.*, 999 F.2d 581, 583 (D.C. Cir. 1993).  "Where a party in control of contested property, the

stakeholder, makes no claim on the property and is willing to release it to the rightful claimant, interpleader allows him 'to put the money or other property in dispute into court, withdraw from the proceeding, and leave the claimants to litigate between themselves the ownership of the fund in court.'" *Id.* (citations omitted).  Interpleader may be brought in federal court under either the Federal Interpleader Act, 28 U.S.C. § 1335, or under Rule 22 of the Federal Rules of Civil Procedure.  *Id.*  Here, the Banks propose to use Rule 22 interpleader.

Rule 22 is "merely a procedural device; it confers no jurisdiction on the federal courts." *Morongo Band of Mission Indians v. California State Bd. of Equalization*, 858 F.2d 1376, 1382 (9th Cir. 1988).  In light of this, the Banks' proposed interpleader action must fall within a statutory grant of federal jurisdiction.  *See Commercial Union*, 999 F.2d at 584.  Here, three statutory grants of authority exist: the interpleader action arises under federal law, satisfying 28 U.S.C. §1331, is against a foreign state, satisfying 28 U.S.C. § 1330, and arises out of transactions involving international or foreign banking, satisfying 12 U.S.C. § 632.  *Id.*  Assured of its jurisdiction, this Court will grant the Banks' Motion for Leave to File a Third Party Petition.

## IV.     CONCLUSION

This Court lamented in its *In Re Islamic Republic of Iran Terrorism Litigation* treatise that FSIA terrorism cases often "turn[] into a long and [] futile quest for justice . . . ."  659 F. Supp. 2d at 138.  The victims and their families "have often been opposed by the Executive Branch and their struggles have rarely produced positive results."  *Id.*  The recent passage of the Iran Sanctions, Accountability, and Human Rights Act of 2012 gives this Court some hope that victims of terrorism may finally see substantial compensation.  *See* Pub. L. No. 112-158, § 501 *et seq.*, 126 Stat. 1214; Basil Katz, *Tweak to US bill on Iran sanctions opens door to damages*

(Aug. 27, 2012, 7:00am EDT), http://www.reuters.com/article/2012/08/27/usa-iran-idUSL2E8JO8W920120827 (nothing that this new law targets over $1.75 billion in Iranian securities frozen in a New York bank account).

Nevertheless, this Court is under no illusions that the path ahead will be much easier for victims than it has been in the past.  The Uncontested Accounts contain $364,572, which is less than one-tenth of one percent of the approximately $591 million awarded against Iran in this case.  This tiny sum is dwarfed by even greater magnitudes when compared to the endless suffering of these victims.  "A step in the right direction, to be sure.  But a very small one." *Heiser III*, 807 F. Supp. 2d at 27.

A separate Order consistent with this opinion shall issue this date.

Signed by Chief Judge Royce C. Lamberth on August 31, 2012.